# EXHIBIT 1



null / ALL
**Transmittal Number: 28012044**
**Date Processed: 11/15/2023**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Laurie Ford<br>Markel Corporation<br>4521 Highwoods Pkwy<br>Glen Allen, VA 23060-6148 |

| | |
|---|---|
| **Entity:** | Markel Service, Incorporated<br>Entity ID Number  4414701 |
| **Entity Served:** | Markel Service, Incorporated |
| **Title of Action:** | Incinia Contracting, Inc. vs. Evanston Insurance Company |
| **Matter Name/ID:** | Incinia Contracting, Inc. vs. Evanston Insurance Company  (14862112) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | New York County Supreme Court, NY |
| **Case/Reference No:** | 655502/2023 |
| **Jurisdiction Served:** | New York |
| **Date Served on CSC:** | 11/15/2023 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Sender Information:** | Benesch, Friedlander, Coplan & Aronoff LLP<br>646-593-7050 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** New York
-----------------------------------------------------------------x
Incinia Contracting Inc.

                              Plaintiff/Petitioner,

            - against -                                    Index No. 655502/2023

Evanston Insurance Company, Markel Service,
Incorporated

                              Defendant/Respondent.
-----------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Consensual Case)
(Uniform Rule § 202.5-b)

**You have received this Notice because:**

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically

  - free access to view and print your e-filed documents

  - limiting your number of trips to the courthouse

  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit:  <u>http://www.nycourts.gov/efile-unrepresented</u>  or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at <u>www.nycourts.gov</u>

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**

An attorney representing a party who is served with this notice must either consent or decline consent to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated: 11/13/2023

Brandon McTigue
          Name
Benesch, Friedlander, Coplan & Aronoff LLP

       Firm Name

1155 Avenue of the Americas, 26th FL
         Address

New York, New York 10036

646-593-7050
       Phone

bmctigue@beneschlaw.com
       E-Mail

To:   Markel Services, Incorporated

    80 State Street, Albany NY 12207

    Evanston Insurance Company

6/6/18

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )
)
)
INCINIA CONTRACTING, INC.,                            )       Index No.            /2023
)
)
                                    Plaintiff,         )       **SUMMONS**
)
-against-                                              )
)
EVANSTON INSURANCE COMPANY, MARKEL                     )
SERVICE, INCORPORATED                                  )
)
                                    Defendants.        )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

     **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or, if the Complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorneys within 20 days after the service of this summons, exclusive

of the day of service (or within 30 days after the service is complete if this summons is not

personally delivered to you within the State of New York); and in case of your failure to appear or

answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: November 8, 2023                    **BENESCH, FRIEDLANDER,**
     New York, New York                    **COPLAN & ARONOFF LLP**

                                                  */s/ Brandon S. McTigue*
                                                  Brandon S. McTigue
                                                  1155 Avenue of the Americas, 26th Floor
                                                  New York, New York 10036
                                                  T: (646) 593-7050
                                                  E: bmctigue@beneschlaw.com
                                                  *Attorneys for Plaintiff Incinia Contracting, Inc.*

*Page 1*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------- )
                                       )
                                       )
INCINIA CONTRACTING, INC.,             )          Index No.          /2023
                                       )
                                       )
                Plaintiff,             )          **COMPLAINT**
                                       )
       -against-                       )
                                       )
EVANSTON INSURANCE COMPANY MARKEL      )
SERVICE, INCORPORATED,                 )
                                       )
                Defendants.            )
-------------------------------------- )

Plaintiff Incinia Contracting Inc. ("Incinia" or "Plaintiff"), by its attorneys, Benesch, Friedlander, Coplan & Aronoff LLP, for its Complaint against Defendants Evanston Insurance Company ("Evanston") and Markel Service, Incorporated ("Markel") (collectively, the "Defendants") alleges as follows:

### NATURE OF THIS ACTION

1.      This action arises out of Defendants' bad-faith refusal to defend and indemnify the parties named as additional insureds under the insurance policy that Incinia procured from Evanston (the "Policy").

2.      Rather than honor the terms of the Policy, Defendants have ignored Evanston's obligations thereunder, improperly denying coverage as to additional insured CityMeals on Wheels, Property LLC ("CityMeals") and failing to address the demands sent by additional insured Hollister Construction Service ("Hollister"), let alone providing the required defense and indemnification that Incinia contracted for.

3.      As a result of Defendants' improper attempts to avoid the plain terms of the Policy, and pass those costs off on Incinia, Incinia now faces liability exceeding $3,125,000 in the

*Page 1*

consolidated action titled *Marlon Garcia v CityMeals-On-Wheels Property, LLC and Hollister Construction Services, LLC*; and *CityMeals-On-Wheels Property, LLC, v Incinia Contracting, Inc.*, presently before the New York Supreme Court, New York County under Index No. 160938/2016 (the "Underlying Action").

4.      Accordingly, Incinia brings this action against Defendants seeking (i) a declaration that Evanston is required to defend and indemnify both CityMeals and Hollister in the Underlying Action pursuant to the terms of the Policy; or in the alternative, (ii) damages for Evanston's breach of contract for failing to defend and indemnify CityMeals and Hollister as required pursuant to the terms of the Policy.

## THE PARTIES

5.      Plaintiff Incinia Contracting Inc. provides asbestos abatement services in the New York and New Jersey area. Its principal place of business is located at 250 Rutherford Boulevard, Clifton, NJ 07014.

6.      Defendant Evanston Insurance Company is an insurance firm that provides property and casualty insurance. It is headquartered in Deerfield, Illinois.

7.      Defendant Markel Services, Incorporated acts as a claim services manager for certain Evanston policies, including the one at issue in this action. It is headquartered in Glen Allen, Virginia.

## JURISDICTION AND VENUE

8.      The Court has personal jurisdiction over the parties pursuant to CPLR 302(a), as both Incinia and Evanston transact business within and contract to supply goods or services in New York State.

*Page 2*

9.      Venue is proper in this Court pursuant to CPLR 503 because the New York County

is where a substantial part of the events or omissions giving rise to the claims herein occurred.

### FACTUAL ALLEGATIONS

**A.    Incinia is Hired to Perform Asbestos Abatement by Hollister and Enters into a Contract Requiring the Provision of Insurance**

10.     On or about September 23, 2016, CityMeals entered into a General Contractor's

Agreement (the "General Contractor's Agreement") with Hollister to provide general contracting

services for a build-out of an existing warehouse owned by CityMeals and located at 1376 Viele

Avenue, Bronx, New York 10474 (the "Project"). A copy of the General Contractor's Agreement

is attached hereto as **Exhibit A**.

11.     As part of the Project required specialized asbestos abatement and avian removal,

on or about October 21, 2016, Hollister entered into a Project Agreement (the "Project

Agreement") with Incinia to perform those specialized services. A copy of the Project Agreement

is attached hereto as **Exhibit B**.

12.     The Project Agreement incorporates by reference a preexisting Master Subcontract

General Conditions Agreement (the "Subcontract Agreement") between Hollister and Incinia

dated August 7, 2013. A copy of the Subcontract Agreement is attached hereto as **Exhibit C**.

13.     Specifically, Article III of the Project Agreement provides, in relevant part that:

> "This Project Agreement is subject to all terms and conditions of
> that certain Master Subcontract General Conditions Agreement
> dated [sic] between Subcontractor and Construction Manager (the
> "Master Agreement") and together the Project Agreement and the
> Master Agreement shall collectively be referred to as the
> "Subcontract"...Capitalized terms not otherwise defined in this
> Project Agreement shall have the meaning set forth in the Master
> Agreement..."

14.     As is relevant to this action, the Subcontract Agreement requires Incinia to procure

insurance for both Hollister and CityMeals. Specifically, Article XIII, Subsection C, of the

*Page 3*

Subcontract Agreement, titled <u>Insurance</u>, requires Incinia, upon execution of the Project

Agreement and Subcontract Agreement to:

> "[U]ntil final completion and acceptance of the Subcontract…maintain workers compensation insurance, public liability insurance, property damage liability insurance, contractual liability insurance, umbrella liability insurance, comprehensive automobile liability insurance, and such other insurance as provided herein with an insurance company or companies acceptable to the Subcontractor in the following amount: SEE SCHEDULE "B" – INSURANCE LIMIT REQUIREMENTS
>
> Compliance with this Article shall be evidenced by furnishing to the Owner and Construction Manager satisfactory certificates of insurance from acceptable carriers, prior to the commencement of work under this Subcontract…Each such insurance policy shall include the Owner and the Construction Manager as additional insured."

15.    Article XIII, Subsection D of the Subcontract Agreement, titled <u>Indemnity</u>

<u>Agreement</u>, also provides, in relevant part that:

> "To the fullest extent permitted by law, the Subcontractor agrees to defend, indemnify and hold harmless the Construction Manager, the Owner, and any other party whom the Construction Manager has agreed to defend, indemnify and hold harmless, as well as each of their officers, directors, partners, agents, servants, employees, successors and assigns (collectively, the "Indemnitees") from and against any and all claims, damages, losses, costs and expenses of any kind, including but not limited to attorneys fees, incurred by reason of any breach of the Subcontract…any liability for damage because of bodily injury, including death resulting from such injuries, or property damage to real and personal property of any kind whatsoever, sustained by any person or persons, whether employees of the Subcontractor or otherwise, resulting from, arising out of, or occurring in connection with he performance of the Work provided for in this Subcontract…
>
> The Subcontractor agrees that the obligation to defend, indemnify and hold harmless, as described above, specifically includes the obligation to defend, indemnify and hold harmless the indemnitees for the Indemnitees' [sic?] shall be absolute, excepting from the foregoing the sole negligence of the Construction Manager."

*Page 4*

16.     Article XIII, Subsection E of the Subcontract Agreement, titled

Exclusions, provides in relevant part that:

> "No policy shall contain any provisions for exclusions from liability
> other than provisions to exclude from liability forming part of the
> standard basic unamended and unendorsed form of policy, except
> that no exclusions will be permitted in any event if it conflicts with
> a coverage expressly required in this Subcontract, and in addition,
> no policy shall contain any exclusions from bodily injury to or
> sickness, disease, or death of any employee of Subcontract which
> would conflict with or in any way impair coverage under the
> contractual liability endorsement of the liability of the Subcontractor
> under this Subcontract."

17.     Schedule B to Article XIII of the Subcontract Agreement, titled

Insurance Limit Requirements, provides, in relevant part that:

> "The Subcontractor shall purchase and maintain insurance of the
> following types of coverage and limits of liability of no less than:
>
> (1)     COMMERCIAL GENERAL LIABILITY (GCL)
> with limits of Insurance of not less than $1,000,000 each
> occurrence and $2,000,000 Annual Aggregate.
>
>> (i) If the GCL coverage contains a General Aggregate
>> Limit, such General Aggregate shall apply separately to
>> each project.
>>
>> (ii) GCL coverage shall be written on ISO Occurrence
>> form CG 00 01 1093 or a substitute form providing
>> equivalent coverage and shall cover liability arising from
>> premises, operations, Independent Subcontractors,
>> products-completed operations, and personal and
>> advertising injury.
>>
>> (iii) Construction Manager, Owner and all other parties
>> required of the Construction Manager, shall be included
>> as insured s on the CGL, using ISO Additional Insured
>> Endorsement CG 20 10 (11 85) or CG 20 10 (10 93)
>> AND CG 20 37 (10 01) or CG 20 33 (10 01) AND CG
>> 20 37 (10 01) or an endorsement providing equivalent
>> coverage to the additional insureds. This insurance for
>> the additional insureds shall be as broad as the coverage
>> provided for the named insured supplier. It shall apply as
>> Primary and non-contributing insurance before any other

*Page 5*

insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured.

**B.    Incinia Procures Proper Insurance from Evanston**

18.    Pursuant to the terms of the Project Agreement and the Subcontract Agreement, Incinia purchased the Policy, a commercial general liability insurance policy from Evanston Insurance Company effective from October 18, 2016, to October 18, 2017. A copy of the Policy is attached hereto as **Exhibit D**.

19.    The Policy provided, among other things, the aggregate limits of $1,000,000 per occurrence and $2,000,000 Annual Aggregate, as required pursuant to Article XIII, Schedule B of the Subcontract Agreement and was written on ISO Occurrence form CO 00 01 (04 13) which provides equivalent coverage to the CG 00 01 (10 93) form referenced therein.

20.    The Policy also covered liability arising from, among other things, premises, operations, Independent Subcontractors, products-completed operations, and personal and advertising injury. While the form disclaims liability for "Bodily Injury" it also explicitly concedes that "[t]his exclusion does not apply to liability assumed by the insured under an 'insured contract'". Insured contract is defined in Form MEEI 2700 05 13, titled <u>General Terms and Conditions Section</u>, on pages 11 and 12 to include "part of any other contract or agreement pertaining to your business…under which you assume the tort liability of another party to pay for "bodily injury"…provided the "bodily injury"…is caused, in whole or in part, by you or by those operating on your behalf." Accordingly, no exclusions for bodily injury exist in conflict with the terms of the Subcontract Agreement.

21.    The Policy, by Commercial General Liability Endorsements CG 20 10 (04 13), and CG 20 37 (04 13), added as additional insureds under the policy "[a]ny person(s) or organizations(s) to whom the Insured agrees to provide Additional Insured status in a written

*Page 6*

contract." These forms, among others, provided equivalent coverage to Hollister and CityMeals as those which were required under Article XIII, Schedule B, Section (1)(iii). Accordingly, as Incinia agreed to name Hollister and CityMeals as additional insureds in the Project Agreement and Subcontract Agreement, this conferred additional insured status on both.

**C.**   **A Covered Accident Occurs During Incinia's Work and Hollister Sends a Notice of Tender to Evanston**

22.     On November 11, 2016, one of Incinia's employees, Marlon Garcia ("Garcia"), was involved in an accident while performing asbestos removal during his employment.

23.     Specifically, Garcia was hit by a falling 'paraclamp' which had become unfastened due to strong winds that day.[1]

24.     A little more than a month later, on December 14, 2016, Hollister's insurance carrier, Travelers Indemnity Company of America ("Travelers") sent a Notice of Tender to Evanston (the "Notice of Tender"). A copy of the Notice of Tender is attached hereto as **Exhibit E.**

25.     The Notice of Tender demanded that Evanston unconditionally accept its duty to defend Hollister and CityMeals as required under the terms of the Policy on a primary and non-contributory basis.

**D.**   **Garcia Commences an Action Against CityMeals and CityMeals Impleads Incinia**

26.     On December 29, 2016, Garcia commenced an action against CityMeals titled *Marlon Garcia v CityMeals-On-Wheels Property, LLC*, New York Supreme Court, New York

---

[1] A 'paraclamp' consists of an "L" shaped metal part with a vise-like structure on the bottom used to attach to parapet walls on a roof, and a wooden "2x4" that is attached to the top to increase its height to approximately ten feet. Plastic sheeting is then run between multiple paraclamps and stapled to the wooden parts to create a vertical obstructive barrier that prevents any asbestos contaminated material from escaping a job site.

County, Index No. 160938/2016. A copy of the complaint in that action is attached hereto as **Exhibit F**.

27.     CityMeals answered on January 26, 2017, and subsequently impleaded Incinia into that action on September 20, 2017. CityMeals third-party complaint asserted five causes of action against Incinia sounding in common-law indemnification, contribution, contractual indemnification, and breach of contract for failure to procure insurance. A copy of CityMeals's third-party complaint is attached hereto as **Exhibit G**.

**E.     Evanston Waits Almost An Entire Year Before Disclaiming Coverage**

28.     Almost eleven months after receiving Traveler's Notice of Tender on behalf of Hollister and CityMeals, on November 9, 2017, Evanston, through its insurance services provider Markel, disclaimed any obligation to defend and/or indemnify CityMeals (the "Disclaimer Letter"). A copy of the Disclaimer Letter is attached hereto as **Exhibit H**.

29.     The Disclaimer Letter relies on an endorsement to the Policy, which provides that an additional insured would be modified to be "[a]ny person(s) or organization(s) to whom the insured agrees to provide Additional Insured status in a written contract signed by both parties and executed prior to the commencement of operations."

30.     Defendants then assert that, because no written contract exists between Incinia and CityMeals, no duty to defend and/or indemnify exists.

31.     Nothing in Defendants' Disclaimer Letter can be read as a disclaimer against Hollister.

**F.     Garcia Commences a Second Action Against Hollister, the Two Actions are Consolidated, and CityMeals and Hollister Assert Additional Claims Against Incinia**

32.     On May 1, 2018, Garcia commenced a second action against Hollister captioned *Marlon Garcia v Hollister Construction Services LLC*, New York Supreme Court, Bronx County,

*Page 8*

Index No. 25058/2018 based upon the same November 11, 2016, accident. A copy of the summons and complaint in that action is attached hereto as **Exhibit I**

33. On July 23, 2018, counsel for CityMeals and Hollister moved to consolidate the two cases (the "Motion to Consolidate").

34. On October 17, 2018, the Motion to Consolidate was granted, without opposition, and the two actions were consolidated into the Underlying Action, with transfer of the file from the second action occurring on December 19, 2018.

35. Thereafter, on May 14, 2019, both CityMeals and Hollister filed an Answer with Cross-Claims in the Underlying Action asserting four cross-claims against Incinia for common-law and contractual indemnification, contribution, and breach of contract for failure to procure insurance. A copy of CityMeals and Hollister's Answer with Cross-Claims is attached hereto as **Exhibit J**.

36. The claim for breach of contract for failure to procure insurance was based, in part, upon the Disclaimer Letter.

### G. In a Blatant Conflict of Interest, Incinia's Counsel, Who Also Represented Evanston and/or Markel, Ignored Their Duty to Bring Suit or Otherwise Seek Defense and Indemnification from Evanston

37. Despite being faced with the cross-claims from CityMeals and Hollister which clearly implicated the Evanston Policy, Incinia's prior counsel failed to demand that Evanston defend and indemnify CityMeals and Hollister even though (i) Hollister is clearly an additional insured under the Policy and Evanston never indicated otherwise, and (ii) the Disclaimer Letter fails to establish that CityMeals is not entitled to coverage because, among other things, it was untimely.

*Page 9*

38.     This is because, as Incinia's counsel now realizes, Incinia's prior counsel also represented Evanston, Markel and/or one of their related entities and had a clear conflict of interest preventing it from seeking to have Evanston defend and indemnify CityMeals and Hollister.

39.     Despite this conflict of interest, Incinia's prior counsel conducted the entirety of discovery in the Underlying Action, with Note of Issue being filed on December 28, 2022.

40.     Incinia's prior counsel also received a February 2, 2022, Defense and Indemnity Demand Letter from counsel for CityMeals and Hollister demanding full defense and indemnification from Evanston in accordance with the terms of the Policy. A copy of the Defense and Indemnity Demand Letter is attached hereto as **Exhibit K**. Upon information and belief, no response was given by either Incinia's prior counsel or by Evanston.

41.     Additionally, when CityMeals and Hollister moved for summary judgment against Incinia on February 24, 2023 (the "Motion for Summary Judgment"), prior counsel cross-moved for summary judgment, on February 27, 2023, seeking to dismiss the claims and cross-claims asserted against Incinia by CityMeals and Hollister insofar as they were premised on common-law contribution and for failure to procure insurance (the "Cross-Motion for Summary Judgment").

**H.     Incinia's Prior Counsel Seeks to, and is Permitted to Withdraw as Counsel**

42.     It was likely in or about February 2023 that Incinia's prior counsel realized that it could not properly and fully defend Incinia in the Underlying Action.

43.     Thus, after a series of adjournments before Room 130, on May 18, 2023, Incinia's prior counsel moved by Order to Show Cause to withdraw as Incinia's counsel (the "Motion to Withdraw"). The Motion to Withdraw was made prior to Incinia's time to oppose the Motion for Summary Judgment expired.

44.     Indeed, the affidavit submitted in support of prior counsel's Motion to Withdraw (the "Affidavit in Support of Withdrawal") avers that prior counsel "cannot continue to litigate

*Page 10*

this matter due to reasons to be disclosed in further detail at a hearing deciding the request to withdraw to be held *in camera*." A copy of the Affidavit in Support of Withdrawal is attached hereto as **Exhibit L**.

45.     The Motion to Withdraw was granted on June 21, 2023. Upon information and belief, it was granted because evidence demonstrated that Incinia's prior counsel could not adequately defend Incinia's rights in the Underlying Action, and would severely prejudice Incinia's rights to, among other things, timely commence this action were Incinia's prior counsel not permitted to withdraw. A copy of the Order granting the Motion to Withdraw is attached hereto as **Exhibit M**. The Order granting the Motion to Withdraw also stayed the action for 60 days so that Incinia could retain counsel.

### I.  Incinia's Current Counsel is Retained and Discovers that Incinia Must Commence this Action

46.     In accordance with the Court's Order granting the Motion to Withdraw, Incinia retained the undersigned counsel who appeared in the Underlying Action on August 21, 2023.

47.     Upon reviewing the case file provided by Incinia's prior counsel it was discovered that Incinia may be held liable for the claims made by CityMeals and Hollister for contractual indemnification pursuant to the terms of the Project Agreement and Subcontract Agreement.

48.     It was also discovered that Incinia may be held liable for failure to procure insurance based solely on Defendants' bad-faith denial of coverage in the Disclaimer Letter.

49.     Finally, it was uncovered that many, if not all, of CityMeals and Hollister's claims against Incinia would have been mooted if, among other things, Incinia brought an action against Evanston.

50.     Accordingly, this action followed.

*Page 11*

## CAUSES OF ACTION

### First Cause of Action for Declaratory Judgment

51. Plaintiff repeats and realleges the allegations in the prior paragraphs hereof as if set forth fully herein.

52. Pursuant to the terms of the Policy, Evanston is required to defend and indemnify both CityMeals and Hollister.

53. Despite due demand, Defendants refused to defend and indemnify both CityMeals and Hollister, having issued a bad-faith Disclaimer of Coverage as to CityMeals, and having not responded to Hollister's demand.

54. Accordingly, a bona fide justiciable and substantial controversy exists between Plaintiff and Defendants, who are of adverse legal interests with respect to the defense and indemnification of CityMeals and Hollister, and a judgment declaring that Defendants are required to defend and indemnify CityMeals and Hollister in accordance with the terms of the Policy would serve a useful purpose in clarifying or settling the legal issues at issue in the Underlying Action.

### Second Cause of Action, in the Alternative, for Breach of Contract

55. Plaintiff repeats and realleges the allegations in the prior paragraphs hereof as if set forth fully herein.

56. Plaintiff and Evanston entered into a valid, binding, and enforceable insurance agreement, i.e. the Policy.

57. Plaintiff performed all duties required of it under the Policy, including but not limited to the payment of all premiums thereunder.

58. Defendants breached their obligations under the Policy, refusing to defend and/or indemnify CityMeals and Hollister despite the terms of the Policy.

*Page 12*

59.     Plaintiff has suffered, or will suffer, damages to the extent that Plaintiff is/was held liable for CityMeals and Hollister's claims in the Underlying Action, including, but not limited to those for contractual indemnification and breach of contract for failure to procure insurance.

**WHEREFORE,** judgement should be entered in favor of Plaintiff as follows:

(i)     On the First Cause of Action for Declaratory Relief, a judicial declaration that Defendant is required to defend and indemnify CityMeals and Hollister pursuant to the terms of the Policy;

(ii)    In the alternative, on the Second Cause of Action for Breach of Contract, in an amount to be determined at trial, but in no event less than any damages awarded against Incinia in the Underlying Action; and

(iii)   Granting such other and further relief as the Court deems just and proper.

Dated: November 8, 2023                 **BENESCH, FRIEDLANDER,**
New York, New York                      **COPLAN & ARONOFF LLP**

                                        */s/ Brandon S. McTigue*
                                        Brandon S. McTigue
                                        1155 Avenue of the Americas, 26th Floor
                                        New York, New York 10036
                                        T: (646) 593-7050
                                        E: bmctigue@beneschlaw.com
                                        *Attorneys for Plaintiff Incinia Contracting, Inc.*

*Page 13*

# **Exhibit A**

EXECUTION VERSION

# GENERAL CONTRACTOR'S AGREEMENT

## BETWEEN

## CITYMEALS-ON-WHEELS PROPERTY, LLC

## AND

## HOLLISTER CONSTRUCTION SERVICES, LLC

DATED AS OF September 23, 2016

17426180.17

# TABLE OF CONTENTS

1. DEFINITIONS ..................................................................................................1
2. PRE-CONSTRUTION SERVICES; CONTRACTOR'S GENERAL OBLIGATIONS
   AND STATUS.................................................................................................4
3. CONSTRUCTION SERVICES ........................................................................6
4. TIMING ...........................................................................................................8
5. CONTRACTOR'S COMPENSATION ...........................................................9
6. CHANGES IN THE WORK...........................................................................10
7. MANAGEMENT OF WORK.........................................................................11
8. PROJECT RECORDS ....................................................................................14
9. PAYMENTS TO CONTRACTOR..................................................................15
10. INSURANCE AND INDEMNITY ...............................................................17
11. CONSTRUCTION WARRANTY .................................................................19
12. TERMINATION OF THE AGREEMENT; REMEDIES ...............................20
13. TITLE TO THE WORK .................................................................................24
14. LIENS ............................................................................................................25
15. MISCELLANEOUS PROVISIONS...............................................................25

(i)

17426180.17

## **LIST OF EXHIBITS**

1.    EXHIBIT A:        INTENTIONALLY OMITTED

2.    EXHIBIT B:        CONSTRUCTION SERVICES

3.    EXHIBIT C:        INSURANCE COVERAGE

4.    EXHIBIT D:        LIEN PROVISIONS (IF APPLICABLE)

5.    EXHIBIT E:        LIST OF SPECIFIC CONTRACT DOCUMENTS

6.    EXHIBIT F:        PRE-CONSTRUCTION SERVICES

7.    EXHIBIT G:        EXEMPT ORGANIZATION FORM

8.    EXHIBIT H:        FORM OF CONTRACT SUM AGREEMENT

9.    EXHIBIT I:        LIST OF EARLY START SUBCONTRACTORS

10.   EXHIBIT J:        CONSTRUCTION SCHEDULE

## **LIST OF SCHEDULES**

1.    SCHEDULE 1 – Chart of Key People

(ii)

17426180.17

## GENERAL CONTRACTOR'S AGREEMENT

### (the "Agreement")

### BETWEEN

### CITYMEALS-ON-WHEELS PROPERTY, LLC AND HOLLISTER CONSTRUCTION SERVICES, LLC

THIS AGREEMENT (the "Agreement") made as of this 23rd day of September 2016, by and between **CITYMEALS-ON-WHEELS PROPERTY, LLC**, a New York limited liability company having offices at 355 Lexington Avenue, 3rd Floor, New York, New York 10017 ("Owner") and **HOLLISTER CONSTRUCTION SERVICES, LLC**, a New Jersey limited liability company, with offices at 339 Jefferson Road, Parsippany, New Jersey 07054 (the "Contractor).

### WITNESSETH THAT:

**WHEREAS,** Owner desires to undertake the following project (the "Project"): perform, or cause to be performed, the work, in accordance with this Agreement, the Contract Documents, and first-class construction practices, in connection with exterior and interior construction for certain renovations to an existing facility (the "Premises") which will include, without limitation, the exterior roof replacement and interior renovation and build-out of approximately 25,000 square feet of distribution and office space in a warehouse located at 1367-1369 Viele Avenue a/k/a 329 Drake Street in the Bronx, New York, New York (the "Building").

**WHEREAS,** Owner desires to retain the Contractor to perform the Work described herein for the Project upon the terms and conditions contained herein, and the Contractor, having advised Owner that the Contractor is experienced and properly qualified to provide such services, desires to be so retained.

**NOW THEREFORE,** in consideration of the mutual covenants contained herein, Owner and Contractor do hereby covenant and agree as follows:

1. **DEFINITIONS**

   1.1.   Definitions. The following terms shall have the following meanings:

      1.1.1.   "Construction Budget" means that certain budget detailing all costs associated with completion of the Work, which shall be mutually agreed upon by Owner and Contractor promptly and in good faith.

      1.1.2.   "Construction Cost Estimate" means the estimates that shall be prepared from time to time as work on the Project proceeds.

      1.1.3.   "Construction Drawings" means the detailed construction drawings and any other drawings, including, without limitation, written clarifications and sketches,

1

17426180.17

prepared for the Project by CTA Architects P.C. or any replacement thereof ("Architect") (and approved by Owner) and/or other parties designated by Owner.

      1.1.4. "Construction Schedule" means that certain schedule governing the times for performance of the Work attached hereto as Exhibit J.

      1.1.5. "Contract Documents" means (i) this Agreement, and (ii) all reports, schedules, designs, Construction Drawings, Specifications, and all other documents prepared by Architect and/or other consultants or agents in connection with the Project, and (iii) any documents specifically referenced on Exhibit E attached hereto, together with all addenda, additions, Change Orders and modifications to (i), (ii) and/or (iii) above.

      1.1.6. "Employee(s)" means an officer, director, employee, partner, agent or representative.

      1.1.7. "Excusable Delay" means any delay in the Work resulting from Act of God, fire, earthquake, unforeseeable weather conditions, explosion, physical conditions beyond the reasonable control of the Contractor, strike (other than a strike by Employees of the Contractor), civil disturbance, war, enjoining of the Work by a governmental body having jurisdiction thereover, or any act(s) or omission(s) of Owner, provided, however, that if and to the extent that any delay in the Work is attributable to or aggravated by any act, failure to act or neglect of the Contractor or any of its Employee(s) or Subcontractors, or to the Contractor's failure to utilize its best efforts in the performance of this Agreement, such delay shall not constitute an Excusable Delay. In no event shall any delay be deemed to be an Excusable Delay if and to the extent caused by Contractor's inability to obtain or provide sufficient funds to perform or complete the Work, unless such delay is caused by Owner's failure to make any undisputed payment due to Contractor in accordance with Article 9 hereof.

      1.1.8. "Final Completion" means that (i) the Contractor and Owner have approved and Owner shall have been satisfied that the Work (including all Punch List Items) has been completed in accordance with the Contract Documents and evidence of same has been submitted to Architect, including, without limitation, all notices, certificates, affidavits and other requirements to complete obligations under the Contract Documents, including but not limited to (a) delivery to Owner, in legible form, of all operating, servicing, maintenance and cleaning instructions, parts lists and special tools for mechanical and electrical Work incorporated into the Project, and drawings and specifications marked up to show as-built conditions, and (b) delivery and assignment to Owner of all specified warranties, manufacturers' warranties and certificates of inspections, (ii) the Contractor shall have delivered to Owner conditional final waivers of all liens, general releases, and all other documentation reasonably required by Owner, and (iii) Contractor shall have cleared all waste materials, rubbish, debris, tools, machinery and equipment used in connection with the performance of the Work from the Project Site. A condition to the occurrence of Final Completion under this Agreement (and Final Payment) shall be that the Contractor has delivered to Owner all documentation as Owner may request in order for Owner to obtain certifications of completion and/or occupancy issued by the applicable local regulatory body, covering the Project and the Work. Contractor shall use commercially reasonable efforts to achieve Final Completion within the sixty (60) days following Substantial Completion of the Work, subject to Excusable Delays.

2

17426180.17

1.1.9. "Laws" means each law, rule, regulation, requirement, order, judgment, code, decree, or ordinance of every kind issued by any government entity with jurisdiction over the Project or which otherwise pertains to the Project.

1.1.10. "Loss-And-Expense" means any and all loss, liability, obligation, damage, delay, penalty, judgment, cost, fee, claim, charge, tax or expense of every kind, direct or consequential.

1.1.11. "Project Site" means the physical site and areas where the Work will be performed to complete the Project, including any adjacent staging areas.

1.1.12. "Shop Drawings" means those fabrication, erection, layout and setting drawings, diagrams, schedules, and other similar documents prepared by Contractor in accordance with good construction practice, which shall be submitted to Architect for its review to ensure that the materials, equipment, or systems, and the positions thereof, included within the Work, conform to the Contract Documents. Shop Drawings shall (i) establish actual detail of all manufactured or fabricated items and (ii) show how the materials and/or Work reflected therein meet performance criteria in and accurately interpret the Contract Documents.

1.1.13. "Specifications" means that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services prepared for the Project by Owner's design team and approved by Owner.

1.1.14. "Subcontractor" means a contractor or vendor furnishing part of the Work, services, equipment, supplies or materials to the Project pursuant to a contract (a "Subcontract") with Contractor.

1.1.15. "Substantial Completion" means the stage in the progress of the Work, as approved by Owner and certified by Architect and/or construction consultant, when (i) the Work shall have been completed and all systems included in the Work shall be operational in accordance with the Contract Documents, and the public spaces of the premises are complete and ready for Owner to install its Fixtures, Furnishings and Equipment, unless Contractor is responsible for such installation, and may be lawfully occupied by Owner and reasonably used for the conduct of Owner's business in the manner intended by Owner, subject only to the completion of Punch List Items (as hereinafter defined), which Punch List Items have been reduced to a writing and in any event do not impair Owner's ability to lawfully occupy and reasonably use same for the conduct of Owner's business in the manner intended by Owner, (ii) Contractor shall have furnished to Owner all sign-offs, permits and approvals as may be required or necessary under law for occupancy, provided such sign-offs, permits and approvals can be acquired and are within the power of Contractor to obtain, including, without limitation, plumbing, sprinkler and DOB approvals, (iii) Contractor has assisted Owner in obtaining all designated or required governmental inspections and certifications necessary for legal occupancy, including without limitation, a temporary certificate of occupancy, and (iv) final finishes required to be furnished and installed by Contractor by the Contract Documents are in place.

3

17426180.17

1.1.16. "Work" means construction of the Project, including the furnishing of all labor necessary to complete such construction, all materials and equipment (whether for temporary or permanent use) incorporated or to be incorporated in such construction, all tools, equipment, supplies, superintendence, insurance, taxes and all other services and facilities necessary to complete and perform the work required, described or reasonably inferable from the Contract Documents in order to achieve the intended results. An item or work is deemed reasonably inferable from the Contract Documents to the extent that such item or work: (i) is required by applicable legal requirements, or (ii) is necessary for the proper operation or use of any item of Work described in the Contract Documents, or is necessary to complete a system of which any part is described in the Contract Documents. In the event of a known or reasonably identifiable conflict between the Contract Documents, the provision requiring Contractor to provide the greater level of service or the greater quantity or quality of materials at no additional cost to Owner shall govern.

## 2.    PRE-CONSTRUTION SERVICES; CONTRACTOR'S GENERAL OBLIGATIONS AND STATUS

2.1.    Pre-Construction Services. Owner hereby engages the Contractor, and the Contractor hereby agrees to perform on behalf, and for the sole benefit, of Owner, those services identified in Exhibit F attached hereto and made a part hereof (the "Pre-Construction Services"). The Contractor covenants with Owner that, in performing the Pre-Construction Services, Contractor shall consistently furnish first-class professional skill, administration and judgment. Contractor affirms that it has visited the Project Site, has become familiar with all conditions at the Project Site, and has accepted such conditions as suitable to perform the Work and its obligations under this Agreement in accordance with and subject to each of the provisions of the Contract Documents to the fullest extent that each such provision is applicable to the Work. In the event of any inconsistency between or among the terms and conditions of the Contract Documents, the more restrictive provision or the greater quantity, as applied to the Contractor, shall govern.

2.2.    No Conflict. Contractor agrees and covenants that it shall not, during the pendency of the Project, undertake any work or assignment which could create an actual or potential conflict of interest for Contractor or which could conflict in any way with the scheduled completion of the Project.

2.3.    Quality of Parties Involved in the Work. The Contractor shall assign only experienced, competent Employees and Subcontractors to the Project and cause the Pre-Construction Services and the Work to be performed in an efficient and prudent manner. The personnel listed on Schedule 1, which is annexed hereto and made a part hereof, comprise the key people on the Contractor's team (collectively, "Key People"; individually, each a "Key Person") who will perform the Pre-Construction Services and the Work. The Key People shall remain actively involved in all phases of the Project and shall not be replaced without the prior written consent of Owner, not to be unreasonably withheld, conditioned, or delayed. Owner shall have the right to require that Contractor replace any Key Person with a competent substitute acceptable to Owner at any time during the course of the Pre-Construction Services or the Work. Contractor shall assign only experienced, competent employees and Subcontractors to the Project in an efficient and prudent manner.

4

17426180.17

2.4.    Contract Documents.   The Contractor shall cause the Pre-Construction Services and the Work to be performed in accordance with the Contract Documents.

2.5.    Proprietary Nature of the Contract Documents and Work.   The Contract Documents (whether prepared by Contractor or not) shall be the exclusive perpetual property of Owner. All such Contract Documents prepared pursuant to this Agreement and Work shall be delivered to Owner by Contractor free of all intellectual property or other third-party rights.

2.6.    Examination of the Project Site.   The Contractor represents and agrees that it has carefully investigated the nature and locality of the Project Site and the conditions and difficulties under which the Work is to be performed. Contractor shall be solely responsible for all costs attributable to foreseeable (assuming diligent visual inspection and investigation of the Project Site) site conditions whether or not included in the Construction Budget.

2.7.    Compliance With Laws.   Contractor shall comply, and shall cause all of its Employees and Subcontractors to comply, with all Laws (including, without limitation, if the Project is located in the United States of America, the Immigration Reform and Control Act of 1986) in connection with the Project.

2.8.    Permits/Licenses.   Contractor shall procure in a timely fashion and at all times maintain all permits, licenses, filings and governmental approvals necessary in connection with the Project.

2.9.    Pre-Construction Services Fee.   In full consideration of the complete performance by the Contractor of the Pre-Construction Services and compliance by the Contractor with all other obligations imposed upon it herein with respect to the Pre-Construction Services, Owner agrees to pay the Contractor the lump sum of $30,500.00 ("Pre-Construction Services Sum"), subject to the terms and provisions, and at the times, set forth herein. The Pre-Construction Services Sum shall be paid to Contractor in three (3) monthly installments of $10,166.67, payable within thirty (30) days of Owner's receipt of an invoice for such Pre-Construction Services with the first installment due no earlier than July 1, 2016. Contractor shall in no event be entitled to receive any fees, reimbursements or other amounts in respect of the Pre-Construction Services in excess of the Pre-Construction Services Sum. Anything contained herein to the contrary notwithstanding, to the extent that the aggregate cost of the Pre-Construction Services exceeds the Pre-Construction Services Sum, Contractor shall be obligated to promptly pay, without reimbursement from Owner, all such sums necessary to complete the Pre-Construction Services in accordance with the Contract Documents and free of all third-party rights.

2.10.    Proposed Contract Sum Notice; Owner's Right to Terminate.   Upon Contractor's delivery to Owner of the Proposed Contract Sum Notice (as hereinafter defined) in accordance with the terms of Section 8(f) of Exhibit F, Contractor shall negotiate in good faith with Owner to reach an agreement on the single fixed-price, stipulated sum amount for which Contractor shall complete all Work, including all Subcontracts and the Contractor's general conditions and fee (the "Contract Sum"). If Owner and Contractor reach an agreement as to the Contract Sum, the parties shall enter into a signed agreement in the form of Exhibit H attached hereto and made a part hereof memorializing such Contract Sum. In the event that (i) the parties

5

17426180.17

are unable to reach a written agreement with respect to the Contract Sum following the delivery of the Proposed Contract Sum Notice, or (ii) Contractor fails to promptly deliver the Proposed Contract Sum Notice as determined by Owner, in each case, Owner shall have the option, in its sole and absolute discretion, to terminate this Agreement by written notice to Contractor. In the event of a termination pursuant to this Section 2.10:

2.10.1. Owner shall have the same rights with respect to Contractor as are set forth in Section 12.2 below, to the extent applicable.

2.10.2. Owner shall pay to the Contractor all amounts due in accordance with Section 2.9 hereof earned up to the effective date of such termination for Pre-Construction Services performed prior to the date of termination, provided that if Contractor and Owner dispute the amount that is due, the same shall not be payable until the dispute is resolved in accordance with the provisions of Section 15.11 of this Agreement.

### 3.    CONSTRUCTION SERVICES

3.1.    Work.  If and to the extent Owner has not terminated this agreement pursuant to Section 2.10, and Owner and Contractor have executed Exhibit H hereto evidencing the Contract Sum and the parties' agreement to proceed, Owner shall engage the Contractor, and the Contractor agrees to perform on behalf, and for the sole benefit, of Owner, the Work pursuant to this Agreement, including, without limitation, those services set forth on Exhibit B attached hereto and made a part hereof.  The Contractor covenants with Owner that, in performing the Work, Contractor shall consistently furnish first-class professional skill, administration and judgment.

3.2.    Performance by Owner.  Notwithstanding any other provision of this Agreement to the contrary, Owner shall have the right, but not the obligation, from time to time to perform with its own forces or Employees or designees any of the Work.  Disputes regarding the amount of any such reduction may be resolved pursuant to the fast-track arbitration procedures identified in Section 15.11 below.

3.3.    Coordination of the Work.  Contractor shall coordinate all work to be performed at the Project Site on behalf of Owner, including (a) the Work, and (b) any work being performed by third parties directly engaged by Owner.  Contractor shall cause all of such work to be scheduled and sequenced in accordance with good construction practices and any requirements communicated by Owner.

3.4.    Preparation of Submittals.

3.4.1. Contractor shall review, approve and submit to Architect Shop Drawings required by and consistent with the other Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of Owner or any third parties performing work on behalf of Owner.  Contractor shall perform no portion of the Work requiring submittal and review of Shop Drawings until the applicable submittal has been approved by Architect.  All Work must be performed in strict accordance with such approved submittals, and Contractor shall be fully responsible for the prompt and diligent correction, at Contractor's sole cost and expense, of any discrepancies between the Work and

6

17426180.17

submittals approved by Architect. To the extent applicable in connection with a submittal, by submitting Shop Drawings, Contractor shall be deemed to have represented that Contractor has confirmed that submittals and Shop Drawings are in accordance with the Specifications and verified materials, field measurements and field construction criteria related thereto, and has checked and coordinated the information contained within such submittals with the requirements of the Work and the Contract Documents; provided, however, that it is understood that Contractor shall have no responsibility for verifying the underlying design elements of any Shop Drawings.

3.4.2. Notwithstanding the dimensions on the Contract Documents, it shall be the obligation and responsibility of the Contractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work, to verify all dimensions by measurements at the Project Site, and to take any and all measurements necessary to properly lay out the Work, it being the intent that the Work shall be delivered to Owner as a fully-integrated and functional whole. Contractor shall be fully responsible for all errors made in connection with such measurements and verifications and for all costs incurred with respect to the correction of such errors. Contractor shall integrate the various parts of the Project so that no part shall be left in an unfinished or incomplete condition, and shall provide all labor, materials, construction equipment, tools, temporary utilities and services, and subcontracted items necessary to complete the Project.

3.4.3. Contractor shall provide samples of supplies and materials for Owner's approval prior to incorporating same into the Work.

3.5.    Progress.

3.5.1. Contractor shall keep Owner and Owner's consultants informed at all times of the progress of the Work, and of the progress of others whose work may affect, or who may be affected by its progress. At Owner's request, Contractor shall inform Owner about materials on hand, progress made in the manufacturing and fabricating of materials for the Work, or any other matters relating to the condition or progress of the Work. Owner and Owner's consultants shall at all times, subject to applicable safety requirements, have free access to the office, shops and yards of Contractor and its subcontractors to verify any information about the Work given by Contractor.

3.5.2. Contractor, upon forty-eight (48) hours' notice (or upon twenty-four (24) hours' notice in the event of an emergency, as reasonably determined by Owner), in person or by duly authorized representative having power to act and acceptable to Owner, shall attend, at its own expense, all meetings or conferences and participate in all conference calls that Owner, for the purpose of discussing progress of the Work, safety at the Project Site, or ways to expedite the completion of the Project, or any other subject pertinent to Owner regarding the progress of the Project. The Contractor's participants in meetings and conference calls shall be fluent English speakers. Weekly team meetings shall be held on the Project Site.

3.6.    Schedule of Values. Contractor will provide a Schedule of Values (the "Schedule of Values") for inclusion in the Construction Budget setting forth (i) a list of anticipated Subcontract costs (including any sales taxes attributable to such costs); (ii) the

7

17426180.17

amount of Contractor's overhead and profit; and (iii) the cost of general conditions and insurance, individually expressed as a percentage of Subcontract costs.

### 4.    TIMING

4.1.    Substantial Completion Date.  The parties acknowledge that the Work shall commence on September 26, 2016 and is to be Substantially Completed on or before March 17, 2017 (the "Substantial Completion Date"). Any change in the Substantial Completion Date proposed by Contractor shall be subject to approval by Owner.

4.2.    Pre-Substantial Completion Notice.  Contractor shall give Owner not less than fifteen (15) days' prior written notice (the "Pre-Substantial Completion Notice") of the date Contractor reasonably estimates the Work will be Substantially Completed.

4.3.    Final Completion Notice.  Contractor shall give Owner not less than fifteen (15) days' prior written notice of the date Contractor reasonably estimates the Work will reach Final Completion.

4.4.    Time of the Essence.    TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THIS CONTRACT.  Owner may sustain financial loss if the whole Project or any part thereof is delayed because Contractor fails to perform any part of the Work in accordance with the Contract Documents, or the milestone dates and Substantial Completion Date set forth on the Construction Schedule or in a notice to proceed as same may be modified from time to time.  Contractor shall begin the Work at the time directed by Owner and shall perform its obligations under this Contract with diligence and with sufficient manpower to maintain the progress of the Work as scheduled, without delaying other trades or areas of work or contractors retained separately by Owner.  If the Construction Schedule shows a delay in the Project, at the request of Owner, Contractor shall perform certain parts of the Work before other parts, add extra manpower or order overtime labor in order to comply with the Construction Schedule, all without any increase in the Total Contract Value (unless otherwise specifically provided in the scope of work).

4.5.    The Contractor shall be liable for all damages arising out of any failure to perform the Work in accordance with the terms and provisions of the Contract Documents, including, without limitation, the Construction Schedule.    Should Contractor or any Subcontractor fail to maintain progress according to the Construction Schedule, as reasonably determined by Owner, Contractor shall immediately, or shall immediately cause such Subcontractor to, furnish such additional labor and services or work on an additional and/or overtime basis (at no additional expense to Owner), as may be necessary to bring the Work into compliance with the Construction Schedule.  Owner shall have the right to expedite specific items of the Work, even out of sequence.

4.6.    Excusable Delays.  After the occurrence of any Excusable Delay in the Work, the Contractor shall furnish to Owner a written statement setting forth in detail the reason for such Excusable Delay and any change(s) in the Construction Schedule attributable to such delay, which notice must be delivered to Owner within seven (7) days after the occurrence of such Excusable Delay.  If Contractor does not give Owner written notice of such Excusable

8

17426180.17

Delay within such seven (7) days, any claim or excuse for failure to perform relating to such Excusable Delay shall be deemed to be waived by the Contractor. If the Work is delayed at any time by reason of any Excusable Delay, provided that Owner has received such notice as described in this Section 4.6, Owner shall extend the Substantial Completion Date for a like period of time. Contractor shall use its best efforts to avert and/or mitigate any delays (including Excusable Delays) and any increase in costs attributable to an Excusable Delay. No charge shall be made by Contractor for storage of materials, tools and equipment during such delays and no claim shall be made by Contractor for damages for any such delay or cessation of Work, provided, however, if any such delay shall continue for a period of more than fifteen (15) consecutive days, then Owner shall pay all actual, reasonable storage costs in connection therewith. Owner shall have the right to submit any dispute regarding the amount of any increased costs or the length of any delays caused by any Excusable Delay to a fast-track arbitration proceeding as contemplated in Section 15.11 below.

4.7.    Contractor shall be responsible for any delay to the extent caused or aggravated by any act or omission of Contractor, any of its Employees, any Subcontractor or by Contractor's inability to obtain or provide sufficient funds to perform or complete the Work, unless the lack of funds results from Owner's failure to make any undisputed payment then due to Contractor in accordance with Article 9 hereof.

5.    **CONTRACTOR'S COMPENSATION**

5.1.    Total Contract Value. If and to the extent Owner has not terminated this Agreement pursuant to Section 2.10 and Owner and Contractor have executed Exhibit H evidencing the Contract Sum and the parties' agreement to proceed, in full consideration of the complete performance by the Contractor of the Work and compliance by the Contractor with all other obligations imposed upon it herein, Owner agrees to pay the Contractor the sum of the following (the "Total Contract Value"), each subject to the terms and provisions, and at the times, set forth herein:

(i)    the Contract Sum;

(ii)    Contractor's General Conditions in the fixed amount of $230,800.00 (the "Contractor's General Conditions");

(iii)    Contractor's fee in the fixed amount of $122,500.00 (the "Contractor's Fee"); provided, however, that with respect to the Contractor's Fee, the amount of $100,000.00 shall be paid by Owner to Contractor pursuant to the terms hereof, and $22,500.00 shall, in lieu of being paid by Owner to Contractor, be paid by Owner to Citymeals-on-Wheels, a New York 501(c)(3) not-for-profit corporation ("Citymeals") as a donation on behalf of Contractor, which donation shall be the first portion of the $122,500.00 that is being paid by Owner to Contractor. Owner agrees to provide Contractor with a letter of donation on Citymeals' standard form reflecting such donation of $22,500.00 by Contractor.

9

17426180.17

(iv)  Contractor's insurance costs in the amount of 2.70% of the sum of (x) the Contract Sum, (y) Contractor's General Conditions, and (z) Contractor's Fee (the "Contractor's Insurance Costs").

Contractor shall in no event be entitled to receive any fees, reimbursements or other amounts in respect of the Work in excess of the Total Contract Value. Anything contained herein to the contrary notwithstanding, to the extent that the aggregate cost of the Work exceeds the Total Contract Value, Contractor shall be obligated to promptly pay, without reimbursement from Owner, all such sums necessary to complete the Work in accordance with the Contract Documents and free of all third-party rights.

## 6.    CHANGES IN THE WORK

6.1.   Owner May Direct Changes.   Owner from time to time, without invalidating this Agreement or any of the other Contract Documents, shall have the right to authorize changes in the Work, issue additional instructions, require additional Work, direct the omission of the Work previously ordered or to perform any of the Contractor's Work itself (collectively, "Changes in the Work"). Contractor shall be obligated to perform any and all Changes in the Work in accordance with the provisions of this Section 6.

6.2.   Change Orders.

6.2.1.   Contractor shall cooperate, to the fullest extent possible, with Owner to minimize the impact of any Changes in the Work on the cost of the Work and the Construction Schedule.

6.2.2.   Upon proposal by Owner of a Change in the Work, the Contractor shall, within three (3) days of receipt of such proposal (time being OF THE ESSENCE with respect to such 3-day period), furnish to Owner a written statement setting forth in detail the Contractor's projected cost increase or decrease related thereto, and any change(s) in the Construction Schedule necessitated by the proposed Change in the Work. A Change in the Work shall only justify modifications to the amounts payable to Contractor under Article 5 to the extent it actually results in an increase or decrease in costs incurred by Contractor in performance of the Work. The amounts payable by Owner under Article 5 shall be increased or decreased to account for a Change in the Work based on the following pricing formula: (a) the estimated increase or decrease in the cost of the Work associated with the Change in the Work ("Change Cost") plus with respect to any increase in the cost of the Work, 2.70% of such Change Cost for insurance costs, plus (b) with respect to any such increase in the cost of the Work, 11.80% of such Change Cost for overhead and Contractor's profit; provided, that the overhead and profit markup described in clause (b) shall not apply unless and until the total, aggregate Change Costs for all Change Orders (as hereinafter defined) have exceeded ten percent (10%) of the Total Contract Value. If, after reviewing such proposed Change Cost figure Owner desires to implement the Change in the Work, a formal "Change Order", which shall constitute a modification of the Contract Documents, shall be (i) prepared by Architect, (ii) executed by Architect, Contractor and Owner and (iii) delivered by the Contractor to the appropriate Subcontractor for execution. A Change Order shall be in such form and in such detail as may be required by Owner. Once executed, the Change Order shall fix the compensation payable to

10

17426180.17

Contractor in respect of the corresponding Change in the Work, regardless of whether the actual cost thereof exceeds the estimated Change Cost thereof specified in such Change Order.

6.2.3.  The Contractor shall evaluate and negotiate in the best interests of Owner costs of any Change Order proposed by any Subcontractor and advise Owner of any modifications required thereto.

6.2.4.  If Owner and the Contractor are unable to agree on the estimate of the Change Cost and/or adjustments to the Construction Schedule communicated pursuant to Section 6.2.2, Owner shall, within five (5) days after Contractor's proposal of same, either (i) provide notice to Contractor that it does not intend to proceed with the proposed Change in the Work, or (ii), issue a "Construction Change Directive" leaving out the disputed adjustment(s). Architect shall prepare such Construction Change Directive for execution by Owner, Architect, and Contractor, and Contractor shall carry out (or cause the appropriate Subcontractor to carry out) the Work contained therein pending resolution of the disputed adjustment(s) in accordance with this Agreement. If after the expiration of such five (5) day period, Owner has neither provided notice in accordance with clause (i) of the preceding sentence nor issued a Construction Change Directive in accordance with clause (ii) of the preceding sentence, then Owner shall be deemed to have issued a Construction Change Directive and Contractor shall carry out (or cause the appropriate Subcontractor to carry out) the Work contained therein pending resolution of the disputed adjustment(s) in accordance with this Agreement. In the event a Constructive Change Directive is issued or deemed to have been issued, Contractor shall keep and maintain adequate records, invoices and other materials reasonably necessary to document the actual Change Cost caused by the applicable Construction Change Directive. The amount payable by (or to be refunded to) Owner in connection with such Construction Change Directive shall be such actual, documented Change Cost, plus (if applicable) (x) the additional corresponding amount described in clause (b) of Section 6.2.2, and (y) any additional reasonable, demonstrable costs of Contractor of supervision and field office personnel directly attributable to such Construction Change Directive, but only to the extent such costs would not have otherwise been incurred but for such Change in the Work. Owner shall have the right to conduct an open book audit of the actual Change Cost incurred in respect of any Construction Change Directive.

6.2.5.  Any disputes regarding Change Cost or adjustments to the Construction Schedule necessitated by a Change in the Work may be submitted by Owner to a fast-track arbitration proceeding as contemplated in Section 15.11 below.

6.2.6.  Contractor shall develop, for Owner's review and approval, and implement a system for processing Change Orders and Construction Change Directives in an efficient manner and in accordance with good construction practices.

## 7.  MANAGEMENT OF WORK

7.1.  Oversight of Work.  The Contractor shall guarantee that the work of the Contractor and all Subcontractors (including all labor and materials) is free of defects and deficiencies and complies in all respects with the Contract Documents and with applicable Laws. The Contractor shall keep Owner advised of any problems involving any Subcontractor or the Project and shall implement such enforcement actions as Owner may direct. The Contractor

11

17426180.17

shall be fully responsible for and have control over all means, methods, techniques, sequences and procedures (including safety precautions and procedures and deliveries and installation of material and equipment). The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of Architect, or by tests, inspections, or approvals required or performed by persons other than Contractor. The Contractor shall stop and cause correction of Work and/or reject Work which is not in compliance with the Contract Documents; notify Architect of any Work of which Contractor believes is not in compliance with the Contract Documents, and upon rejection of the Work by Architect, stop and require correction of said Work. All rejected Work, defective Work, or Work not in compliance with the Contract Documents shall be replaced by Contractor and/or Subcontractors at Contractor's expense.

7.2.    Safety Program; Hazardous Materials.

7.2.1.    Contractor shall, in coordination with the Subcontractors, establish, implement and observe all safety, health and environmental protection measures during performance of the Work, consistent with the requirements of the Williams-Steiger Occupational Safety and Health Act of 1970 as amended and all other applicable federal, state and local laws, rules and regulations. Prior to the start of Work, Contractor shall submit to Owner, and periodically update, as necessary, appropriate or may be required, a copy of Contractor's safety manual and specific site safety plans for the Project, incorporating safety plans from the respective Subcontractors showing the manner in which the aforesaid measures are implemented; and designate a responsible person or persons of Contractor's organization or an independent person or persons from another firm or organization, as appropriate, whose duty shall be the monitoring and enforcement of compliance with existing safety plans. The performance of such services by Contractor shall not relieve it or any of the Subcontractors of their respective responsibilities for the safety of persons and property in compliance with this Agreement and all statutes, rules, regulations and orders applicable to the Work. Contractor shall maintain at the Project Site copies of all safety inspections performed and any accident investigation reports for review by Owner upon request.

7.2.2.    The Contractor acknowledges that there is Hazardous Material (as hereinafter defined) on the Project Site and agrees to retain, as part of the Work pursuant to this Agreement, a Subcontractor for the abatement of such Hazardous Material. Unless this Agreement specifically provides otherwise, if Contractor encounters at the Project site any material reasonably believed to be asbestos, polychlorinated biphenyl (PCB), or other hazardous substance (hereinafter called "Hazardous Material") which has not been rendered harmless, Contractor shall immediately stop Work in the area affected and report the condition to Owner in writing. Work in the affected area shall not thereafter be resumed except by written agreement of Owner and Contractor if in fact the material is a Hazardous Material, or when it has been rendered harmless. Contractor is responsible for compliance with any requirements contained in the Contract Documents regarding Hazardous Material.

7.2.3.    When use or storage of explosives or other Hazardous Materials or equipment or unusual methods are necessary for execution of the Work, Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

12

17426180.17

7.2.4.  If Contractor encounters Hazardous Material not addressed in the Contract Documents in accordance with Section 7.2.2, Contractor shall coordinate with Owner and Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the Hazardous Material reported by Contractor and, in the event the Hazardous Material is found to be present, Contractor shall, in a manner approved by Owner, pursuant to a contract in compliance with the terms of this Agreement and all Laws, obtain the services of a Subcontractor to abate such Hazardous Material; provided that, notwithstanding the foregoing, Owner may, at its option, elect to directly retain the services of such contractor for such abatement work, and Contractor shall coordinate its activities with the work of such separate contractor. At its option, Owner may elect to furnish in writing to Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. When the Hazardous Material has been rendered harmless, Work in the affected area shall resume upon written agreement of Owner and Contractor.

7.2.5.  Except only for such of its Employees, if any, as are fully qualified to do so, Contractor shall not direct, suffer or permit any of its Employees to at any time handle, use, manufacture, store or dispose of any Hazardous Material in or about the Project Site, nor shall Contractor suffer or permit any Hazardous Material to be used in any manner not fully in compliance with all environmental Laws or the Project Site to become contaminated with any Hazardous Material. Notwithstanding the foregoing and subject to Owner's prior consent, Contractor may handle, store, use, or dispose of Hazardous Material to the extent customary and necessary for the performance of Contractor's duties hereunder, provided that Contractor shall always handle, store, use, and dispose of any such Hazardous Material in a safe and lawful manner and never allow such Hazardous Material to contaminate the Work site or the environment. Contractor shall provide to Owner and keep at the Project Site copies of all Material Safety Data Sheets for any Hazardous Material brought to the site.

7.2.6.  Except to the extent that the cost and expense are due to Owner's fault or negligence or to the requirements of the Contract Documents, Contractor shall indemnify and hold harmless the Indemnitees from and against all claims, damages, losses and expenses (including remediation of a hazardous material or substance Contractor brings to the Project site and negligently handles) and attorneys' fees, arising out of or resulting from: (a) Contractor's failure to perform its obligations under Section 8.2; (b) use, disturbance or storage of hazardous materials or substances for execution of the Work; and (c) disturbing or exacerbating any hazardous materials or substances on the Project Site, provided that Contractor had prior notice of the existence of the hazardous materials or substances. Regardless of fault and regardless of any other clause in this Agreement, Contractor shall not, as a result of the hazardous materials and substances encountered on the Project Site, be entitled to any compensatory damages, including without limitation, damages for delay, disruption, liquidation damages or consequential damages of any type, including lost profits.

7.3.    Correcting Unsafe Conditions.  The Contractor shall, at its own cost and expense, correct or require Subcontractors to correct unsafe conditions, caused by the Contractor or Subcontractor, and shall recommend corrective action if it discovers that any safety standards have been violated.

13

17426180.17

7.4.    Reporting.  Immediately after any accident, loss or damage relating to the Project, the Contractor shall make a written report to Owner and shall provide additional information immediately as it becomes known.

7.5.    Clean Site; Protection of Work.  During the performance of the Work and until the completion thereof, the Contractor shall maintain a clean and secure Project Site. Contractor shall bear the risk of loss with respect to all construction materials until same are incorporated into the Work and accepted by Owner.  In the event of damage, loss, theft, vandalism or destruction, the Contractor shall replace or repair such Work at Contractor's sole cost and expense, in such manner as is acceptable to Owner.

## 8.    PROJECT RECORDS

8.1.    Books and Records.  The Contractor shall check all materials, equipment and labor entering into the Work and shall keep such full and detailed accounts as may be necessary for proper financial management and auditing procedures as requested by Owner.  The Contractor shall be responsible to record the progress of the Work and Project as it relates to all construction activities and report on same to Owner regularly.  Owner and Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, Contractor's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, subcontractor proposals, purchase orders, vouchers, memoranda and other data relating to this Agreement, general conditions costs are excluded.  Contractor shall preserve such records for a period of six (6) years after Final Payment (as hereinafter defined).  Since Owner's sole and managing member, Citymeals, is a tax-exempt organization, Owner may be exempt from sales tax, and therefore sales taxable items (such as carpeting, flooring and other tangible personal property) shall be identified by Contractor in its Project Applications for Payment.  Owner will not process a Project Application for Payment that does not identify and calculate taxable items.  If at any time during the term of this Agreement (i) Owner provides notice to Contractor that Owner is exempt from sales tax pursuant to the Exempt Organization Certification (form ST-119.1) of Citymeals, attached hereto as Exhibit G, or (ii) Owner obtains an Exempt Organization Certification (form ST-119.1) in the name of Owner and provides a copy of same to Contractor, then no sales tax will be charged to Owner by Contractor.

8.2.    Documents on Site.  During the course of the Work, Contractor shall continually maintain a complete and current set of drawings reflecting hand-written, as-built and actual field dimensions, conditions and locations for the Work in place, including all changes thereto, and copies of all Change Orders, Shop Drawings and all other items that would customarily be maintained in accordance with good construction practice.  Such items shall be made available for review by Owner and Architect upon request.  As-built drawings for foundation and any underground utilities shall be provided to Owner and Architect immediately upon completion of such Work, if applicable.

14

17426180.17

## 9. PAYMENTS TO CONTRACTOR

### 9.1. Application for Payment for Construction Phase.

9.1.1. The Contractor shall no more frequently than monthly submit to Owner an itemized written statement ("Project Application for Payment"), which statement shall certify the percentage of total Work to be performed under the Contract Documents which has been completed since the last Project Application for Payment (such date being "Current Progress Date"). The Project Application for Payment shall be in the form of the Certificate for Payment AIA Document G702 and a trade breakdown presented on AIA Document G703, unless other forms are required by Owner, and shall include an affidavit approved for the Project by Owner and showing the following or such portion thereof as Owner requires: (i) the names and addresses of all its Subcontractors and other parties furnishing labor, material or equipment for this Agreement, (ii) the amount being requested with the Project Application for Payment by Contractor on its own behalf and on behalf of all subcontractors and all others furnishing labor, material, and equipment, (iii) the balance that will be due to all such entities after said payment is made, (iv) the additions to and subtractions from the Total Contract Value, (v) a summary of retentions, and (vi) Contractor's statement of percentage of completion based on the Schedule of Values. If not previously submitted, the first Project Application for Payment must be accompanied by a waiver of subrogation endorsement for workers' compensation. No payment shall be made without such submission.

9.1.2. The Project Application for Payment shall show in complete detail all monies due through the Current Progress Date under Section 5 above based on the percentage of the Work that has been completed, including, without limitation, the Contract Sum, Contractor's General Conditions, Contractor's Fee, and Contractor's Insurance Costs, and shall recommend an amount to be paid to Contractor by Owner, less ten (10%) percent or, if applicable, five (5%) percent Retainage (defined below) pursuant to Section 9.3.

9.2. Payment by Owner. Subject to the applicable Retainage and provisions of Section 9.3 below, approval and certification of such Project Application for Payment by Architect or construction consultant and Owner's right to take exception to the payments recommended or claimed by the Contractor, as Owner shall reasonably deem appropriate under the circumstances, Owner shall, within thirty (30) days after submission to Owner of each Project Application for Payment, make payment to the Contractor. Payment by Owner with respect to any Project Application for Payment shall not constitute approval or acceptance of any item of Work included therein. Owner shall be credited with all interest earned, if any, on funds to be disbursed to Subcontractors which are not disbursed (absent Owner's consent) within ten (10) business days of Contractor's receipt of such funds from Owner. Alternatively, in the event of a default or a pending default by Contractor, as reasonably anticipated by Owner, if Contractor is not paying any Subcontractor(s) in a timely manner, Owner, at Owner's election and upon notice to Contractor, may prepare individual joint checks for such Subcontractor(s), for distribution by Contractor.

9.3. Retainage. Retainage of ten (10%) percent of monies otherwise payable to the Contractor in accordance with the provisions of this Article 9 shall be withheld from payments due the Contractor in accordance with the provisions of this Agreement (such monies

15

17426180.17

hereinafter called "Retainage"). Retainage will be reduced to five (5%) percent of such monies otherwise payable to the Contractor upon Substantial Completion of the Project; provided, however with respect to each of the Subcontractors set forth on Exhibit I attached hereto (the "Early Start Subcontractors"), Retainage held with respect to any such Early Start Subcontractor shall be released upon written approval by Owner of the completion of the applicable Early Start Subcontractor's work and receipt of all required documentation with respect thereto. Additionally, Owner shall be entitled to withhold sums from any payment requested hereunder in such amounts as Owner determines may be sufficient to cover any actual or reasonably anticipated Loss-And-Expense that Owner may incur in connection with Contractor's breach of this Agreement.

9.4.    Accompanying Documentation.  At least five (5) days prior to the date of the submission of each Project Application for Payment, the Contractor shall furnish to Owner a statement accounting, on an itemized basis, for the disbursement of all funds previously paid by Owner.    Such statement shall be accompanied by copies of all reasonable supporting documentation required by Owner (including payment vouchers, vendor's invoices, payment receipts, cancelled checks, and, if applicable in the relevant jurisdiction, lien waivers in the form attached to Exhibit D relating to all Work previously performed and paid for). In each Project Application for Payment, the Contractor shall include lien waivers in the form attached to Exhibit D (if applicable in the relevant jurisdiction) relating to Work for which payment is being claimed and certify that such Project Application for Payment represents a just estimate of the portion of the amounts due under Article 5 hereof based on the percentage of the Work that has been completed. The Contractor shall also certify that it has reviewed the Work performed for which payment is being sought, and that such Work has been performed in accordance with the Contract Documents. In taking action on any Project Application for Payment, Owner and Architect each shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and no such action or reliance shall be deemed to imply that (a) Owner or Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with this Article 9 or any other supporting data; (b) Owner or Architect has made exhaustive or continuous on-site inspections; or (c) Owner or Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of this Agreement.    Such examinations, audits and verifications, if required by Owner, will be performed by Owner's accountants acting in the sole interest of Owner.

9.5.    Completion and Final Payment.

9.5.1. Substantial Completion.  Contractor shall recommend to Owner those portions of the Work to be considered for Substantial Completion and prepare in writing a list of defective, incomplete or unsatisfactory Work items and a schedule for their completion. Promptly after the Work is Substantially Complete, Contractor shall arrange for Owner and/or Architect to make an inspection and coordinate with Owner and/or Architect as to the issuance of a Certificate of Substantial Completion noting any Work that has not been finally completed, has been performed improperly, or has yet to be performed or completed to Owner's reasonable satisfaction ("Punch List Items"). Prior to Substantial Completion, Contractor shall thoroughly clean the Project Site, and if Contractor fails to clean the Project Site to Owner's satisfaction, Owner may do so and the cost thereof shall be promptly paid by the Contractor (or set off against

16

17426180.17

sums otherwise due to Contractor). In addition, the Contractor shall turn over to Owner all keys to the Premises upon Substantial Completion. Owner will thereafter reasonably cooperate with Contractor to provide Contractor with access to the Premises for purposes of performing any Punch List Items.

9.5.2. <u>Final Completion</u>. The Contractor shall use its diligent efforts to cause all Punch List Items to be completed or corrected as promptly as possible, and in any event within thirty (30) days, after the issuance of the Certificate of Substantial Completion. Owner shall thereafter make a final inspection of such Punch List Items to determine if such Punch List Items have been properly completed. Contractor shall coordinate with Owner regarding completion of the Punch List Items so as to minimize the disturbance caused thereby to Owner's use of the space.

9.5.3. <u>Final Application for Payment</u>. After Architect or construction consultant has confirmed that the Project has reached Final Completion, the Contractor shall submit a final Project Application for Payment (the "<u>Final Application for Payment</u>") which shall set forth all amounts due and remaining unpaid to Contractor. Final Payment shall be conditioned upon the following documents being furnished to Owner: (a) a certificate from Owner, Architect or construction consultant stating that the Work (including all Punch List Items) has reached Final Completion; (b) sign-offs from all authorities having jurisdiction over the Project, including without limitation, Final Certificate(s) of Occupancy or other similar certificates for the Project; (c) Fire Underwriter's certificate(s); (d) digital and PDF final drawings showing the Work "as-built" as required by the Contract Documents (which show as-built and actual field dimensions, conditions and locations for the entire Work, including changes thereto); (e) if applicable, a conditional final waiver of all liens arising out of this Agreement (with a final lien waiver in the form attached to <u>Exhibit D</u> to follow upon Final Payment); and (f) such other documents as are required by the Contract Documents.

9.6.    <u>Final Payment</u>.

9.6.1. Subject to <u>Section 9.5.3</u> above, within thirty (30) days after issuance and approval of a Final Application for Payment, Owner shall pay the Contractor the undisputed amounts due, less any monies withheld pursuant to other provisions of this Agreement ("<u>Final Payment</u>"). In the event it is determined that the aggregate of previous payments made by Owner exceeds the amount due the Contractor, the difference shall be paid to Owner by the Contractor within thirty (30) days of such determination by Owner.

9.6.2. The Contractor's acceptance of Final Payment under this Agreement shall constitute full and complete release of Owner from any and all claims the Contractor may have against Owner arising out of or resulting from this Agreement.

**10.    INSURANCE AND INDEMNITY**

10.1.    <u>Insurance</u>.

10.1.1. General Requirement. The Contractor shall procure and maintain insurance of such types and in such amounts as required in this <u>Section 10.1</u> and <u>Exhibit C</u>. With the exception of Workers Compensation benefits coverage, such insurance shall name the

17

17426180.17

Indemnitees (as hereinafter defined) as additional insured and shall be in form and substance reasonably satisfactory to Owner. Evidence of this addition shall be a signed endorsement to the policies. Additional insured coverage shall be on a primary and noncontributory basis and shall be as broad as coverage afforded to the named insured (to the extent available to an additional insured) and for full policy limits, regardless of any minimums in this Agreement. Each insurance policy shall be endorsed with a Waiver of Subrogation in favor of the Owner and all additional insureds for any loss or claims paid or payable under such policy.

10.1.2. Periods of Coverage. The Contractor shall deliver to Owner evidence of all insurance required under this Section 10.1 within two (2) days of the signing of this Agreement, and shall keep such insurance in force until Final Completion of the Project unless indicated otherwise on Exhibit C.

10.1.3. Subcontractors' Coverage. The Contractor shall not allow any Subcontractor to perform work under any Subcontract until such Subcontractor has obtained insurance which is consistent with the coverages required to be maintained by Contractor hereunder; provided, however, if the foregoing requirement, as applied to any Subcontractor, would increase the Construction Budget, Contractor shall so notify Owner by submitting a Change Order and Owner may, in its sole discretion, elect to (i) waive such requirement by providing written notice to Contractor, (ii) execute such Change Order, or (iii) request that Contractor solicit additional bids for the applicable work. If Owner requests that Contractor solicit additional bids, Contractor shall solicit such bids and select a potential replacement subcontractor (the "Replacement Subcontractor") in accordance with Section 8 of Exhibit F hereto and, to the extent the cost of such work would increase or decrease the Construction Budget based on the bid package received from such Replacement Subcontractor, Contractor shall submit a Change Order to Owner reflecting such increase or decrease. Upon receipt of such Change Order, Owner may, in its sole discretion, elect to (i) waive the foregoing insurance requirement with respect to the original Subcontractor, in which event such original Subcontractor shall perform the applicable work, or (ii) execute such Change Order, in which event the Replacement Subcontractor shall perform the applicable work. Subcontractors' additional insured coverage shall be effective even though there is no direct contract between any such Subcontractor and the additional insureds.

10.2.   Indemnification.

10.2.1. To the fullest extent permitted by the Laws, the Contractor hereby agrees to indemnify (i) Owner; (ii) Citymeals; (iii) Levien & Company, Inc.; (iv) any additional persons Owner may from time to time require to be added as additional insureds; and (v) the respective members, partners, shareholders, officers, directors, agents, employees, affiliates and successors and assigns of each of the foregoing (collectively, the "Indemnitees") against, and hold each of them harmless from, and pay the full amount of, all Loss-And-Expense, whenever asserted or occurring, which any Indemnitee may suffer, incur or pay out, or which may be asserted against any Indemnitee in whole or in part, by reason of, or in connection with, the following: (a) any act, error, omission, fault or neglect of Contractor, its Employees or Subcontractors, or anyone employed by any of them in connection with the Work or anyone for whose acts any of them may be liable; (b) all income, use, personal property, sales, and other taxes (including interest and penalties thereon) to be paid or collected by the Contractor, any

18

17426180.17

Subcontractor or vendor or any other person or persons acting for, through or under it or any of them; (c) all liabilities related to the employment of Employees by Contractor or Subcontractors; (d) all claims for infringement of intellectual property rights in connection with materials or processes used by Contractor or Subcontractors during the course of the Work; (e) all claims arising out of the unauthorized use, reuse or modification of the Contact Documents and other documents; (f) all costs or liabilities arising out of the occurrence of any event giving rise to Owner's right to terminate under Section 12.1; and/or (g) all claims arising out of any breach of Contractor's covenants, representations or warranties in this Agreement. In addition, the Contractor releases the Indemnitees from the matters for which the Contractor has indemnified the Indemnitees under this Section.

10.2.2. In the event that any Loss-And-Expense is incurred by or asserted against any Indemnitee(s) in connection with any of the items listed in Section 10.2.1(a) through (g) above, Owner shall have the right to withhold from any payments due or to become due to Contractor an amount sufficient in its judgment to protect and defend the Indemnitee(s) from and against all such Loss-And-Expense, including legal fees or disbursements.

10.2.3. The provisions of this Section 10.2 and indemnities and obligations of the Contractor hereunder shall survive Final Completion, all payments (including Final Payment) to Contractor, and any termination of this Agreement.

## 11. CONSTRUCTION WARRANTY

11.1. Warranty. The Contractor warrants that all materials and equipment included in the Work performed by the Contractor and the Subcontractors will be new and that such Work will be of a level of quality conforming to the highest standards of sustainable construction practices, free from improper design (with respect to items designed by Contractor or its Subcontractor or agent), workmanship and defective materials, in conformance with the Contract Documents and fit for the intended use and purpose. With respect to such Work the Contractor further agrees to correct all Work defective in design (to the extent designed by Contractor or its Subcontractor or agent), material and workmanship, including latent defects, for a period of one (1) year from the later of (i) the date of Final Completion or (ii) the date on which the item in question is placed into service, or for such longer periods of time as may be set forth elsewhere in the Contract Documents. The Contractor shall bear all costs of correcting such Work. On or prior to Final Completion or in the event of a termination of the Work, Contractor shall assign and deliver to Owner any warranties and guarantees required by the Contract Documents to be obtained from materialmen and others, including, without limitation, all extended guarantees or warranties from Subcontractors.

11.2. Reperformance. If, within 1 year after the beginning of the warranty period as provided for above, any of the services or Work required to be performed by the Contractor or any Subcontractor are found not to be in accordance with the Contract Documents, first-class industry standards or Owner's reasonable requirements, the Contractor shall promptly reperform (or cause to be reperformed) such services or Work at the Contractor's sole cost and expense. The existence of the foregoing warranties and undertakings by Contractor shall not relieve or reduce Contractor's liability for defects in the Work and shall be in addition to all of Owner's other rights and remedies hereunder, under any other Contract Document, or under law,

19

17426180.17

and to any other applicable guaranties or warranties, whether express or implied. Contractor's obligations under this Section 11.2 shall survive the termination of this Agreement.

### 12. TERMINATION OF THE AGREEMENT; REMEDIES

12.1. In addition to Owner's right to terminate this Agreement pursuant to Section 2.10, Owner shall have the right to terminate this Agreement at any time upon three (3) days' written notice to the Contractor, if the following shall be applicable to the Contractor:

12.1.1. if the Contractor shall fail to fulfill or observe its covenants, obligations or responsibilities under this Agreement;

12.1.2. if the Contractor is no longer able to furnish the services specified in this Agreement;

12.1.3. if the Contractor should become bankrupt or insolvent;

12.1.4. if the Contractor should have a judgment entered against it which would have a material adverse impact on Contractor's ability to perform its obligations under this Agreement;

12.1.5. if the Contractor shall breach any representation made by it to Owner;

12.1.6. if Contractor shall fail or refuse to pay any of its subcontractors, suppliers or workers for any materials, labor or other things incorporated into, or used in connection with the Work when such payments are due after receipt of payment from Owner; provided, however, that if Contractor disputes the amount due to a worker, contractor, or supplier, and Contractor, within two (2) days of the due date of such payment, at its own expense, posts a bond for the disputed payment in amount and form satisfactory to Owner as security for such payments, then such non-payment shall not constitute an event of default hereunder; or

12.1.7. if Contractor shall abandon the Work or reduce its labor force to a number insufficient to complete the Work within the scheduled time.

12.2. In the event of a termination pursuant to Section 12.1, to the extent directed by Owner, Contractor shall:

12.2.1. stop work under this Agreement on the date and to the extent specified in the notice of termination;

12.2.2. reasonably cooperate with Owner and only take such other actions that Owner may reasonably require to wind up Contractor's involvement in the terminated Work, transfer title to the Work to Owner, and transition the Work to Owner or a new Contractor of Owner's choice;

20

17426180.17

12.2.3. cause any Subcontracts that Owner may identify to be assigned to Owner or Owner's successor general contractor; and

12.2.4. Contractor shall pay, within three (3) days after demand therefor, all costs, losses, damages and expenses including, without limitation, all administrative, management, overhead and other direct or indirect expenses, including reasonable attorneys' fees incurred by Owner in connection with and as a result of any default by Contractor or the exercise of any right or remedy upon Contractor's default. If Contractor does not pay such costs within such three (3) day time period, Owner may withhold and deduct all such costs from any payments of the Total Contract Value. If payments due to Contractor for completed portions of the Work are not sufficient to cover such costs, upon three (3) days' notice by Owner to Contractor, Contractor shall pay to Owner the full amount of any such excess with interest thereon at the per annum rate of interest published in The Wall Street Journal (or a comparable publication selected by Owner if The Wall Street Journal is not published or does not publish a "prime rate") from time to time as the "prime rate," *plus* two hundred (200) basis points, but in no event higher than the maximum rate permitted by applicable law. The liability of Contractor hereunder shall extend to and include the full amount of costs incurred and obligations assumed by Contractor or Owner (i) in protecting and completing the Work and providing labor, materials, equipment, supplies and other items in connection therewith or in recontracting and accelerating the Work, and (ii) in settlement, discharge or compromise of any claims, demands, suits and judgments pertaining to or arising out of the Work. An itemized statement of such obligations and payments shall be prima facie evidence of Contractor's liability.

12.3. Upon the termination of all or any portion of the Work pursuant to the provisions of Section 12.1 above, Owner shall not be obligated to make any further payment to Contractor for any purpose thereafter until all of such Work shall have been completed. If the cost to Owner for completing such Work, including, without limitation, the cost of correcting defective Work, shall exceed the amounts payable to Contractor for the Work under this Agreement, such excess cost shall be immediately due and payable by the Contractor to Owner and Owner shall have the right to offset any amounts owed by Contractor against any amounts not yet paid to Contractor. In the event of a termination, Owner shall only pay for the portion of the Total Contract Value earned to the date of such termination.

12.4. Upon the termination of all or any portion of the Work, the Contractor shall remain liable to Owner for all damages suffered by Owner. Owner may deduct such damages from any amounts due to Contractor hereunder.

12.5. In addition to the termination rights granted to Owner pursuant to Sections 2.10 and 12.1 above, Owner may terminate this Agreement at any time without cause and for its convenience, upon seven (7) calendar days' written notice to the Contractor. In the event of such termination:

12.5.1. Owner shall have the same rights with respect to Contractor as are set forth in Sections 12.2 and 12.3 above.

12.5.2. Owner shall pay to the Contractor, but only upon receipt of a release, satisfactory to Owner, of all claims against Owner pertaining to the Project (i) all

21

17426180.17

amounts due in accordance with Article 5 hereof earned up to the effective date of such termination for Work performed prior to the date of termination, (ii) 50% of the then-remaining, unpaid balance of Contractor's Fee, and (iii) Contractor's reasonable general conditions close out costs, provided that if Contractor and Owner dispute any of the amounts due pursuant to clauses (i) through (iii) above, the same shall not be payable until the dispute is resolved in accordance with the provisions of <u>Section 15.11</u> of this Agreement.

12.6. Except as otherwise set forth in Section 12.5.2 above, in no event shall Contractor be entitled to lost profits or any other commission (actual or potential) arising out of or in connection with the Project by reason of any termination by Owner and Contractor hereby waives such claim(s).

12.7. If the Contractor fails to perform any of its obligations under this Agreement (including, without limitation, any of Contractor's indemnification obligations hereunder), then upon seven (7) days' prior written notice to the Contractor, and provided that during such seven (7) day period the Contractor fails to perform such obligation (except in case of emergency, where Owner may proceed without notice), Owner may make good such deficiencies, charge the Contractor any cost occasioned by the Contractor's failure to perform and make an appropriate deduction on account of such failure from the amounts due to Contractor hereunder.

12.8. Owner may, without cause, order Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as Owner may determine, at no additional cost to Owner, provided, however, notwithstanding the foregoing, (i) in the event that Owner suspends the Work for a period in excess of thirty (30) days and Contractor does not terminate this Agreement pursuant to this <u>Section 12.8</u>, Owner shall pay the actual, reasonable, out-of-pocket costs of Contractor directly arising from such suspension ("<u>Contractor's Suspension Costs</u>"), and (ii) Owner shall not be entitled to suspend the performance of the Work pursuant to this <u>Section 12.8</u> for a period in excess of one hundred eighty (180) consecutive days. Upon the recommencement of the Work after a period of suspension, Contractor shall be entitled to an equitable adjustment of the Construction Schedule. Any disputes as to the length of any such adjustments to the Construction Schedule that are not resolved by the parties within three (3) days after recommencement of the Work may be submitted to a fast-track arbitration proceeding under <u>Section 15.11</u> below. If Owner suspends, delays or interrupts the Work through no act or fault of Contractor, or any Subcontractor, or any of their respective agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with Contractor (and the work is not suspended, delayed or interrupted for one or more of the reasons set forth in <u>Section 12.10</u>), for a period in excess of sixty (60) days, then, Contractor may give Owner ten (10) days' written notice of its intent to terminate this Agreement, and, if such suspension, delay or interruption is not resolved within such ten (10) day time period following the delivery of Contractor's written notice to Owner, then this Agreement shall terminate upon the expiration of such ten (10) day period and Contractor may recover from Owner, but only upon receipt of a release, satisfactory to Owner, of all claims against Owner pertaining to the Project, (i) all amounts due in accordance with Article 5 hereof earned up to the effective date of such termination for Work performed prior to the date of termination, (ii) 50% of the then-remaining, unpaid balance of Contractor's Fee, and (iii) Contractor's reasonable general conditions close out costs, less any Contractor's Suspension Costs previously paid by

22

17426180.17

Owner to Contractor, provided that if Contractor and Owner dispute Contractor's Suspension Costs or any of the amounts due pursuant to clauses (i) through (iii) above or whether the event giving rise to Contractor's termination right exists, the same shall not be payable until the dispute is resolved in accordance with the provisions of Section 15.11 of this Agreement. If this Agreement is terminated in accordance with Contractor's election to terminate pursuant to the terms of this Section 12.8, then Contractor shall not be entitled to any Contractor's Suspension Costs. For the avoidance of doubt, Contractor's rights to terminate this Agreement pursuant to this Section 12.8 shall arise only in connection with a suspension, delay, or interruption of Work caused by Owner to the extent set forth above, and shall not apply in the event of a stoppage of Work due to either of the events set forth in clauses (i) or (ii) of Section 12.10 below. In the event of a termination under this Section 12.8, Contractor shall reasonably cooperate with Owner and only take such other actions that Owner may reasonably require to wind up Contractor's involvement in the terminated Work, transfer title to the Work to Owner, and transition the Work to Owner or a new Contractor of Owner's choice. Receipt of the foregoing payments pursuant to this Section 12.8 by Contractor from Owner shall be Contractor's sole and exclusive remedy in connection with a termination of this Agreement pursuant to this Section, Contractor hereby waiving all other rights, claims and remedies, by contract, at law or in equity, in connection with a termination by Contractor pursuant to this Section.

12.9. Contractor agrees that if it (or its attorney) becomes aware that any criminal proceeding is commenced or to be commenced against Contractor (and/or one or more of its principals) and/or one or more of the Subcontractors and/or one or more principals of any of the Subcontractors, it shall immediately notify Owner thereof.

12.10. If the Project, in whole or part, is stopped (or Owner is required to stop the Work in whole or in part) for a period in excess of one hundred eighty (180) days: (i) under an order of any court, governmental agency or other public authority having jurisdiction, or (ii) as a result of an act of government, such as a declaration of a national emergency making materials unavailable, in both cases through no act or fault of Contractor, or any Subcontractor, or any of their respective agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with Contractor, then following the expiration of such one hundred eighty (180) day time period, Contractor may give Owner ten (10) days' written notice of such event, and, if such suspension is not resolved within such ten (10) day period following the delivery of Contractor's written notice to Owner, then this Agreement shall terminate at the expiration of such ten (10) day period, and Contractor shall be entitled to receive, but only upon receipt of a release, satisfactory to Owner, of all claims against Owner pertaining to the Project, (i) all amounts due in accordance with Article 5 hereof earned up to the effective date of such termination for Work performed prior to the date of termination, (ii) 50% of the then-remaining, unpaid balance of Contractor's Fee, and (iii) Contractor's reasonable general conditions close out costs, provided that if Contractor and Owner dispute the amount that is due or whether the event giving rise to Contractor's termination right exists, the same shall not be payable until the dispute is resolved in accordance with the provisions of Section 15.11 of this Agreement. Upon the recommencement of the Work after a period of suspension pursuant to this Section 12.10, Contractor shall be entitled to an equitable adjustment of the Construction Schedule. Any disputes as to the length of any such adjustments to the Construction Schedule that are not resolved by the parties within three (3) days after recommencement of the Work may be submitted to a fast-track arbitration proceeding under Section 15.11 below. In the event of a

23

17426180.17

termination under this Section 12.10, Contractor shall reasonably cooperate with Owner and only take such other actions that Owner may reasonably require to wind up Contractor's involvement in the terminated Work, transfer title to the Work to Owner, and transition the Work to Owner or a new Contractor of Owner's choice. Receipt of the foregoing payments pursuant to this Section 12.10 by Contractor from Owner shall be Contractor's sole and exclusive remedy in connection with a termination of this Agreement pursuant to this Section, Contractor hereby waiving all other rights, claims and remedies, by contract, at law or in equity, in connection with a termination by Contractor pursuant to this Section.

12.11. If Owner shall fail without cause to pay Contractor for the Work for a period in excess of thirty (30) days after the date due under this Agreement, then Contractor may give Owner ten (10) days' written notice of such default and, in the event such default is not cured within said ten (10) day time period, this Agreement shall terminate and Contractor shall be entitled to and recover from Owner, but only upon receipt of a release, satisfactory to Owner, of all claims against Owner pertaining to the Project, (i) all amounts due in accordance with Article 5 hereof earned up to the effective date of such termination for Work performed prior to the date of termination, (ii) 50% of the then-remaining, unpaid balance of Contractor's Fee, and (iii) Contractor's reasonable general conditions close out costs, provided that if Contractor and Owner dispute any of the amounts due pursuant to clauses (i) through (iii) above or whether payment was due to Contractor, the same shall not be payable until the dispute is resolved in accordance with the provisions of Section 15.11 of this Agreement. Receipt of the foregoing payments pursuant to this Section 12.11 by Contractor from Owner shall be Contractor's sole and exclusive remedy in connection with a termination of this Agreement pursuant to this Section, Contractor hereby waiving all other rights, claims and remedies, by contract, at law or in equity, in connection with a termination by Contractor pursuant to this Section. In the event of a termination under this Section 12.11, Contractor shall reasonably cooperate with Owner and only take such other actions that Owner may reasonably require to wind up Contractor's involvement in the terminated Work, transfer title to the Work to Owner, and transition the Work to Owner or a new Contractor of Owner's choice.

12.12. The provisions of this Article 12 shall survive termination of this Agreement.

## 13. TITLE TO THE WORK

13.1. Title to the Work completed or under construction, and to all materials and equipment delivered to the Project Site or held by Contractor or Subcontractors for the Work, shall pass to Owner upon installation into the Project or upon Contractor's or Owner's making payment for such materials, whichever event occurs first. Contractor agrees that all materials to which Owner has acquired or may acquire title shall be properly incorporated in the Work, and Contractor shall protect and safeguard all such materials against damage, loss, theft, or diversion from the Work in accordance with first-class construction practice. At the completion of the Work and when no longer required, such tools, equipment and materials that remain shall be sold at the direction of Owner and all sums and allowances credited to Owner, provided that items can be sold or were not consumed in the execution of the Work.

24

17426180.17

### 14.    LIENS

14.1.  If applicable Law permits the filing of mechanics', materialmens' or similar liens in connection with the performance of work or services, or the delivery of materials, then Exhibit D hereto shall apply.

### 15.    MISCELLANEOUS PROVISIONS

15.1.  Guarantees to Owner.  Any and all warranties and guarantees called for by the Contract Documents shall inure to the benefit of Owner.  Contractor shall execute and cause its Subcontractors, their sub-subcontractors and any manufacturers or fabricators, to the extent applicable, to execute any assignments of warranties and guarantees that Owner may require to ensure that Owner shall have the full benefit thereof.  Promptly upon completion of the Work, and as a condition precedent to Final Completion and Final Payment, Contractor shall assign and deliver to Owner all warranties from contractors, suppliers and third parties for materials, equipment and labor incorporated into or used in connection with the Work.

15.2.  Successors and Assigns.  This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns; provided, that the Contractor may not assign, subcontract, or otherwise delegate its responsibilities under this Agreement, directly or indirectly, without the prior written consent of Owner.  Owner may assign this Agreement or any part of Owner's right, title and interest under this Agreement to any current or prospective lender of the Owner (each, a "Lender").  The Contractor agrees that the Contractor will perform its obligations under this Agreement for the benefit of any Lender or other assignee, whether such Lender is a third-party beneficiary or an assignee.  The Contractor agrees to execute any documents which any such Lender may reasonably require to confirm the foregoing and to consult with any such Lender when the Owner so requests.  Upon the request of the Owner, the Contractor shall at any time, and from time to time, agree to modifications of this Agreement to comply with the requirements of any Lender, governmental agency, and all applicable laws, so long as the modifications do not materially increase the Contractor's services, responsibilities or liabilities, or reduce the Contractor's compensation and reimbursement under this Agreement.

15.3.  Confidentiality.  Owner reserves the exclusive right to release any and all information relating to the Project, the Work and this Agreement and to determine the form, content and timing of the release of such information.  The Contractor will not divulge information concerning the Project to anyone except to the extent required to be included in an application for a permit, approval, or clearance, or to Subcontractors on a need-to-know basis without Owner's prior written consent, which will not be unreasonably withheld when required in connection with the Project.  No signs advertising the Project or the Work to be performed by Contractor hereunder or identifying any person, firm or entity concerned with or related to the Work to be performed by the Contractor shall be allowed at the Project Site or elsewhere unless required by Laws or approved, in advance, in writing by Owner, which approval shall lie within Owner's sole and exclusive discretion.  In addition, Contractor agrees that it will not, without the prior written consent of Owner in each instance, use Owner's name, trademark, servicemark, or logo in any of Contractor's advertising, publicity or marketing materials nor reveal the existence of this Agreement or the parties' business relationship.

25

17426180.17

15.4. Governing Law. This Agreement shall be governed by the laws of the State of New York.

15.5. Independent Contractor. The Contractor is an independent contractor and not an employee or agent of Owner. Nothing contained in this Agreement shall be construed to mean that Contractor and Owner are joint venturers or partners.

15.6. No Third Party Relationships. Except with respect to Lender, nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either Owner or the Contractor.

15.7. Limitation of Liability; Personal Liability. Recourse hereunder against Owner shall be limited to the amounts earned by and payable to Contractor by Owner under Article 5 of this Agreement. No personal liability shall accrue pursuant to this Agreement, and no claim hereunder shall be made against, nor shall recourse be held against the assets of, any officer, member, director, shareholder, partner, employee, joint venturer, representative or fiduciary of Owner or Contractor, or any of their respective parent companies, affiliates or subsidiaries. Notwithstanding anything to the contrary contained herein, recourse hereunder by Owner against Contractor or by Contractor against Owner shall in no event include consequential, special or indirect damages.

15.8. Severability. If any provision of this Agreement is invalid or unenforceable as against any person, party or under certain circumstances, the remainder thereof and the applicability of such provision to other persons, parties or circumstances shall not be affected thereby. Each provision of this Agreement shall, except as otherwise herein provided, be valid and enforced to the fullest extent permitted by law.

15.9. Representations and Warranties. Contractor represents and warrants the following to Owner, which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement and the Final Completion of the Work:

15.9.1. Contractor is authorized to do business in the jurisdiction where the Project is located and is properly licensed by all necessary governmental and public authorities having jurisdiction over Contractor and over the Work and the Project;

15.9.2. Contractor's execution of this Agreement and performance thereof is within Contractor's duly authorized powers;

15.9.3. Contractor is a sophisticated contractor who possesses a level of experience and expertise in the construction of projects of the size, complexity and nature of this Project; and

15.9.4. There are no pending criminal investigations or proceedings against the Contractor or any of its principals or affiliates.

26

17426180.17

15.9.5. Contractor is financially solvent, able to pay its debts as they mature, and possessed of sufficient working capital to complete the Work and perform all obligations hereunder.

15.10. Notices. All notices, consents, demands, statements, requests or other communications required pursuant to this Agreement shall be in writing and shall be (a) hand delivered (against a signed receipt), (b) sent postage prepaid, registered or certified mail, return receipt requested or (c) sent by nationally recognized courier service, provided the sender shall obtain a written receipt for such delivery. Notices to Owner shall be addressed as follows:

> Robert Chapman
> Associate Executive Director
> Chief Operating Officer
> Citymeals on Wheels
> 355 Lexington Avenue, 3rd Floor
> New York, New York 10017
> Bob@citymeals.org

> With a copy to:

> Kenneth Levien
> President
> Levien & Company, Inc.
> 570 Lexington Avenue
> New York, New York 10022
> kenl@levienco.com

Notices to the Contractor shall be addressed as follows:

> Hollister Construction Services
> 339 Jefferson Road
> Parsippany, New Jersey 07054
> Attention: Brendan Murray, LEED AP
> bmurray@hollistercs.com

Notices shall be deemed given and received (a) in the case of hand delivery, on the day such notice is personally delivered or when acceptance of delivery is refused, (b) in the case of delivery by United States mail, on the third (3rd) business day following the day on which such notice or other document is deposited in the mail, and (c) in the case of delivery by courier service, on the day of actual delivery or the date such delivery was refused.

15.11. Disputes Between Owner and the Contractor.

15.11.1. If a dispute shall arise under this Agreement, Contractor shall continue during the pendency of such dispute to perform the Work as if no dispute shall have arisen. During the pendency of any such dispute, Contractor shall be entitled to receive

27

17426180.17

payments from Owner only for non-disputed items and payments for disputed items shall be deferred until the final resolution of the dispute. It is understood that a violation of this provision shall cause irreparable harm to Owner.

15.11.2. Any claims or disputes between the parties arising out of or relating to this Agreement or the breach thereof shall be decided by arbitration in accordance with the "Fast Track" procedures of the Construction Industry Arbitration Rules of the American Arbitration Association unless the parties mutually agree otherwise. The arbitration proceedings shall take place in New York, New York. Notice of demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The demand shall be made within 30 days after the claim, dispute or other matter in question has arisen. An award or decision shall be rendered by an independent and duly qualified arbitrator(s) within 30 days after the appointment of the arbitrator(s), and the decision of such arbitrator(s) may be entered into evidence in any court having jurisdiction over the parties. The decision of the arbitrator(s) shall be binding on the parties hereto.

15.12. No Waiver. The failure of Owner to insist upon the strict performance of any provisions of this Agreement, or the failure of Owner to exercise any right, option or remedy hereby reserved, shall not be construed as waiver for the future of any such provision, right, option or remedy or as a waiver of a subsequent breach thereof. No provision of this Agreement shall be deemed to have been waived unless such waiver shall be in writing signed by the party to be charged. All rights and remedies set forth in this Agreement are cumulative, and the exercise of one remedy shall not be deemed a waiver of any other. The rights and remedies available to Owner under this Agreement shall be in addition to any legal or equitable rights and remedies available to Owner under the Contract Documents or under applicable Law.

15.13. Survival. The terms, indemnities, provisions, representations and certifications contained in this Agreement, or inferable therefrom, including any representation or warranty by Contractor contained herein which by its nature and effect is required to be observed kept or performed after the termination of this Agreement, shall survive the completion of the Project and the payment of any sums due pursuant to the terms of this Agreement and the termination of this Agreement.

15.14. Complete Agreement. This Agreement represents the entire and integrated agreement between Owner and Contractor regarding the subject matter hereof and supersedes all prior negotiations, representations or agreements. This Agreement may be amended only by written instrument signed by both parties hereto.

15.15. Access. Owner and its representatives, employees and agents, shall have access to the Project and the Work at all times.

15.16. Schedules and Exhibits. All Schedules and Exhibits attached hereto are incorporated herein as if set forth in full in this Agreement.

15.17. Counterparts. This Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute but one and the same instrument. An executed counterpart of this Agreement transmitted and received by electronic

28

17426180.17

mail in .pdf format shall be deemed for all purposes to be an original, executed counterpart hereof.

[signatures on following page]

29

**IN WITNESS WHEREOF,** Owner and the Contractor have executed this Agreement as of the day and year first written above.

                                                 **CITYMEALS-ON-WHEELS PROPERTY, LLC**

                                                 By: Citymeals-on-Wheels

                                                 Its: Member

                                               By: _Beth Shapiro_

                                               Name: Beth Shapiro

                                               Title: Executive Director

                                                 **HOLLISTER CONSTRUCTION SERVICES, LLC**

                                               By: _____

                                             Name: _____

                                             Title: _____

[Signature Page to General Contractor's Agreement]

IN WITNESS WHEREOF, Owner and the Contractor have executed this Agreement as of the day and year first written above.

CITYMEALS-ON-WHEELS
PROPERTY, LLC

By: Citymeals-on-Wheels
Its: Member

By: _____
Name: Beth Shapiro
Title: Executive Director


HOLLISTER CONSTRUCTION
SERVICES, LLC

By: _____
Name: _Brendan Murry_
Title: _VP of Construction_

[Signature Page to General Contractor's Agreement]

# **<u>Exhibit B</u>**

| Accounting Use | | |
|---|---|---|
| Cost Code | Description | Amount |
| 02-02.080-S | Roofing Materials Removal | $71,550.00 |
| 02-02.080-S | Vinyl Floor Tile Removal | $23,000.00 |
| 02-02.080-S | Avian (Guano) Debris Cleanup | $81,850.00 |
| 02-02.080-S | Regulatory Filing Fees | $2,600.00 |
| 02-02.080-S | Variance Application Fee | $1,000.00 |
| | Total: | $180,000.00 |

HC HOLLISTER
CONSTRUCTION
SERVICES
Building Sound Relationships & Structures

s

PROJECT AGREEMENT BETWEEN

Incinia Contracting Inc
(SUBCONTRACTOR)
1360 Clifton Avenue
Clifton, NJ 07012
.AND
Hollister Construction Services, LLC
(CONSTRUCTION MANAGER)
339 Jefferson Road
Parsippany, NJ 07054
201-393-7500

Contract Number: 16263INCI02
Contract Date: 10/21/2016

Owner:

Project Name: 16-263 Citymeals on Wheels - CM Construction

Project Number: 16-263

Site Address: , ,

Architect:

Engineer:

**ARTICLE I SCOPE OF WORK**
The Subcontractor shall furnish all of the materials, tools, methods, labor, equipment, plant, services, transportation, power, fuel, water, supervision, field and office engineering, drawings, permits and such other items and facilities of every kind required to perform the following work (the "Scope of Work") set forth in this Article I as follows:

**ASBESTOS ABATEMENT and AVIAN (GUANO) REMOVAL - GENERAL**

Means and Methods are up to the discretion of the subcontractor but must adhere to all city, state and federal regulatory agencies having jurisdiction over such work.

Provide qualification data and certifications as required.

Submit work plan / method statement for handling asbestos waste.

Submit all Quality Control Submittals as required.

Provide for all temporary protective measures and tools including polyethylene sheeting, signage and impermeable containers prior to start of asbestos abatement work in accordance with OSHA requirements.

Provide log book, waste removal documentation and disposal records, including but not limited to waste manifests.

Submit all contract closeout submittals.

Provide for licensed waste hauler certified by the State of NY.

**Removal of Asbestos Containing Materials (ACM), Guano and Mold - SPECIFIC**

Abated roofing (ACM) as shown on drawings.

Furnish and install full containment of work areas with air filtration devices and decontamination units for asbestos abatement personnel and for use during the load-out of waste materials.

Remove built-up roofing material.

Remove roof tar flashing.

Remove roof base flashing.

Abate 12" x 12" VCT floor tile, including mastic and underlayment.

Any demolition activities which expose previously unidentified suspect Asbestos Containing Material must be controlled and work suspended until additional sampling can be completed to confirm/deny asbestos content of these materials.

Contract #: 16263INCI02

Provide final air clearance air samples from within the work areas after all asbestos containing materials have been removed and send to an independent laboratory confirming that asbestos fibers are below state and federal guidelines.

Provide report of its air sampling results for approval.

Remove avian (guano) as per the environmental report and as shown on drawings.

Remove mold as per environmental report and as shown on drawings.

Any demolition activities which expose previously unidentified suspect mold spores must be controlled and work suspended until additional sampling can be completed to confirm/deny mold spore content of these materials.

Furnish and install full containment of work areas with air filtration devices, negative pressure tent with an air lock for mold abatement personnel and for use during the load-out of waste materials.

Provide final air monitoring from within the work areas after all mold containing materials have been removed to and send to an independent laboratory confirming that mold spore counts are below state and federal guidelines.

This contractor must include cleanup for this trade's work. This contractor shall be responsible for providing all equipment and tools required for asbestos remediation work, mold and guano removal.

Water and electric (generator) required to perform the work will be provided by Incinia ONLY if needed.

It is expressly understood that the Subcontractor assumes all obligations of the Construction Manager under the applicable Contract Documents as defined below, in relation to the Scope of Work, including but not limited to provisions concerning time of performance and shall execute all obligations under the Scope of Work so as not to delay completion of the project that relates to the Scope of Work. In no event shall the Subcontractor be entitled to greater rights, or remedies, then the Construction Manager actually secures from the Owner.

### ARTICLE II  SCHEDULE
The Work to be performed under this Project Agreement shall conform to the following schedule, except as such schedule may be extended in writing by the Construction Manager, time being of the essence (on or before the following dates):

Start of Work: **10/25/16**
Completion of Work: **11/29/16**

### ARTICLE III  THE CONTRACT SUM
Construction Manager will pay the Subcontractor for the performance of this Project Agreement, subject to additions and deductions as provided for herein, the sum of **$180,000.00** (the "Contract Sum"), which sum includes all applicable Federal, State, and local taxes and fees. The Subcontractor is responsible for supplying Construction Manager with all documents as required in this Project Agreement (hereinafter the "Subcontractor Documents").

This Project Agreement is subject to all terms and conditions of that certain Master Subcontract General Conditions Agreement dated between Subcontractor and Construction Manager (the "Master Agreement") and together the Project Agreement and Master Agreement shall collectively be referred to as the "Subcontract". The signer agrees that he has read and understands all of the terms and conditions of this Project Agreement. Capitalized terms not otherwise defined in this Project Agreement shall have the meaning set forth in the Master Agreement. This Project Agreement and the Master Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which collectively shall constitute one and the same instrument representing the Agreement between the Construction Manager and Subcontractor hereto, and it shall not be necessary for the proof of this Agreement that any Party produce or account for more than one such counterpart. Any facsimile or signature by electronic mail of any Party or person on the signature pages hereto, or the signature pages of any other agreement or document contemplated hereby, received by any other person or Party shall constitute an original signature for all purposes.In the event of a conflict between this Project Agreement, the Master Agreement, or any of the other Contract Documents, the Project Agreement shall take precedence and control to the extent of such conflict. The "Contract Documents" consist of this Project Agreement, the Master Agreement, the contract between the Owner and the Construction Manager (hereinafter the "Prime Contract"), all Exhibits attached hereto and enumerated herein, changes and addenda to this Project Agreement that supersedes all prior negotiations, representations or agreements, either written or oral; Conditions of the Subcontract, if any, , Plans, Specifications, Changes and Addenda to the Plans and Specifications, Change Orders made to this Project Agreement, and all such Contract Documents shall be attached hereto as Exhibit "A". The Subcontractor, by signing this Project Agreement, acknowledges that all of the above-referenced Contract Documents are part of this Project Agreement.

Contract #: 16263INCI02

CONSTRUCTION MANAGER: HOLLISTER CONSTRUCTION
SERVICES LLC

BY:

PRINT NAME:

DATE:

SUBCONTRACTOR : Incinia Contracting Inc

BY:

PRINT NAME: MILENA ZORIC

DATE:

Vendor ID

PLEASE SIGN AND RETURN ONE ORIGINAL

# Exhibit C



**HOLLISTER CONSTRUCTION SERVICES**

Building Sound Relationships & Structures

339 Jefferson Road Parsippany, NJ 07054 201-393-7500

Contract: INCI02

## MASTER SUBCONTRACT GENERAL CONDITIONS AGREEMENT

THIS MASTER SUBCONTRACT GENERAL CONDITIONS AGREEMENT (the "Master Agreement") is dated 7/30/2013, by and between HOLLISTER CONSTRUCTION SERVICES LLC, with an address of 339 Jefferson Road, Parsippany, NJ 07054 (hereinafter the "Construction Manager") and Incinia Contracting Inc. , with an address of  , (hereinafter the "Subcontractor"). (Construction Manager and Subcontractor may be referred to individually as a "party" or collectively as the "parties"). References to the word "Subcontract" in this Master Agreement shall refer to this Master Agreement as well as the applicable Project Agreement.

The Construction Manager and Subcontractor agree as follows:

### ARTICLE IV

**A. GENERAL PROVISIONS**
The Subcontract shall be deemed to have been made in New Jersey and shall be construed under the laws of the State of New Jersey.

**B. CONSTRUCTION MANAGER'S REPRESENTATIVE**
Construction Manager's agent for purposes of this Subcontract is the designated project manager, to whom the Subcontractor shall address all correspondence.

**C. WORKMANSHIP AND QUALIFICATION**
The Subcontractor shall perform its services under this Subcontract in a skillful and competent manner in accordance with the highest standards of the construction industry and in accordance with all applicable codes, rules, regulations and laws. The Subcontractor shall be responsible to the Construction Manager for errors or omissions in construction and failure to perform this Subcontract. The Subcontractor represents and warrants that it is fully qualified to perform the Work and is properly licensed; has sufficient manpower; supervision; equipment; and is financed to perform the Work. Furthermore, the Subcontractor fully understands the terms and conditions under which the Subcontract is to be performed, has acquainted itself with the Project site and its conditions and has priced and will provide services to complete the Work in a timely manner within the stipulated time for completion.

**D. NOTICE**
Written notice shall be sufficiently served when delivered or sent by Regular First Class Mail, United States Certified Mail, or such other overnight mail carrier to the Subcontractor at its address, as stated in the Subcontract, and to the Construction Manager, attention of the Project Manager, at the Construction Manager's address as stated in the Subcontract.

**E. TIME OF ESSENCE**
The time limits stated in the Subcontract are of the essence. The Subcontractor shall cooperate with the Construction Manager and execute the Work in a timely fashion to avoid delaying or interfering with the progress of the entire Project. The Construction Manager has the right to require the Subcontractor, without cost or liability to the Construction Manager, to schedule Work to minimize delay or interference which could increase the cost of the Work of other subcontractors. Subcontractor agrees to keep the Construction Manager thoroughly informed with the overall progress of the Project; to commence and prosecute the Work in prompt and diligent manner whenever the Subcontractor's Work becomes available, or such time as the Construction Manager may direct. The Subcontractor shall not delay or otherwise interfere with the work or the progress of the Construction Manager or any other subcontractor.
It is acknowledged by the Subcontractor that the Construction Manager may prepare or distribute Project schedules which may be modified in its sole, exclusive and absolute discretion from time to time to account for, without limitation, job conditions, changes required in the plans and specifications, the rate of performance attributable to other subcontractors, suppliers, the Owner, or other prime contractors or the Construction Manager, for acts of God or other events which may delay the progress of the Work. The Construction Manager makes no representation that the Subcontractor will be able to commence, prosecute, sequence or complete the Work in accordance with the Project schedule. Subcontractor agrees and will perform the Work in accordance with the revised Project schedules, commencement dates, completion dates, sequences and durations determined at the sole, exclusive and absolute discretion of the Construction Manager. It is the Subcontractor's obligation to complete the Work within the time, duration and sequence scheduled from time to time during the Project by Construction Manager and if the start or completion date or the durations of time for completion of the Work or any portions thereof is changed, condensed or increased, such modifications to the progress schedule by the Construction Manager shall not be the basis of any claim by the Subcontractor for delay or damages, acceleration, constructive acceleration, interferences or any other claim for an increase in the Contract Sum, or excuse the Subcontractor's performance as required herein.
The Subcontractor hereby agrees that failure to maintain the Project schedule may result in additional costs to the Construction Manager sustained by reason of such delay, directly or indirectly attributed to, or caused by the Subcontractor. The Subcontractor shall reimburse the Construction Manager for any damages assessed or asserted by the Owner and the Construction Manager as the result of delays caused by or attributable to the Subcontractor. These actual damages along

with the Construction Manager's acceleration costs, extended job overhead, and all other direct and indirect costs including reasonable attorney fees, shall be promptly reimbursed by the Subcontractor or offset in the sole discretion of the Construction Manager, against monies payable or retainage due to the Subcontractor.

No extension of time will be granted to the Subcontractor for delays in the performance of the Work unless the Construction Manager has received an extension of time and only to the extent that the time the Construction Manager receives from the Owner. Regardless of the cause of the delay, the Subcontractor shall not be entitled to compensation for delay. Furthermore, the Subcontractor shall not be entitled to any extension of time for delay unless written notice to the Construction Manager has been submitted in writing within ten (10) days of such delay, and then upon the written approval of the Owner, Architect and Construction Manager.

F. CONFIDENTIALITY
The Subcontractor shall not divulge information concerning this Project to anyone without the Construction Manager's prior written authorization. In addition, the Subcontractor, its agents and suppliers shall be prohibited from disclosing the name of the Construction Manager, the Owner and/or the name of the Project to any third party. Similarly, the Subcontractor shall ensure that the Subcontractor's suppliers, employees and agents do not divulge any information concerning the Project to anyone. All of the Subcontractor's written contracts with the foregoing shall contain a similar confidentiality clause. The Subcontractor shall be responsible for all non-compliance. Subcontractor shall obtain similar agreements from persons, firms and corporations employed by it. This requirement shall survive the expiration of the Subcontract.

G. WORD USAGE
Words describing materials or work, which have a well-known technical or trade meaning, unless otherwise specifying alternates or substitutions, must be approved in writing as defined in the Subcontract and shall be construed in accordance with such well-known meaning as recognized by architects, engineers and trades.

H. CONFLICTS
The Subcontract and each of the Contract Documents are complementary and they shall be interpreted so that what is called for by one shall be as binding as if called for by all. Should the Subcontractor observe any conflicts within the Contract Documents, it shall bring them to the Construction Manager's attention for decision and revision as soon as possible after initially observed.

I. ASSIGNMENTS
(1) The Construction Manager and the Subcontractor each binds himself/itself, his/its partners, successors, assigns and legal representatives to the other party hereto and to the partners, successors, assigns and legal representatives of such other party in respect to all covenants, agreements and obligations contained in the Subcontract. The Subcontractor shall not assign the Subcontract or sublet it as a whole without the prior written consent of the Construction Manager, nor shall the Subcontractor assign any monies due to or to become due to him hereunder, without the previous written consent of the Construction Manager.

(2) The assignment by Subcontractor of this Subcontract or any interest therein, or of any money due or to become due by reason of the terms hereof without the written consent of the Construction Manager shall be void. Any assignment, if consented to, will be deemed subject to labor preferences and liabilities imposed upon the Construction Manager for unpaid obligations of Subcontractor, or for any other liabilities for which Subcontractor might be held responsible.

J. OWNERSHIP
All drawings, specifications and copies thereof furnished by the Construction Manager are and shall remain the Construction Manager's property. They shall not be used on any other Project, and are to be returned on request, at the completion of the Work.

K. BANKRUPTCY
If the Subcontractor shall be adjudged bankrupt or insolvent, if it makes a general assignment for the benefit of its creditors; if a trustee or receiver should be appointed on account of its insolvency or for any of this property, if it files a petition to take advantage of any debtors' act or to reorganize under bankruptcy or similar laws; if it persistently or repeatedly refuses or fails (except in cases for which extension of time is provided) to supply properly skilled workers or proper materials or equipment; if it should fail to make prompt payment to supplier or for labor, materials or equipment; if it should persistently disregard statutes, laws, ordinances, codes, rules or regulations; or if it should otherwise be guilty of substantial violation of any term, condition or provision of this Agreement, then the Construction Manager, without prejudice to any other right or remedy and after giving the Subcontractor three (3) days written notice, may terminate this Subcontract, take possession of the Project and all materials, equipment and all else thereon, and finish the Work by whatever method the Construction Manager deems expedient. In the event any of the aforementioned events occur, the Subcontractor shall not be entitled to receive further payment until the Work is finished; if the unpaid balance of the Contract Sum exceeds the Construction Manager's expenses of finishing the Work, including compensation for additional engineering, managerial, administrative and legal services, such excess shall be paid to the Subcontractor; if such expenses exceed such unpaid balance, the Subcontractor shall promptly pay the difference to the Construction Manager upon its request.

L. RESPONSIBILITY OF SUBCONTRACTOR
(1) The Subcontractor shall be responsible to the Construction Manager for the acts and omissions of all its employees and all suppliers, their agents and employees, and all other persons performing any of the Work under this Contract. The Subcontractor shall satisfy such supplier claims within ten (10) days of their filing and to defend and indemnify the Construction Manager and its sureties from such claims and from any and all losses, damages, liability, costs and expenses, including legal fees and disbursements that may incur in connection therewith. To the extent permitted by law, the Subcontractor shall not allow or cause any Construction Lien or Notice of Unpaid Balance and Right to File Lien (hereinafter "NUB") to remain of record as a claim against any property interest of the Owner; nor shall the Subcontractor suffer or permit any such Construction Lien or NUB to be so filed because of any claim or demand against, Subcontractor or any of its supplier or suppliers.

S

(2) In the event that any suppliers and/or material suppliers or any other party with whom the Subcontractor has entered into a relationship, which affords to said party Construction Lien rights, files a Construction Lien or a NUB arising out of or in connection with the work, labor and/or material, which is included within this Subcontract, the Subcontractor shall immediately cause same to be discharged, satisfied and/or bonded and in default thereof, the Construction Manager shall have the right to bond any Construction Lien, and/or NUB or otherwise discharge same and to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify itself and the Owner against such Construction Lien or NUB, with interest together with expense incident to discharging such Construction Lien or NUB and the defense of any such suit to enforce such Construction Lien or NUB, including any premiums charged for any bond and all attorneys' fees and disbursements incurred. Should there prove to be any claim and party with whom the Subcontractor has entered into a relationship to perform any part of the Scope of Work after all payments have been made under this Subcontract, the Subcontractor shall refund to the Construction Manager all monies that the Construction Manager may be compelled to pay to discharge and/or in defense of the Construction Lien or NUB. Any such Construction Lien or NUB until satisfied or withdrawn shall preclude any and all claim or demand for payment whatsoever by the Subcontractor. The Subcontractor agrees to indemnify, protect and hold harmless the Construction Manager and the Owner from and against any and all claims, actions, fines, penalties or judgments rendered thereon, or any loss, damages, liability, costs and expenses including legal fees and disbursements which the Construction Manager and/or the Owner may sustain/incur as a consequence of the Subcontractor's failure to comply with the terms of this Article.

(3) The failure of Subcontractor after ten (10) days written demand by the Construction Manager to satisfy, discharge and/or bond a Construction Lien or NUB filed by a supplier of the Subcontractor shall constitute a material breach of this Subcontract.

(4) The Subcontractor shall within ten (10) days of the date of this Subcontract, provide the Owner with an accurate list of the names and addresses of each supplier or other party with whom it shall Subcontract and who may have a right to file a Construction Lien or NUB pursuant to the provisions of law. The Subcontractor covenants and agrees that it shall furnish the name and address of such other supplier or other parties with whom it enters into an agreement hereafter, who may have a right to file a Construction Lien and/or NUB pursuant to the provisions of law.

(5) If the Subcontractor files a Construction Lien or NUB, which is ultimately judged to be invalid or overstates the amount properly subject to a Construction Lien or NUB, then the Subcontractor shall in addition to all liabilities resulting from the provisions of the law, be liable to the Construction Manager for all bonds, deposits or costs of removal of the invalid Construction Lien or NUB and/or the overstated portion of such Construction Lien or NUB (including without limitation, all attorneys' fees and expenses), and the Subcontractor shall indemnify and hold harmless the Owner from all resulting losses and expenses.

**M. EMERGENCY**
In any emergency affecting the safety of persons or property, the Subcontractor shall act at its discretion to prevent threatened damage, injury or loss. Any additional compensation or extension of time claimed by the Subcontractor on account of emergency work shall be determined as provided herein for changes in the Work.

**N. REJECTION OF WORK**
(1) The Construction Manager will have authority to reject Work which does not conform to the Subcontract. The Subcontractor shall promptly correct all Work rejected by the Construction Manager as defective or as failing to conform to the Subcontract whether observed before or after completion. The Subcontractor shall bear all costs of correcting such rejected Work. Should a dispute arise as to the Construction Manager's decision to reject the Work, the Subcontractor shall proceed immediately in accordance with Construction Manager's instructions.

(2) Payments otherwise due may be withheld by the Construction Manager on account of defective work not remedied, failure of the Subcontractor to make payments properly to its supplier or for material or labor, a reasonable doubt that the Scope of Work can be completed for the balance then unpaid or for any other claim by the Construction Manager against Subcontractor. If the aforementioned causes for withholding payments are not remedied or begun to be remedied and there is likelihood that the remedy will not be completed within a reasonable time, then after two (2) days written notice from the Construction Manager, the Construction Manager may remedy the cause of nonpayment at the Subcontractor's expense. The Construction Manager may offset against any sums due Subcontractor under this Subcontract or any other agreement between Subcontractor and the Construction Manager the amount of any un-liquidated obligations of the Subcontractor incurred by the Construction Manager in the performance of this Contract.

(3) Written notice of any claim by the Subcontractor for damages by reason of any act or omission of the Construction Manager shall be presented to the Construction Manager within two (2) days after the initiation of such act or omission. Failure to make written notice of claim within the time and in the manner herein provided shall constitute a waiver thereof and no recovery therefore can be had.

**ARTICLE V**
**DEFINITIONS**

**A. COMPLETION**
The term "Completion" means the completion of all of the Work called for under the Subcontract, including but not limited to, satisfactory operation of all equipment, correction of all punch list items, settlement of all claims, if any, release of records of all liens, removal of all rubbish, tools, scaffolding and surplus materials and equipment from the job site, delivery of all guarantees, equipment operation and maintenance manuals, as-built drawings, all required approvals, certificates and acceptances by all governmental agencies and authorities, or any other agency or authority having jurisdiction including, but not limited to, insurance underwriters and bonding companies.

**B. CONTRACT DOCUMENTS**

(1) The "Contract Documents" consist of this Subcontract, each particular Project Agreement, the Prime Contract (as defined herein) all Exhibits attached hereto and enumerated herein, Changes and Addenda to this Subcontract, and each particular Project Agreement that supersedes all prior negotiations, representations or agreements, either written or oral; Conditions of the Subcontract, if any, the contract between the Owner and the Construction Manager, Plans, Specifications, Changes and Addenda to the Plans and Specifications, Change Orders made to this Subcontract and all such Contract Documents shall be attached as Exhibit "A" to the particular Project Agreement.. In the event of a conflict between this Subcontract, the particular Project Agreement, or any of the other Contract Documents, the particular Project Agreement shall take precedence and control to the extent of such conflict. The Subcontractor, by signing this Subcontract, acknowledges that all of the above-referenced Contract Documents are part of this Subcontract.

(2) With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to the Construction Manager by each and all of the terms and provisions of the General Contract and the other Contract Documents to the same extent to which the Construction Manager is bound to the Owner, and to assume toward the Construction Manager all of the duties, obligations, and responsibilities that the Construction Manager by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that the Construction Manager shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against the Construction Manager with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of this Subcontract with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

**C. SUBCONTRACTOR**

The term "Subcontractor" means the person, firm or corporation responsible for the execution of the work contracted for herein.

**D. CONTRACT SUM**

The term "Contract Sum" means the Contract Sum shown in the Subcontract, including allowances, as revised by approved Contract Modification Orders.

**E. PROJECT**

The "Project" is the total construction of which the Work performed under the particular Project Agreement is a part.

**F. SUPPLIER**

A "Supplier" is a person or organization who has a direct contract with the Subcontractor to perform any of such Subcontractor's work.

**G. WORK**

(1) The term "Work" unless otherwise specified, indicates everything necessary to complete the entire performance of this Subcontract, as more fully described in the particular Project Agreement. As set forth above, the Subcontractor agrees to be bound to the Construction Manager, and to assume toward the Construction Manager, all of the obligations and responsibilities that the Construction Manager has assumed toward the Owner under the contract between the Owner and the Construction Manager (hereinafter the "Prime Contract"). These assumed obligations and responsibilities shall include, but not be limited to, all work necessary and/or reasonably inferable to complete Subcontractor's Scope of Work.

(2) Subcontractor's Scope of Work shall include, but not be limited to, all work set forth or implied by that Scope of Work set forth in the particular Project Agreement.

**ARTICLE VI**
**ADDITIONAL OR DELETED WORK**

**A. MODIFICATION ORDERS**

The Construction Manager may at any time order changes in the Work; such Work to be described by Change Orders presented to the Subcontractor. Increases or decreases in the Contract Sum shall be determined, where possible, as follows: (1) a lump sum; (2) unit costs; or (3) a predetermined cost plus 10% markup as agreed to by the Construction Manager and Subcontractor prior to the execution of the Work (as such term is defined in the current edition of the AIA Standard Form of Agreement Between Owner and Subcontract where the basis of payments is the cost of the work plus a fee; such work is not to be performed with overtime without the prior written consent of the Construction Manager).

Without invalidating this Subcontract, the Construction Manager may add to or reduce the Work to be performed hereunder. If the provisions of the Subcontract or the Owner require the Construction Manager to file, within a specified time period, notices, claims or other documents with the Owner in order to receive compensation for extra or change work, the Subcontractor shall comply with these requirements so as to allow Construction Manager to timely file them with Owner. No extra work or changes from the plans and specifications for the project will be recognized or paid, unless agreed to in writing before the extra work is started or the changes are made. Subcontractor agrees that it shall make no claim for extra or additional compensation on account of any such Work, unless same has been done pursuant to a written order, signed by the designated representative of the Construction Manager as having the authority to order such Work, as provided herein. If such additions, alterations, or deviations shall result in the omission of any of the Subcontractor's Work, then the fair and reasonable value of the omitted Work shall be deducted from the particular Contract Sum. Unless otherwise agreed, if the Subcontractor performs extra work other than overtime work ordered by the Construction Manager, it shall receive the predetermined cost plus 10% markup as agreed to by the Construction Manager and Subcontractor prior to the execution of

S

the Work. Notwithstanding the foregoing, at the sole option of the Construction Manager, the Subcontractor shall receive either: (i) unit prices as specified in the Subcontract Documents; or (ii) payment shall be made on a time and material basis. In the event the Prime Contract has a more restrictive method to calculate the amount paid for change work, the Subcontractor shall be bound by the terms of the Prime Contract. In no event shall Subcontractor be entitled to recover any sum greater than the Construction Manager is permitted to recover for the payment of change order work under the terms of the Prime Contract.

In the event that the Construction Manager directs, instructs, or orders the Subcontractor to perform any item of Work which the Subcontractor claims involves extra or additional Work, the Subcontractor within three (3) days after receipt of such direction, instruction or order and before proceeding with the item of Work, submit in writing to Construction Manager its claim that the Work constitutes extra work, giving in detail the basis of its contention and providing a breakdown showing the additional cost of each item of labor, material, equipment and services to be provided. All such change orders must be signed by the Construction Manager's designated representative having the authority to order such work. Subcontractor shall then proceed with this work. The Subcontractor's failure to provide Construction Manager with its written notice of claim within the three (3) days specified, and in the manner as provided herein, shall constitute a waiver of its claim that the work constituted an extra and additional work under this Subcontract and the Subcontractor shall be barred from any recovery on any account of the performance of the particular work. The failure of the Subcontractor to perform this work, immediately after giving written notice of its claim, or on the fourth day subsequent to being directed to perform the work, whichever is less, shall constitute a material breach of this Subcontract, regardless of the legitimacy of the Subcontractor's contentions, as it is specifically understood that the progress of the work may not be delayed by reason of any dispute between the parties.

With respect to any item of work claimed by the Subcontractor to be extra and additional work, including claims arising from alleged omissions, errors, or discrepancies in the plans and specifications prepared by the Owner, upon receipt of the Subcontractor's written notice of claim, the Construction Manager may submit the same to the Architect or Owner's designated representative for its determination as to whether or not the claim constitutes extra work under the Prime Contract and, if so, determine the amount to be paid for such extra work. Any Subcontractor notice of claim must be submitted under the notice requirements to the Construction Manager in a timely fashion so that Construction Manager can review in its sole discretion, submit such claim to the Owner. The Subcontractor agrees to be bound by the determination of the Architect and/or the Owner's designated representative and will accept such payment, if any, as specified by the Architect and paid by the Owner. Should the Architect determine that the work is not an extra and awards no payment for such, or awards partial payment for such claim, Subcontractor agrees to accept such determination and payment as payment in full for the extra work and shall be bound by that determination as provided by this Subcontract.

Should the Construction Manager receive a bulletin, supplement, revision or other change to the Contract Documents together with a request by the Construction Manager to identify any extra or additional work and provide a price to perform said work, the Subcontractor shall submit its proposal to the Construction Manager within ten (10) days of receipt in a formal acceptable to the Construction Manager, unless the Construction Manager, in its sole discretion and in the best interest of the project, requires a shorter time period. It is agreed that if the Subcontractor does not submit such proposal to Construction Manager within ten (10) days, then the Construction Manager may estimate the value of the work to be performed by the Subcontractor or at its sole, exclusive and absolute discretion, may submit its own request for a change order without any additional sums for Subcontractor's performance of the extra or additional work. Subcontractor shall have waived any right to recover any change order and payment for said extras and additional work if it has failed to submit its proposal to the Construction Manager within the time period specified herein.

Should overtime work be ordered by Architect or Owner, due to no fault of the Subcontractor, payment shall be made to the Subcontractor only for the actual premium portion of labor cost of said overtime plus taxes and insurance applicable only to the actual premium portion of such labor cost. Subcontractor shall not be entitled to any profit or overhead for overtime work. In the event that the Construction Manager and the Subcontractor agree that the Subcontractor has been instructed to perform extra work for which a change order should be issued and the Construction Manager and Subcontractor do not agree upon the adjustment to be made to the Contract Sum for said work, the Construction Manager may issue a directive for the performance or deletion of said work and the value of the change order will be decided within a reasonable period of time thereafter, which shall include time for the review and the decision of the Construction Manager, Architect, or Owner. Upon receipt of the directive, Subcontractor shall promptly proceed with its performance or deletion of the work set forth in the directive.

In the event that the Construction Manager and Subcontractor are in dispute as to whether the work constitutes extra work for which a change order should be issued, the Subcontractor shall precede with the performance or deletion of said work as set forth by the Construction Manager. In no event may Subcontractor stop work or suspend work due to the existence of the dispute or a claim.

**ARTICLE VII**
**SCHEDULE**

A. Recognizing that time is of the essence in this Subcontract, the Subcontractor agrees:

(1) To supply materials, labor, and payment as necessary to commence the Work when directed by the Construction Manager;

(2) To diligently pursue the completion of the Subcontractor's Scope of Work and coordinate its work with any and all other work being performed at the Project so as to prevent any delay in Subcontractor's Scope of Work or work by others at the Project;

(3) To acknowledge 1) the Construction Manager's complete control of the premises on which work is to be performed and 2) the Construction Manager's right to decide the time or order in which all work at the Project shall be performed;

(4) To perform its Scope of Work in accordance with the Construction Manager's progress schedule, which schedule may be modified as Project work progresses;

(5) To work overtime, Saturdays, and Sundays at the direction of the Construction Manager without additional cost to the Construction Manager if, in the judgment of the Construction Manager, such overtime and Saturday and Sunday work is necessary due to delays or the likelihood of delays caused by Subcontractor;

(6) To acknowledge that if the Subcontractor delays the progress of the work so as to cause any damage to property for which the Construction Manager shall suffer or become liable, the Subcontractor shall compensate the Construction Manager for any such damages;

(7) To acknowledge that any assent or permission of the Construction Manager to the delayed finishing of the work shall not be construed as a waiver of the Construction Manager's rights to seek damages caused by such delay;

(8) To acknowledge that in the event the work of the Subcontractor is damaged by any person or entity on the site other than the Construction Manager, the Subcontractor shall immediately replace or repair the damaged work so that it is in "like new" condition and the Subcontractor shall look only to that person or entity that caused the damage for restitution;

(9) To acknowledge that the Construction Manager shall not be liable to the Subcontractor for any delays to the Subcontractor's work resulting from acts, negligence, or default of the Owner, the Construction Manager, or other Subcontractor(s), their employees or representatives, or by reason of fire or other casualty, weather, riots, strikes, acts of God, force majeure, or any cause beyond the Construction Manager's control.

B. If the Subcontractor fails to complete the Work as scheduled in Article II above, or as extended in writing by the Construction Manager, then the Subcontractor shall pay to the Construction Manager, as liquidated damages, an amount equal to the liquidated damages that Construction Manager owes to the Owner as provided in the Prime Contract. Since the exact amounts of the Construction Manager's losses due to the Subcontractor's delay in performance are not readily ascertainable, the amounts herein constitute agreed upon damages and not a penalty.

C. Should the Subcontractor be delayed in the commencement, prosecution or completion of the Work because of damage caused by fire or other casualty, or extraordinary conditions arising out of war or government regulations, or other cause beyond the Subcontractor's control and not due to any fault, neglect, act or omission on its part, then the Subcontractor shall be entitled as its sole remedy for such delay to an extension of time, but only for a period equivalent to the time lost by reason of any and all of the aforesaid causes, as determined by the Construction Manager. The Subcontractor shall not be entitled to any such extension of time, however, unless a claim is presented in writing to the Construction Manager within seven (7) calendar days of the commencement of such claimed delay. Such extension or extensions of time shall release and discharge the Construction Manager of and from any and all claims of whatever character by the Subcontractor on account of the aforesaid or any other causes of delay.

## ARTICLE VIII

A. RESPONSIBILITIES OF SUBCONTRACTOR
Responsibility of Subcontractor with regard to other Subcontractors performing Work on the Project:

(1) The Subcontractor shall not interfere with other firms', Subcontractors', or supplier' introduction and storage of their material and the execution of their work, and shall properly coordinate the Subcontractor's work with the work of other firms, Subcontractors or supplier.

(2) COOPERATION
The Subcontractor shall cooperate with other firms, subcontractors, or suppliers on the Work and with the Construction Manager so that all portions of the Work may be completed in the least possible time within normal working hours. The Subcontractor shall furnish to the Construction Manager, immediately subsequent to execution of this Subcontract, detail and erection drawings giving full information regarding the fabrication and assembly of the Subcontractor's work wherever the Subcontractor's work is to be fitted into the work of others.

(3) INSPECTION OF OTHERS' WORK
If the proper execution of any part of the Subcontractor's Work depends on the results of any other separate Subcontractor, the Subcontractor shall inspect and promptly report to the Construction Manager any apparent discrepancies or defects in such work that render it unsuitable for such proper execution and results. Failure of the Subcontractor to so inspect and report shall constitute an acceptance of the other Subcontractor's work as fit and proper to receive the Subcontractor's work, except as to defects, which may develop in the other separate Subcontractor's work after the execution of the Subcontractor's Work.

(4) PROTECTION OF WORK
Subcontractor shall take every reasonable precaution to protect its Work or materials from loss or damage. If Subcontractor or its employees are responsible for any loss or damage to the Work or materials of the Owner, the Owner's separate Subcontractors, or any other Subcontractor, it shall be charged with same, and any monies necessary to replace such loss or damage shall be deducted from monies due to the Subcontractor.

(5) CUTTING AND PATCHING
The Subcontractor shall do all cutting and fitting necessary to complete its Work in a neat and workmanlike manner so as to minimize the cost of patching by other Subcontractors of their Work. The Subcontractor shall patch all of its Work by not interfering with other Subcontractors in the progress of their Work. The Subcontractor shall not endanger any work of any other subcontractors or any portion of the Project by cutting, excavating or otherwise altering any work. Any costs caused by such work, which is defective or ill-timed, shall be borne by the party responsible therefore.

B. LIST OF SUPPLIER, EMPLOYEES, AND AGENTS

Page 6of 18                                                  S

No later than five (5) days following the execution of the particular Project Agreement, the Subcontractor shall provide the Construction Manager with a written list of each supplier, employees, and agents who the Subcontractor intends to involve in the Work and with Certificates of Insurance for each. The list shall be updated in writing as any change occurs.

## C. STORAGE
The Subcontractor shall use only such areas as are designated by the Construction Manager for storage.

## D. CLEANING
The Subcontractor, at all times, shall keep the premises free from accumulation of waste materials or rubbish caused by its operations. At the completion of its Work, it shall remove all of its waste materials and rubbish from and about the Project as well as all of its tools, surplus and demolished materials, construction equipment and machinery, which shall be the property of the Subcontractor, and leave the Work area "broom clean" or its equivalent. If the Subcontractor fails to clean up, the Construction Manager may do so and the cost thereof plus 15% overhead and profit shall be charged to and paid by the Subcontractor.

## E. COMMUNICATIONS
All communications of the Subcontractor concerning the Work or the Project shall be made through the Construction Manager's designated project manager.

## F. DISCIPLINE
The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work, any unfit person or anyone not skilled in the task assigned to it. The Subcontractor agrees to remove promptly any employee designated by the Construction Manager as unsatisfactory.

## G. MATERIALS AND WORKMANSHIP
The Subcontractor agrees and warrants that all materials furnished under this Subcontract will be new unless agreed to in writing by the Construction Manager, and that all Work will be free from faults and defects and in conformance with the Subcontract. All work not so conforming to these standards shall be considered to be defective and shall be removed from the job and promptly replaced at the Subcontractor's expense. If required by the Construction Manager, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of the materials. The warranty provided in this paragraph shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract.

## H. SHOP DRAWINGS AND SAMPLES
(1) Shop drawings and samples shall be property identified. At the time of submission, the Subcontractor shall inform the Construction Manager, in writing, of any deviation in the shop drawings or samples from the requirements of the Subcontract. Upon submission, the Construction Manager will review and approve shop drawings and samples within a reasonable time. Should corrections be required by the Construction Manager, the Subcontractor shall resubmit corrected copies of shop drawings or new samples until approved or "approved as noted." The Construction Manager's approval of shop drawings or samples shall not relieve the Subcontractor of responsibility for any deviation from the requirements of the Subcontract unless agreed by Construction Manager in writing. Construction Manager's approval shall not relieve the Subcontractor from responsibility for errors or omissions in the shop drawings or samples. No portion of the Work requiring a shop drawing or sample submission shall be commenced until the submission has been approved by the Construction Manager and all such portions of the Work shall be in accordance with such approved shop drawings and samples.

(2) The Subcontractor shall carefully examine the Contract Documents to identify and approve all material to be submitted, such as, shop drawings, data, schedules, samples, etc. Such submittals shall be made at the Subcontractor's expense and in such form as required by the Contract Documents in sufficient time to prevent any delay in the delivery and installation of such materials. The Subcontractor shall notify the Construction Manager in writing of the lead times and shipping times of all materials.

## I. AS-BUILT DRAWINGS
Upon completion of the Work or any portion thereof, the Subcontractor shall submit, with reasonable promptness, drawings of such Work or portion thereof, "As-Built", as required by the Construction Manager. The Subcontractor shall keep "As-Built" drawings up-to-date as the Work progresses and shall not wait until the end of the job to prepare.

## J. SUBCONTRACTOR'S REPRESENTATIVE
(1) The Subcontractor shall provide the services of a competent representative, as approved by the Construction Manager, from the commencement of the construction to final completion and acceptance of the Work to act as the Subcontractor's liaison with the Construction Manager; the Subcontractor or such representative shall be available for communications from the Construction Manager at all times during the progress of the Work.

(2) Such representative shall represent the Subcontractor in its absence from the Work, and all directions, instructions or notices given to the representative by the Construction Manager shall be as binding as if given to the Subcontractor.

## K. ROYALTIES AND PATENTS
The Subcontractor shall pay all royalties and license fees. It shall defend all suits or claims for infringement of any patents and shall defend and hold the Construction Manager harmless from loss on account thereof, except that the Construction Manager shall be responsible for all such loss when a particular process or product is specified by it unless the Subcontractor shall have information that a particular process or product infringes a patent, in which event, the Subcontractor shall be responsible for loss on account thereof unless the Subcontract promptly provides such information to the Construction Manager.

## L. PERMITS, FEES, TAXES AND NOTICES

S

(1)  The Subcontractor shall secure and pay for all permits, governmental fees, licenses and/or certificates necessary for the property execution, completion, and occupancy of the Work.

(2)  The Subcontractor shall give all notices and comply with all laws, ordinances, rules, regulations and orders of any public authority or utility company bearing on the performance of the Work.  If the Subcontractor performs any work contrary to such laws, ordinances, rules and regulations, it shall assume full responsibility therefore, and shall bear all costs attributable thereto or resulting therefrom.  The Subcontractor shall be solely responsible for the expense of conforming its Work to such laws, ordinances, rules and regulations.

(3)  Subcontractor will pay all social security and other taxes imposed upon it as an employer in connection with the performance of this Subcontract, and will furnish evidence, when required by the Construction Manager, showing that all such payments required to be made have been paid.  Subcontractor shall pay all local, state, and federal taxes in connection with its Work.

**M. FIELD ENGINEERING AND CONSTRUCTION MANAGER'S REFERENCE POINTS**
The Subcontractor shall be responsible for all engineering necessary for the proper execution and completion of the Work and shall confirm the Work to the reference points provided by the Construction Manager.

**N. LABOR RELATIONS**
The Subcontractor agrees that in the performance of the Work it will employ only such labor as will not delay or interfere with the speedy and lawful progress of the Project, and as will be acceptable to and work in harmony with all other workers employed on the construction site or on any other building, structure, or other improvement whether public or private which the Construction Manager may then be erecting or altering.  In the event of a strike resulting from a union jurisdictional dispute, involving or affecting the labor employed by Subcontractor, the Construction Manager may, at its option, terminate this Subcontract but shall compensate the Subcontractor for the value of labor and material furnished proportioned upon the Contract Sum. All municipal, state, and federal Anti-Discrimination and Right-to-Work Laws will be observed by Subcontractor in the employment of all personnel for this Subcontract.

**O. FAILURE TO MAN**
If the Subcontractor should refuse enough properly skilled workers or proper materials, then the Construction Manager may, after giving the Subcontractor 48 hours written notice, terminate the employment of the Subcontractor and take possession of the premises and of all materials, tools, and appliances thereon and finish the Work by whatever method the Construction Manager may deem expedient. In the event the Subcontractor shall correct the situation, which caused the notice of cancellation to be given to the Construction Manager, within the period of 48 hours from the time of receipt of such notice, the cause of cancellation shall be deemed waived, and this Subcontract shall continue in effect in the same manner as though such cause of cancellation had not existed, with the exception that the Construction Manager is obligated to make only one such notice and any subsequent refusal or failure of the Subcontractor to supply enough properly skilled workers or proper materials shall effect a termination of the employment of the Subcontractor without further notice to the Subcontractor.

**P. GUARANTEE**
(1)  Subcontractor warrants and guaranties that all materials and equipment furnished under this Subcontract will be new unless otherwise specified, and that its work under the Subcontractor's Scope of Work will be of good quality, free from faults and defects and in conformance with this Subcontract.  The Subcontractor shall repair and make good any defect in the Subcontractor's workmanship or materials that may appear within one (1) year after the date of that acceptance by the Construction Manager of the entire Project, it being understood that the Subcontractor's obligation under this Section shall not be conditioned upon a determination of any reason or cause for the existence of such defect.

(2)  However, the foregoing Guarantee shall not deprive the Construction Manager of any action, right or remedy otherwise available to it for breach of any of the provisions of the Contract Documents by the Subcontractor, including but not limited to the failure of the Subcontractor to conform the Work to the design and performance criteria specified in such document.

**Q. BRAND NAME APPROVAL**
No later than ten (10) days following execution of this Subcontract, the Subcontractor shall provide the Construction Manager with the brand names of the materials the Subcontractor will be using in connection with the work.  The brands shall be subject to the approval of the Construction Manager, which shall not be unreasonably withheld.

**R. TESTS**
The Construction Manager shall have the right to perform tests on samples, work in progress and completed work.  Subcontractor shall supply labor and materials for such tests.

**S. SAFETY**
(1) Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Project is its responsibility.  Subcontractor agrees to comply with all Federal, State, County, and Municipal laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the Work, including, without limitation, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules regulations, and orders which have been and shall be adopted or issued thereunder, and with safety standards established by Construction Manager, during the progress of the Work.  When so ordered, the Subcontractor shall stop any part of the Work which Construction Manager deems unsafe and shall immediately implement at Subcontractor's cost corrective measures satisfactory to Construction Manager.  Subcontractor agrees that it shall not have or make any claim for damages growing out of such stoppages.  Should the Subcontractor neglect to take such corrective measures, Construction Manager may do so at the cost and expense to the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor.  Failure on the part of Construction Manager to stop unsafe practices shall in no way relieve the Subcontractor of its responsibilities therefore.

(2) Subcontractor agrees to reduce the Contract Sum by $1,000.00 and/or removal from the site, as determined by the Construction Manager, for each occurrence when an employee of the Subcontractor or any employees of its subcontractors are on the premises and not wearing a hard hat or required eye protection, or is not properly using any other safety protection required by the character of the Work. Subcontractor agrees to remove any employee from the premises who is not in compliance and compromises safety.

(3) Subcontractor shall notify Construction Manager of any injury to any of its employees or any employee of its subcontractors on the day of the injury and provide a written description of the injury within 24 hours of such injury.

(4) Subcontractor shall hold weekly site safety "tool box" meetings and shall provide proper minutes of such meetings in writing to Construction Manager within five (5) working days after the meeting is held. Subcontractor understands that the trade foreman must attend Construction Manager's weekly site safety "tool box" meetings.

(5) When safety protection has been installed by others, if required for the performance of the Work, the Subcontractor may remove this protection for the installation of the Work and must replace such protection or provide a suitable and acceptable alternative in accordance with Federal, State, County and Municipal jurisdictional agency standards and which is also acceptable to Construction Manager.

(6) Notwithstanding any other provision of the Subcontract, the Subcontractor agrees that it is ultimately responsible for all construction safety procedures and precautions under Federal, State, County and Municipal law, and the Subcontractor shall hold, indemnify, defend and save the Owner, the Architect and Construction Manager and all of their employees and affiliates harmless from and against any and all claims or expenses including attorneys' fees and disbursements resulting from any act taken by any employee of the Subcontractor, its subcontractor, or any injury for damage caused by any unsafe or negligent act or occurrence resulting from, or in connection with, the Work.

The Construction Manager shall designate a responsible member of the Construction Manager's organization at the project whose duties shall include overseeing safety precautions and who shall also have authority to order the Subcontractor to stop any practice or correct any conditions deemed in his sole discretion, to be unsafe.

## ARTICLE IX

### A. DISPUTE RESOLUTION

Any and all disputes between the parties shall be resolved in a manner determined exclusively by the Construction Manager, including, but not limited to, arbitration with the American Arbitration Association. If Subcontractor wants to make a claim against the Construction Manager, Subcontractor agrees that it will inquire of the Construction Manager in writing, sent by Certified Mail, Return Receipt requested, which form of Dispute Resolution it desires be used for the claim. The Construction Manager shall have seven (7) days from the date it receives the written inquiry sent pursuant to this Article to respond to Subcontractor in writing setting forth the desired forum for the dispute. In the event that Arbitration is selected by the Construction Manager, such Arbitration shall take place in Morris County, New Jersey. If the Construction Manager fails or refuses to set forth a forum for the dispute, Subcontractor must choose litigation in the State courts located in the State of New Jersey,, and venue shall be in such County in which Construction Manager is located. The only exception to the foregoing is where a specific statute of a particular State mandates that venue for a dispute take place in the State that the particular Project is located.. If a dispute is resolved through Arbitration, the Construction Manager reserves the right to join all other necessary parties.

B. Pending final resolution of any dispute or claim, Subcontractor shall proceed diligently with the performance of the Subcontract.

C. Should Construction Manager employ an attorney to institute suit or demand arbitration to enforce any of the provisions of this Subcontract, to protect its interest in any matter arising under this Subcontract, to collect damages for the breach of this Subcontract, or to recover on a surety bond given by a party under this Subcontract, and Construction Manager prevails in said action, then in addition to any other damages Construction Manager may be awarded, Construction Manager is entitled to recover reasonable attorney fees, costs, charges and other expenses expended or incurred therein as part of its verdict or award.

## ARTICLE X
## SEPARATE CONTRACTS

The Construction Manager reserves the right to enter into other contracts in connection with the Project.

## ARTICLE XI
## ASSUMPTION OF RISK

The Subcontractor represents that prior to submitting its proposal for the Work it has examined carefully all of the Contract Documents, acquainted itself with the site and all other conditions relevant to the Work, and made all investigations essential to a full understanding of the difficulties which may be encountered in performing the Work. The Subcontractor assumes full and complete responsibility for, and all risk in connection with the Work. Should concealed conditions encountered in the performance of the Work below the surface of the ground be at variance with the conditions indicated by the Subcontract or should unknown physical conditions below the surface of the ground of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Subcontract be encountered, then the Contract Sum shall be equitably adjusted by Modification Order upon claim by either party made

Page 9of 19

S

within a reasonable time after the first observance of the conditions.

**ARTICLE XII**

**A. PROGRESS PAYMENTS**
The Construction Manager will make progress payments to the Subcontractor on account of the Contract Sum on or before the 30th day of the month an amount equal to 90%, provided that the payment has been made by Owner to the Construction Manager, of the value of work in place completed during the previous month and provided that an approved invoice is received by the 25th day of such preceding month.

If, in Construction Manager's discretion, Construction Manager makes payment to Subcontractor, minus retainage and/or other contractually allowed deductions, within 10 days of the first of the month following Subcontractor's timely submission of its invoice by the 25th day of the previous month, Construction Manager shall be entitled to deduct 2% of the monies owed Subcontractor for Construction Manager approved Work in place. Thereafter, the Contract Sum shall be adjusted by this two percent (2%) reduction. Regardless of whether the Subcontractor's invoice is submitted on the 25th day of the month, Construction Manager shall be entitled to deduct 2% of the monies owed Subcontractor for Construction Manager approved Work in place if such payment is made to Subcontractor within fifteen (15) days of receipt of such invoice consistent with this subsection.

The Subcontractor agrees that the Construction Manager has the right to make payment directly by joint check to any subcontractor, vendor, or supplier of the Subcontractor, and any such payments made by Construction Manager will be credited against any amounts otherwise owed to Subcontractor. No payment shall be made until all improper or rejected Work is corrected, and no payment shall be considered as an acceptance of any defective Work under this Subcontract. All material and Work covered by application, including any stored materials on or off-site, become the property of the Construction Manager and/or the Owner upon payment of the respective application.
**B. CERTIFICATION AS TO PAYMENT AND WAIVER**
As a condition precedent to the Subcontractor's receipt of a progress and/or final payment from the Construction Manager, the Subcontractor shall provide the Construction Manager with the following:

(1)  Written certification of the Subcontractor that payment in the sum of $ Amount [specify the total of all payments the Subcontractor received to date from the Construction Manager for the Work] was received from the Construction Manager and that there are no liens or encumbrances whatsoever on the title to the premises relating to the Work;

(2)  Written certification of each of the Subcontractor's supplier and agents that it has no claims against or offsets as to the Subcontractor or the Construction Manager for work performed or materials supplied in connection with the Work;

(3)  Written waiver from the Subcontractor as to construction lien rights, if any, to the extent of $ Amount [specify the total of all payments the Subcontractor received to date from the Construction Manager for the Work]; and

(4)  Written waivers from each of the Subcontractor's supplier and agents as to construction lien rights, if any, to the extent of $ Amount [specify the total of all payments the person giving the waiver has received from the Subcontractor to date in connection with the work].

(5) Work performed and requested to be paid for is accepted and approved by the Construction Manager, the Architect and the Owner.

(6) Approved and in force Certificates of Insurance on file with the Construction Manager and has supplied the Construction Manager with acceptable performance and payment bonds, if required, by the Construction Manager.

Construction Manager shall have the right to withhold payment for the Subcontractor's failure to submit a proper request for payment, failure to submit all required waivers of liens and releases, for claims of unpaid lower tier subcontractors or suppliers, for disputed claims, for defective Work not remedied, because of any delay on the part of the Subcontractor, for any breach of this Subcontract by Subcontractor, or for payments due to Construction Manager on this Project or any other project. Construction Manager may in its sole, exclusive and absolute discretion give guarantees or make payments to others for labor, equipment, material or services furnished or to be furnished on behalf of the Subcontractor and may deduct the amount of such guarantees or payments from any payments which may otherwise become due under this Subcontract. Construction Manager shall have the right to disregard any Schedule of Values that the Subcontractor may have furnished and defer or withhold in whole or in part any payment if it appears to the Construction Manager, in its sole, exclusive and absolute discretion, that the balance available in the Contract Sum, as adjusted and less retained percentages, may be insufficient to complete the Work. The obligations of the surety or sureties (if applicable) or the Subcontractor under any performance, payment or other bond given by such sureties and Subcontractor hereunder shall not be waived, released, or discharged by reason thereof. Neither the failure of the Construction Manager to retain any percentage payable to the Subcontractor, nor any payments made to the Subcontractor or on its behalf, which represent a change in or variations to the requirements of the Subcontract pertaining to the time, method, condition, or amount of payments to be made to the Subcontractor, nor the giving of any guaranty to others for labor and materials required to be furnished shall be construed in any manner to waive, release or discharge the obligations of the surety for sureties under any performance, payment or other bonds given by said sureties and Subcontractor hereunder.
Should the Construction Manager require the Subcontractor to provide performance and payment bonds for the Work, the bond instruments must accompany the Subcontractor's first draw and include a copy of the invoice for bond premium reimbursement. The surety bond forms and company underwriting the bonds must be acceptable to the Construction Manager as a precedent to any payment.
No payment shall constitute evidence of the performance or progress of the Work or imply acceptance by the Owner, Architect, or Construction Manager of the Work. Subcontractor agrees that payment by the Construction Manager

S

constitutes a release of the Construction Manager from all claims, liabilities, other than retainage, for any Work, services, material, or equipment performed or provided during the period in which the payment relates. Acceptance of payment by the Subcontractor shall constitute a general release against the Construction Manager, its surety, and the Owner. Subcontractor hereby agrees to make prompt payment to all lower-tier persons and/or entities furnishing labor, materials, services or equipment to Subcontractor in the prosecution of the Work hereunder, and that such payment is of the essence to this Subcontract. Subcontractor agrees that if and when requested to do so by Construction Manager it shall furnish such additional information, evidence and documents as Construction Manager may require with respect to the nature and extent of all obligations incurred by the Subcontractor for and in connection with its Work, and all payments made by the Subcontractor therefore, and the amounts remaining unpaid to any sub-Subcontractor or supplier. Subcontractor shall earmark all payments made to Subcontractor's sub-subcontractors, materialmen, and suppliers by: (a) identifying the particular project which payment is being made; and b) including language on the check limiting application of the payments to bills owed on the particular project. In the event Subcontractor or its sub-subcontractors, suppliers, or materialmen, or a lower tier persons and/or entities acting through or under it or them, fails to pay any sum of money, including union dues and benefits, due any party furnishing labor, materials or equipment hereunder, or fails to pay any tax obligations or premiums due for insurance or surety bonds, the Construction Manager is hereby authorized to exercise its sole and exclusive and absolute discretion and retain out of any payment due or to become due hereunder any portion of said unpaid sum and to pay same directly to the party to whom the sum is due. The provisions of this paragraph shall not require Construction Manager to determine the validity of or adjust any claims or disputes between those parties furnishing labor, materials, services or equipment hereunder, or withhold any money or make payments for their protection; nor shall Construction Manager be liable to any party for its failure to do so.

The Construction Manager may deduct from any Contract Sum, any sum owed to the Construction Manager and in the event of any breach by Subcontractor of this Subcontract, or in the event of the substantial assertion by others of any claim or lien against the Owner, Construction Manager, or Construction Manager's surety, which claim or lien arises out of the Subcontractor's performance, the Construction Manager may retain out of any payment due to Subcontractor an amount sufficient to protect Construction Manager from any and all loss, damage or expense therefrom, until the claim or lien has been adjusted by the Subcontractor to the satisfaction of the Construction Manager, even though the Subcontractor may have posted a payment or performance bond.

C. VALUE OF WORK
The value of the work in place completed during the previous month shall be that amount which is estimated by the Subcontractor and approved by the Construction Manager. In the event of non-approval by the Construction Manager, the Construction Manager will apply to the Architect for certification as to the value of work in place completed during the previous month. The Architect shall determine the value of the work in the event of a dispute.

D. PARTIAL PAYMENTS
Partial payment shall not constitute acceptance of the Subcontractor's work by the Construction Manager or be construed as a waiver of any right or claim by the Construction Manager in connection with the Work.

E. INVOICES
The Subcontractor shall submit his invoices by the 25th of each month with detailed cost breakdown in accordance with the attached Application for Payment Form or the AIA 702 and 703 documents.

F. PAYMENTS TO SUBSUBCONTRACTOR AND SUPPLIERS
The Subcontractor, at the Construction Manager's request, shall furnish evidence of payments to his supplier, suppliers and employees.

G. FINAL PAYMENT
The Construction Manager will make Final Payment to the Subcontractor after Subcontractor's Scope of Work is completed and accepted by the Owner and Architect, and once final payment has been made by Owner to Construction Manager. Before submitting his application for Final Payment the Subcontractor shall, unless the Construction Manager shall otherwise direct, do the following:

(1) Submit to the Construction Manager an affidavit certifying that the Subcontractor has paid all Federal, State and local taxes including excise, use and sales taxes and unemployment and workers compensation insurance.

(2) Pay and obtain recorded releases of all notices of unpaid balance, lien claims, lis pendens, mechanics, materialmen's and like liens which affect the premises.

(3) Deliver to the Construction Manager his written undertaking, with sureties acceptable to the Construction Manager:
(i) to promptly pay and obtain recorded releases as to any notices of unpaid balances, which shall mean lien claims, lis pendens, mechanics, materialmens' and like liens in connection with the work covered by this Contract which may in the future affect the premises; and
(ii) to defend and indemnify and save the Construction Manager harmless from any liability or expense because of any such lien or the enforcement thereof; and

(4) Deliver to the Construction Manager all required guarantees and warranties; and

(5) Deliver to the Construction Manager three (3) copies of operation and maintenance manuals for all major equipment; and

(6) Deliver to the Construction Manager one reproducible drawing of any design work done by Subcontractor and two (2) sets of "As-Built" drawings (one in reproducible form).

H. PAYMENT IN FULL
The Subcontractor, by acceptance of the Final Payment, warrants that he has received payment in full for his performance of

the Subcontract and waives all further claims against the Construction Manager in connection with the Work. Final Payment by the Construction Manager shall be conclusive proof of the Construction Manager's performance of the Subcontract.

### ARTICLE XIII
### INSURANCE

#### A. DEFINITION
(1)  Subcontractor, as used in this Article XIII shall mean the Subcontractor and any and all of the Subcontractor's supplier, employees, agents and representatives.

(2)  Extended Coverage is the usual form currently available and covering perils of windstorm, hail, explosion, riot and civil commotion, damage from aircraft and vehicles and smoke damage.

#### B. FIRE, EXTENDED COVERAGE, VANDALISM AND MALICIOUS MISCHIEF INSURANCE
(1)  Owner or Construction Manager, will, at its expense, provide Fire, Extended Coverage, Vandalism, Malicious Mischief Insurance on the building under construction, including materials, plus equipment, machinery and apparatus, all of which are incorporated in and a part of the building at time of loss.

(2)  Subcontractor will, at its expense, provide Fire, Extended Coverage, Vandalism, and Malicious Mischief Insurance on all unincorporated materials, supplies, equipment, machinery and apparatus. Owner and Construction Manager shall not be responsible in any manner for property, tools, equipment, or machinery (whether owned, leased, used, rented, borrowed or otherwise) of the Subcontractor or supplier or the employees or agents of either of them except as provided in the preceding paragraph.

#### C. GENERAL PROVISIONS
Subcontractor, upon execution of this Subcontract and until final completion and acceptance of the Subcontract, shall maintain worker's compensation insurance, public liability insurance, property damage liability insurance, contractual liability insurance, umbrella liability insurance, comprehensive automobile liability insurance, and such other insurance as provided herein with an insurance company or companies acceptable to the Subcontractor in the following amount: SEE SCHEDULE "B" - INSURANCE LIMIT REQUIREMENTS

Compliance with this Article shall be evidenced by furnishing to the Owner and Construction Manager satisfactory certificates of insurance from acceptable carriers, prior to commencement of work under this Subcontract, which shall contain a statement that such policies will not be canceled until after at least thirty (30) days written notice by registered mail to that effect has been given to the Owner and Construction Manager. Each such insurance policy shall include the Owner and the Construction Manager as additional insured.
#### (1) PUBLIC LIABILITY INSURANCE
Subcontractor shall provide Public Liability and Broad Form Property Damage insurance including Completed Operations and the indemnity agreement as outlined in paragraph D. Limited coverage shall be in the amount as indicated on Schedule B attached hereto. Completed Operations Coverage shall be continued for not less than three (3) years after acceptance of the Work under Subcontract by the Construction Manager.

#### (2) AUTOMOBILE INSURANCE
Subcontractor shall provide Automobile Bodily Injury and Property Damage Insurance covering all vehicles owned and non-owned, moving under its own power and engaged in the Work under Subcontract. Limits are to be no less than called for in Schedule B.

#### (3) WORKER'S COMPENSATION INSURANCE
Subcontractor shall carry Worker's Compensation Insurance on his employees and cause any and all of the Subcontractor's supplier, employees, agents and representatives to carry such insurance on their employees in accordance with the laws of the State in which the Work is to be performed.

#### (4) HAZARD INSURANCE
Hazard Insurance coverage shall be provided by the Subcontractor for all materials stored on or off site for which payment is included in monthly invoices, and a certificate of insurance indicating the Construction Manager and the Owner as additional insured shall be attached to the invoice.

#### (5) POLLUTION INSURANCE
Site Subcontractors or such Subcontractors that handle contaminated soils and/or materials, as reasonably determined by Construction Manager, shall carry insurance covering the hazardous and/or contaminated soils or materials which may be either brought to and/or removed from the Site by Subcontractor and/or which are contaminated by Subcontractor and/or its agents as a result of their activities on or about the Site.

#### D. INDEMNITY AGREEMENT
To the fullest extent permitted by law, the Subcontractor agrees to defend, indemnify and hold harmless the Construction Manager, the Owner, and any other party whom the Construction Manager has agreed to defend, indemnify and hold harmless, as well as each of their officers, directors, partners, agents, servants, employees, successors and assigns (collectively, the "Indemnitees") from and against any and all claims, damages, losses, costs and expenses of any kind, including but not limited to attorneys fees, incurred by reason of any breach of Subcontract, environmental claims, arising out of or in any way connected with the performance or lack of performance of the Work under this Subcontract, and any change orders or additions to the Work included in this Subcontract, any liability for damage because of bodily injury, including death resulting from such injuries, or property damage to real and personal property of any kind whatsoever, sustained by any person or persons, whether employees of the Subcontractor or otherwise, resulting from, arising out of, or occurring in connection with the performance of the Work provided for in this Subcontract, together with any change orders

S

or additions to the work included in the Subcontract.

The Subcontractor agrees that the obligation to defend, indemnify and hold harmless, as described above, specifically includes the obligation to defend, indemnify and hold harmless the indemnitees for the indemnitees' shall be absolute, excepting from the foregoing the sole negligence of the Construction Manager.

The Subcontractor agrees that the obligation to defend commences when a claim is made against an indemnitee, even if the Subcontractor disputes its obligation to indemnify and hold harmless. The defense shall be provided through council chosen by the indemnitee, and the Subcontractor agrees to pay for the defense of indemnitee upon demand.

The indemnity obligation under this Subcontract shall not be construed to negate, abridge, or reduce any other right or obligation of indemnity that would exist as to any person or entity described in this Subcontract. The indemnity obligations set forth in this Subcontract shall not be limited by any limitation on the amount or type of damages, compensation, or benefit payable by or for Subcontractor. In addition, the indemnification obligations under this Subcontract shall not be limited in any way by the amount or type of insurance required to be provided to or for the benefit of an indemnitee as described in this Subcontract.

The obligation to defend, indemnify and hold harmless, as described above, survives completion or acceptance of the work. This indemnification clause supersedes any other indemnification clause in the contract documents, including those that are incorporated by reference, that conflict with it in any way. Subcontractor also agrees to contractually bind its subcontractors (if any) to defend, indemnify and hold harmless the indemnitees to the same extent as the Subcontractor is obligated. This indemnification clause, irrespective of any other choice of law provision, shall be interpreted according to the laws of the State of New Jersey..

**E. EXCLUSIONS**
No policy shall contain any provisions for exclusions from liability other than provisions to exclude from liability forming part of the standard basic unamended and unendorsed form of policy, except that no exclusions will be permitted in any event if it conflicts with a coverage expressly required in this Subcontract, and in addition, no policy shall contain any exclusions from bodily injury to or sickness, disease or death of any employee of Subcontractor which would conflict with or in any way impair coverage under the contractual liability endorsement of the liability of the Subcontractor under this Subcontract.

**F. FAILURE TO MAINTAIN**
In the event of the failure of the Subcontractor to furnish and maintain such insurance, the Construction Manager immediately may terminate this Subcontract or take out and maintain the said insurance for and in the name of the Subcontractor and Subcontractor agrees to pay the cost thereof and to furnish all necessary information to permit the Construction Manager or the Owner to take out and maintain such insurance for the account of Subcontractor. Compliance by Subcontractor with the foregoing requirements to carry insurance and furnish certificates shall not relieve Subcontractor from liability otherwise assumed under any other provisions of this Subcontract.

**G. INSURANCE CONFIRMATION AND CONSEQUENCES.**

Periodically during performance of the Work, in Construction Manager's sole discretion, Construction Manager may request that Subcontractor provide evidence that the insurance policies then in effect (the "Insurance Policies"), are currently paid and in full force and effect. In the event that Subcontractor cannot provide such proof, the Construction Manager may, in its discretion, pay such amounts that are owed to make the Insurance Policies currently paid and in full force and effect through the completion of the Subcontractor's Work (hereinafter the "Insurance Payment"). The Insurance Payment, plus 20% of the Insurance Payment as an administrative fee (the "Administrative Fee"), will be deducted from any amounts owed to the Subcontractor. In the event that the Insurance Payment and the Administrative Fee is more than the amounts owed to the Subcontractor, the Subcontractor shall immediately pay such difference to Construction Manager. In such instance, Construction Manager will have no further payment obligations to the Subcontractor. In the event that the Subcontractor does not maintain the Insurance Policies as provided herein, the Construction Manager, may, in its sole and absolute discretion, immediately terminate the Subcontractor without providing Subcontractor the ability to cure such breach. In addition, the Construction Manager may withhold such amounts which may be due to Subcontractor, in an amount reasonably determined by Construction Manager in its reasonable discretion, until such time that the damages resulting from such loss attributable to Subcontractor not maintaining the Insurance Policies, can be determined by Construction Manager.

**ARTICLE XIII - Schedule B**
**INSURANCE LIMIT REQUIREMENTS**

A. The Subcontractor shall purchase and maintain insurance of the following types of coverage and limits of liability of no less than:
(1) COMMERCIAL GENERAL LIABILITY (CGL) with limits of insurance of not less than $1,000,000 each occurrence and $2,000,000 Annual Aggregate.
(i) If the CGL coverage contains a General Aggregate Limit, such General Aggregate shall apply separately to each project.
(ii) CGL coverage shall be written on ISO Occurrence form CG 00 01 1093 or a substitute form providing equivalent coverage and shall cover liability arising from premises, operations, independent Subcontractors, products-completed operations, and personal and advertising injury.
(iii) Construction Manager, Owner and all other parties required of the Construction Manager, shall be included as insureds on the CGL, using ISO Additional Insured Endorsement CG 20 10 (11 85) or CG 20 10 (10 93) AND CG 20 37 (10 01) or CG 20 33 (10 01) AND CG 20 37 (10 01) or an endorsement providing equivalent coverage to the additional insureds. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured supplier. It shall apply as Primary and non-contributing insurance before any other insurance or self-insurance, including any deductible,

maintained by, or provided to, the additional insured.
(iv) Subcontractor shall maintain CGL coverage for itself and all additional insureds for the duration of the project and maintain Completed Operations coverage for itself and each additional insured for at least 3 years after completion of the Work.

(2) AUTOMOBILE LIABILITY
(i) Business Auto Liability with limits of at least $1,000,000 each accident.
(ii) Business Auto coverage must include coverage for liability arising out of all owned, leased, hired and non-owned automobiles.
(iii) Construction Manager, Owner and all other parties required of the Subcontractor, shall be included as insureds on the auto policy.

(3) COMMERCIAL UMBRELLA
(i) Umbrella limits must be at least $5,000,000.
(ii) Umbrella coverage must include as insureds all entities that are additional insureds on the CGL.

(4) WORKERS COMPENSATION AND EMPLOYERS LIABILITY
(i) Employers Liability Insurance limits of at least $1,000,000 each accident, $1,000,000 for bodily injury by accident, and $1,000,000 each employee for injury by disease.
(ii) Where applicable, U.S. Longshore and Harborworkers Compensation Act Endorsement shall be attached to the policy.
(iii) Where applicable, the Maritime Coverage Endorsement shall be attached to the policy

(5) POLLUTION INSURANCE
(i) Coverage limits must be at least $2,000,000.
(ii) Coverage must include as insureds all entities that are additional insureds on the CGL.
(6) COVERAGE FOR ANY THIRD PARTY PERFORMING WORK ON BEHALF OF SUBCONTRACTOR.
(i) Subcontractor shall not sublet any part of the Work without assuming full responsibility for requiring similar insurance from its subcontractors and shall submit satisfactory evidence to the Construction Manager. Each such policy shall include the Owner and the Construction Manager as an additional insured.

B. WAIVER OF SUBROGATION
Subcontractor waives all rights against Construction Manager, Owner and their agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial umbrella liability, business auto liability or workers compensation and employers liability insurance maintained per requirements stated above. Subcontractor's Workers Compensation policy has WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT with Construction Manager and Owner listed on SCHEDULE.

## ARTICLE XIV
## THIRD PARTY

All guarantees and warranties received by the Subcontractor or his supplier from material dealers, equipment makers or supplier shall be approved by the Construction Manager and shall be made or assigned directly to the Construction Manager. Such guarantees, however, shall be enforced by the Subcontractor if the occasion arises. If the makers of the guarantees or warranties fail to fulfill their obligations there under, any costs incurred by the Construction Manager in connection with such failure shall be at the expense of the Subcontractor.

## ARTICLE XV
## CONTRACT TERMINATION AND SUSPENSION

A. TERMINATION FOR CAUSE
(1) The Construction Manager may terminate this Subcontract or any part thereof after two (2) days written notice is mailed to, delivered personally, or left at the Subcontractor's place of business should any of the following conditions occur:
i. Subcontractor refuses or neglects to supply sufficient, properly skilled workmen as directed by the Construction Manager;
ii. Subcontractor refuses or neglects to supply materials of the proper quality and quantity as specified in the Contract Documents and directed by the Construction Manager;
iii. Subcontractor becomes insolvent or unable to pay its obligation as it matures;
iv. Subcontractor, in the opinion of the Construction Manager, fails in any respect to prosecute the Work with sufficient promptness and diligence to ensure completion in accordance with the progress schedule prepared by the Construction Manager, or fails in the performance of any of the terms and conditions in this Subcontract;
v. If the Construction Manager, in its sole judgment, believes that the Subcontractor cannot perform all or some of its obligations under this Subcontract; or
vi. If the Architect or Owner determines that the Work is not in accordance with the Contract Documents

(2) Upon such termination, the Construction Manager may:
i. Use any materials, implements, equipment, appliances, or tools on the site furnished by or belonging to the Subcontractor in completing the Subcontractor's Scope of Work;
ii. Take over any subcontracts or purchase orders of the Subcontractor, which subcontracts and purchase orders the Subcontractor hereby assigns to the Construction Manager effective upon termination or taking over of the Scope of Work of the Subcontractor in whole or in part, as herein provided; and
iii. Itself or through another Subcontractor furnish any such labor and/or material, in whole or in part, and offset the cost thereof and expenses therefore against any money due or to become due hereunder.

(3) Subcontractor shall be liable for any excess cost to complete Subcontractor's Scope of Work after Termination.

(4) If this Subcontract is wrongfully terminated or the Construction Manager in its sole discretion determines at any time to change the termination for default to a termination for convenience, the Subcontractor agrees that such termination will be deemed to be a cancellation for convenience of this Subcontract under this Article, and Subcontractor shall only be entitled to receive such sums that were to become due upon a termination for convenience of this Subcontract. In no event shall the Subcontractor be entitled to recover anticipated profit upon any unperformed work.

(5) Without limitation, the following obligations, among others shall survive the termination or cancellation of this Subcontract: (i) warranties and guarantees of the Work performed, to the extent that the Work has been performed; (ii) the obligations of the Subcontractor to have performed said Work in accordance with the terms of the Contract Documents; (iii) obligations to defend, indemnify and hold harmless; (iv) payment of taxes, damages, losses and expenses, certifications as previously provided by the Subcontractor or on behalf of Subcontractor; and (v) delivery of materials, data on electronic media and as-built drawings, correction of work, removal of liens, mitigation of damages, including when applicable costs to complete and cooperate with the Construction Manager or construction lender.

(6) The remedies provided under this Article shall be separate and in addition to any other remedies the Construction Manager may have under the Contract Documents or at law or in equity. Subcontractor's guarantors and sureties agree to be bound to the Construction Manager, with respect to such other entities notwithstanding any language to the contrary in their instruments of guaranty or their surety bonds.

(7) Notwithstanding anything to the contrary herein and regardless of whether the termination is complete or partial, whether the termination is for default or for no fault, and whether the termination converted from default to convenience, the Subcontractor's sole and exclusive remedies for termination of this Subcontract shall be those expressly provided and under no circumstances, shall the Subcontractor be entitled to special, consequential, or punitive damages, anticipated or lost profit, or other recovery of any nature except for payment for Subcontract work properly performed and actually completed by the Subcontractor. In no event shall the Subcontractor be entitled to any compensation for Subcontract Work not performed by the Subcontractor or for payment in excess of the Subcontract amount as may be adjusted by property authorized written Change Orders.

B.      TERMINATION FOR CONVENIENCE

(1) The Construction Manager, during the pendency of this Subcontract, may terminate Subcontractor for the Construction Manager's convenience and without cause.

(2) If the Construction Manager terminates Subcontractor for convenience, Subcontractor shall immediately stop all work it is performing, cease ordering materials, terminate all supplier and protect Subcontractor's Scope of Work that is in place.

(3) In the event of a Termination for Convenience, Subcontractor shall be paid for all work in place.


C. SUSPENSION

Construction Manager, the Owner or Architect may at any time, or for any reason, issue a written directive to Subcontractor to suspend or stop work or any part thereof. Such direction shall be in writing and shall specify the period in which the work is to be suspended or stopped. Subcontractor shall resume the Work upon the date specified, and the manner specified or directed, or upon such other date as the Construction Manager may thereafter specify in writing. The period during which the Work shall be suspended or stopped, if warranted under a schedule analysis of critical delays to the substantial completion date, and if the suspension or stoppage was through no fault of the Subcontractor, additional time may be added to the time fixed for performance. At no time, however, shall that time added, be greater than the time authorized by the Owner. A suspension or stoppage of work pursuant to this provision shall not give rise to any claim against the Construction Manager for additional compensation. This clause shall not serve as any limitation on the Construction Manager to seek damages, backcharges, set off, or claims that the Construction Manager may assert against the Subcontractor for any stoppage or delays proximately caused by the acts or omissions of the Subcontractor.

IN WITNESS WHEREOF, CONSTRUCTION MANAGER and SUBCONTRACTOR have signed this Subcontract which has been negotiated and prepared through the joint efforts of the parties, and in so doing, the parties have read, understand, had an opportunity to review with legal counsel and accept all terms and conditions herein. Furthermore, the parties by signing this contract agree the Subcontract does not benefit one party over the other.

SUBCONTRACTOR

BY: _____          Date  8-7-13

WITNESS: _____

ADDRESS: 1360 CLIFTON AVENUE, CLIFTON, NJ 07012

CONSTRUCTION MANAGER: HOLLISTER CONSTRUCTION SERVICES LLC

BY: _____          Date _____

Page 16 of 19

S

# Exhibit D



**MARKEL®**

ENVIRONMENTAL
POLICY NUMBER: 16PKGNE60712

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DESIGNATED WORK/DESIGNATED OPERATIONS

This endorsement modifies insurance provided under the following, where indicated by an "X" below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

| Description of Your Work / Operations: |
|---|
| Asbestos Abatement, Interior demolition related to asbestos abatement, Industrial Cleaning, Underground Storage Tank Removal, Emergency Response, Cleanup, Lead Based Paint Remediation, Mold Remediation, Hazardous Waste Cleanup, PCB Removal, Carpentry, Drywall, Clean up and Insulation. |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

This insurance does not apply to nor shall we have any duty to defend any "suits", claims, or damages, or pay any Supplementary Payments, arising out of "bodily injury", "property damage", "personal and advertising injury", or loss caused by or arising out of your operations or "your work" other than the operations or work shown in the Schedule above.

All other terms and conditions remain unchanged.

MEEI 2213 08 13          Includes copyrighted material of Insurance Services Office, Inc.,          Page 1 of 1
                         with its permission.

28 of 175

**INTERLINE**



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

**CHANGE NUMBER: 2**

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES<br>EFFECTIVE DATE:<br>07/12/2017 | COMPANY:<br>EVANSTON INSURANCE<br>COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br>02860<br>Risk Replacement Services, Inc. RPS Metcom/Paramus<br>245 Main St.<br>Ridgefield Park NJ 07660 | |

| COVERAGE PART(S) AFFECTED: Commercial General Liability |
|---|

The following item(s):

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Insured's Name/Additional Named Insureds | ☐ | Insured's Mailing Address | ☐ | Policy Number |
| ☐ | Effective/Expiration Date/Policy Period | ☐ | Company | ☐ | Locations/Location Description |
| ☐ | Insured's Legal Status/Business Description | ☐ | Minimum Earned Premium | ☐ | Rates |
| ☒ | Coverage Forms and Endorsements | ☐ | Policy Cancel/Reinstatement | ☐ | Limits/Exposures/Premium Basis |
| ☐ | Additional Insureds, Loss Payees, Mortgagees | ☐ | Buildings/Personal Property | ☐ | Deductibles |
| ☐ | Aggregate Cap | ☐ | Classification/Class Codes | ☐ | Underlying Insurance Information |
| ☐ | Per Vehicle Limit | ☐ | Vehicle | ☐ | Drivers |
| ☐ | Vehicle Description (Type/Year/Make/Model/<br>Vehicle Identification Number/Cost New/Value) | ☐ | Equipment | ☐ | Other (describe below) |

is (are) ☒ changed  ☒ added  ☐ deleted as shown below:

Added CG 20 10 07 04 Additional Insured- Owners, Lessees or Contractors- Scheduled Person or Organization to the policy as per attached.

Amended CG 20 37 04 13 Additional Insured- Owners, Lessees or Contractors- Completed Operations to read as per attached.

The above amendments result in a change in the premium as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | NO CHANGES | | TO BE ADJUSTED<br>AT AUDIT | ☒ | ADDITIONAL PREMIUM<br>$ 300 | ☐ | RETURN PREMIUM<br>$ |
| ☐ | NO RETURN<br>PREMIUM –<br>CLAIM STILL IN<br>PROCESS | | NO RETURN<br>PREMIUM –<br>TOTAL LOSS TO<br>INSURED ITEM | ☐ | NO RETURN PREMIUM –<br>FULLY EARNED<br>PROVISION APPLIES | ☐ | OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

MEIL 1203 03 12        Includes copyrighted material of Insurance Services Office, Inc. with its<br>permission.        Page 1 of 1

29 of 175

_____
AUTHORIZED REPRESENTATIVE

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
CG 20 10 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| Any person(s) or organization(s) to whom the insured agrees to provide Additional Insured status in a written contract. | Not Applicable |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

CG 20 10 04 13                    © Insurance Services Office, Inc., 2012                    Page 1 of 2

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

C. With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 04 13**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| Any person(s) or organization(s) to whom the insured agrees to provide Additional Insured status in a written contract. | Not Applicable |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13                    © Insurance Services Office, Inc., 2012                    **Page 1 of 1**

**INTERLINE**



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

CHANGE NUMBER: 3

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES<br>EFFECTIVE DATE:<br>08/28/2017 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br>02860<br>Risk Placement Services, Inc. RPS Metcom/Paramus<br>245 Main St<br>Ridgefield Park NJ 07660 | |

| COVERAGE PART(S) AFFECTED: Commercial General Liability |
|---|

The following Item(s):

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Insured's Name/Additional Named Insureds | ☐ | Insured's Mailing Address | ☐ | Policy Number |
| ☐ | Effective/Expiration Date/Policy Period | ☐ | Company | ☐ | Locations/Location Description |
| ☐ | Insured's Legal Status/Business Description | ☐ | Minimum Earned Premium | ☐ | Rates |
| ☒ | Coverage Forms and Endorsements | ☐ | Policy Cancel/Reinstatement | ☐ | Limits/Exposures/Premium Basis |
| ☐ | Additional Insureds, Loss Payees, Mortgagees | ☐ | Buildings/Personal Property | ☐ | Deductibles |
| ☐ | Aggregate Cap | ☐ | Classification/Class Codes | ☐ | Underlying Insurance Information |
| ☐ | Per Vehicle Limit | ☐ | Vehicle | ☐ | Drivers |
| ☐ | Vehicle Description (Type/Year/Make/Model/<br>Vehicle Identification Number/Cost New/Value) | ☐ | Equipment | ☐ | Other (describe below) |

is (are) ☐ changed  ☒ added  ☐ deleted as shown below:

Added CG 20 10 07 04 Additional Insured - Owners, Lessees or Contractors - Scheduled Person or Organization to the policy as per attached.

Added CG 20 37 04 13 Additional Insured - Owners, Lessees or Contractors - Completed Operations to the policy as per attached.

Added CG 24 04 05 09 Waiver of Transfer of Rights of Recovery Against Others to Us to the policy as per attached.

Added MEEI 2220 09 14 Amendment of Cancellation Provisions to the policy as per attached.

The above amendments result in a change in the premium as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | **NO CHANGES** | ☐ | **TO BE ADJUSTED AT AUDIT** | ☒ | **ADDITIONAL PREMIUM**<br>$ 600 | ☐ | **RETURN PREMIUM**<br>$ |
| ☐ | **NO RETURN PREMIUM –<br>CLAIM STILL IN PROCESS** | ☐ | **NO RETURN PREMIUM –<br>TOTAL LOSS TO INSURED ITEM** | ☐ | **NO RETURN PREMIUM –<br>FULLY EARNED PROVISION APPLIES** | ☐ | **OTHER (DESCRIBE):** |

All other terms and conditions remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 20 10 07 04**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 26 West 17th Street, Suite 801, New York, NY 10011 | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;
in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to "bodily injury" or "property damage" occurring after:
1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04                          © ISO Properties, Inc., 2004                          Page 1 of 1          □

POLICY NUMBER:                                          **COMMERCIAL GENERAL LIABILITY**
                                                        **CG 20 37 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 26 West 17th Street, Suite 601, New York, NY 10011 | |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A. **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**CG 20 37 04 13**                      © Insurance Services Office, Inc., 2012                      **Page 1 of 2**

**B.** With respect to the insurance afforded to these additional Insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© ISO Properties, Inc., 2004

CG 20 37 07 04

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **Name Of Person Or Organization:** |
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 26 West 17th Street, Suite 801, New York, NY 10011 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of Section IV – **Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

CG 24 04 05 09                    © Insurance Services Office, Inc., 2008                    **Page 1 of 1**



**ENVIRONMENTAL**
**POLICY NUMBER: 16PKGNE60712**

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF CANCELLATION PROVISIONS

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ ENVIRO FLEX ENVIRONMENTAL IMPAIRMENT LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

In the event of cancellation by us, we agree to mail prior written notice of cancellation to:

### SCHEDULE

| Name Of Person Or Organization | Storage Construction Company, LLC |
|---|---|
| Address | 26 West 17th Street- Suite 801<br>New York, New York 10011 |
| Number Of Days Advance Notice | 30 |

All other terms and conditions remain unchanged.

**MEEI 2220 09 14**      Includes copyrighted material of Insurance Services Office, Inc.,      **Page 1 of 1**
                                        with its permission



INTERLINE

**MARKEL®**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## POLICY CHANGES

CHANGE NUMBER: 4

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES<br>EFFECTIVE DATE:<br>9/5/2017 | COMPANY:<br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br>02860<br>Risk Placement Services, Inc.<br>245 Main St<br>Ridgefield Park NJ 07660 | |

| COVERAGE PART(S) AFFECTED: Commercial General Liability |
|---|

The following item(s):

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Insured's Name/Additional Named Insureds | ☐ | Insured's Mailing Address | ☐ | Policy Number |
| ☐ | Effective/Expiration Date/Policy Period | ☐ | Company | ☐ | Locations/Location Description |
| ☐ | Insured's Legal Status/Business Description | ☐ | Minimum Earned Premium | ☐ | Rates |
| ☒ | Coverage Forms and Endorsements | ☐ | Policy Cancel/Reinstatement | ☐ | Limits/Exposures/Premium Basis |
| ☐ | Additional Insureds, Loss Payees, Mortgagees | ☐ | Buildings/Personal Property | ☐ | Deductibles |
| ☐ | Aggregate Cap | ☐ | Classification/Class Codes | ☐ | Underlying Insurance Information |
| ☐ | Per Vehicle Limit | ☐ | Vehicle | ☐ | Drivers |
| ☐ | Vehicle Description (Type/Year/Make/Model/ Vehicle Identification Number/Cost New/Value) | ☐ | Equipment | ☐ | Other (describe below) |

is (are) ☐ changed ☒ added ☐ deleted as shown below;

Added form CG 20 01 04 13 (Primary & Noncontributory - Other Insurance Condition) as per attached.

The above amendments result in a change in the premium as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | NO CHANGES | ☐ | TO BE ADJUSTED AT AUDIT | ☒ | ADDITIONAL PREMIUM<br>$ 150.00 | ☐ | RETURN PREMIUM<br>$ |
| ☐ | NO RETURN PREMIUM -- CLAIM STILL IN PROCESS | ☐ | NO RETURN PREMIUM -- TOTAL LOSS TO INSURED ITEM | ☐ | NO RETURN PREMIUM -- FULLY EARNED PROVISION APPLIES | | OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

AUTHORIZED REPRESENTATIVE

MEIL 1203 03 12        Includes copyrighted material of Insurance Services Office, Inc. with its permission.        Page 1 of 1

**COMMERCIAL GENERAL LIABILITY**
**CG 20 01 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PRIMARY AND NONCONTRIBUTORY – OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the **Other Insurance** Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(1)** The additional insured is a Named Insured under such other insurance; and

**(2)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

**CG 20 01 04 13**                    © Insurance Services Office, Inc., 2012                    **Page 1 of 1**



INTERLINE

**MARKEL**®

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## POLICY CHANGES

CHANGE NUMBER: 5

| POLICY NUMBER: 16PKGNE60712 | POLICY CHANGES EFFECTIVE DATE: 08/28/2017 | COMPANY: EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED: INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE 02860 Risk Placement Services, Inc. RPS Metcom/Paramus 245 Main St Ridgefield Park NJ 07660 | |

COVERAGE PART(S) AFFECTED: Commercial General Liability

The following item(s):

| | | | | |
|---|---|---|---|---|
| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☐ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☐ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/ Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☒ Other (describe below) |

is (are) ☐ changed   ☐ added   ☒ deleted as shown below:

Endorsement #3 is hereby declared null and void, and deleted in its entirety from this policy.

The above amendments result in a change in the premium as follows:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | NO CHANGES | ☐ | TO BE ADJUSTED AT AUDIT | ☐ ADDITIONAL PREMIUM $ | ☒ RETURN PREMIUM $ 600.00 |
| ☐ | NO RETURN PREMIUM – CLAIM STILL IN PROCESS | ☐ | NO RETURN PREMIUM – TOTAL LOSS TO INSURED ITEM | ☐ NO RETURN PREMIUM – FULLY EARNED PROVISION APPLIES | ☐ OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

MEIL 1203 03 12        Includes copyrighted material of Insurance Services Office, Inc. with its permission.        Page 1 of 1

INTERLINE



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

CHANGE NUMBER: 6

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES<br>EFFECTIVE DATE:<br>08/28/2017 | COMPANY:<br>EVANSTON INSURANCE<br>COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br>02860<br>Risk Placement Services, Inc. RPS Metcom/Paramus<br>245 Main St<br>Ridgefield Park NJ 07660 | |

| COVERAGE PART(S) AFFECTED: Commercial General Liability |
|---|

The following item(s):

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | Insured's Name/Additional Named Insureds | ☐ | Insured's Mailing Address | ☐ | Policy Number |
| ☐ | Effective/Expiration Date/Policy Period | ☐ | Company | ☐ | Locations/Location Description |
| ☐ | Insured's Legal Status/Business Description | ☐ | Minimum Earned Premium | ☐ | Rates |
| ☒ | Coverage Forms and Endorsements | ☐ | Policy Cancel/Reinstatement | ☐ | Limits/Exposures/Premium Basis |
| ☐ | Additional Insureds, Loss Payees, Mortgagees | ☐ | Buildings/Personal Property | ☐ | Deductibles |
| ☐ | Aggregate Cap | ☐ | Classification/Class Codes | ☐ | Underlying Insurance Information |
| ☐ | Per Vehicle Limit | ☐ | Vehicle | ☐ | Drivers |
| ☐ | Vehicle Description (Type/Year/Make/Model/<br>Vehicle Identification Number/Cost New/Value) | ☐ | Equipment | ☐ | Other (describe below) |

is (are) ☐ changed  ☒ added  ☐ deleted as shown below:

Added CG 20 10 07 04 Additional Insured - Owners, Lessees or Contractors - Scheduled Person or Organization to the policy as per attached.

Added CG 20 37 04 13 Additional Insured - Owners, Lessees or Contractors - Completed Operations to the policy as per attached.

Added CG 24 04 05 09 Waiver of Transfer of Rights of Recovery Against Others to Us to the policy as per attached.

Added MEEI 2220 09 14 Amendment of Cancellation Provisions to the policy as per attached.

The above amendments result in a change in the premium as follows:

| | NO CHANGES | | TO BE ADJUSTED AT AUDIT | ☒ | ADDITIONAL PREMIUM<br>$ 600.00 | | RETURN PREMIUM<br>$ |
|---|---|---|---|---|---|---|---|
| ☐ | NO RETURN PREMIUM –<br>CLAIM STILL IN PROCESS | ☐ | NO RETURN PREMIUM –<br>TOTAL LOSS TO INSURED ITEM | ☐ | NO RETURN PREMIUM –<br>FULLY EARNED PROVISION APPLIES | ☐ | OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

MEIL 1203 03 12          Includes copyrighted material of Insurance Services Office, Inc. with its permission.          Page 1 of 1

AUTHORIZED REPRESENTATIVE

POLICY NUMBER: 16PKGNE60712          **COMMERCIAL GENERAL LIABILITY**
         **CG 20 10 07 04**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 26 West 17th Street, Suite 601, New York, NY 10011. | 1158 McDonald Avenue, Brooklyn, NY 11230 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04        © ISO Properties, Inc., 2004        Page 1 of 1   □

POLICY NUMBER:                                          **COMMERCIAL GENERAL LIABILITY**
                                                        **CG 20 37 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 26 West 17th Street, Suite 801, New York, NY 10011. | 1158 McDonald Avenue, Brooklyn, NY 11230 |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A. **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**CG 20 37 04 13**               © Insurance Services Office, Inc., 2012               **Page 1 of 2**

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© ISO Properties, Inc., 2004

CG 20 37 07 04

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:** |
| CS 1158 McDonald Ave, LLC – Landlord, Storage Deluxe Management Company LLC – Property Manager, CubeSmart Asset Management, LLC – Property Manager, Storage Construction Company LLC – General Contractor, and their respective Owners, Managers, Principals, Employees, Agents and Assigns, Lender as needed, ATIMA c/o Storage Deluxe, 1158 McDonald Avenue, Brooklyn, NY 11230. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of Section IV – **Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

**CG 24 04 05 09**

© Insurance Services Office, Inc., 2008

**Page 1 of 1**



**ENVIRONMENTAL**
POLICY NUMBER: 16PKGNE60712

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF CANCELLATION PROVISIONS

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☐ ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ ENVIRO FLEX ENVIRONMENTAL IMPAIRMENT LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

In the event of cancellation by us, we agree to mail prior written notice of cancellation to:

**SCHEDULE**

| Name Of Person Or Organization | Storage Construction Company, LLC |
|---|---|
| Address | 26 West 17th Street, Suite 801<br>New York, NY 10011 |
| Number Of Days Advance Notice | 30 |

All other terms and conditions remain unchanged.



INTERLINE

**MARKEL®**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

CHANGE NUMBER: 7

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES<br>EFFECTIVE DATE:<br>09/14/2017 | COMPANY:<br>EVANSTON INSURANCE<br>COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br>02860<br>Risk Placement Services, Inc. RPS Metcom/Paramus<br>245 Main St<br>Ridgefield Park NJ 07660 | |

| COVERAGE PART(S) AFFECTED: Commercial General Liability |
|---|

The following item(s):

| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
|---|---|---|
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☒ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☐ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☐ Other (describe below) |

is (are) ☐ changed ☒ added ☐ deleted as shown below:

Added CG 20 10 07 04 Additional Insured - Owners, Lessees or Contractors - Scheduled Person or Organization to the policy as per attached.

Added CG 20 37 04 13 Additional Insured - Owners, Lessees or Contractors - Completed Operations to the policy as per attached.

The above amendments result in a change in the premium as follows:

| ☐ | NO CHANGES | ☐ | TO BE ADJUSTED<br>AT AUDIT | ☒ | ADDITIONAL PREMIUM<br>$ 300 | ☐ | RETURN PREMIUM<br>$ |
|---|---|---|---|---|---|---|---|
| ☐ | NO RETURN<br>PREMIUM –<br>CLAIM STILL IN<br>PROCESS | ☐ | NO RETURN<br>PREMIUM –<br>TOTAL LOSS TO<br>INSURED ITEM | ☐ | NO RETURN PREMIUM –<br>FULLY EARNED<br>PROVISION APPLIES | ☐ | OTHER (DESCRIBE): |

All other terms and conditions remain unchanged.

**MEIL 1203 03 12**    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **Page 1 of 1**

AUTHORIZED REPRESENTATIVE

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 20 10 07 04**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| As required by written contract | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;
in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to "bodily injury" or "property damage" occurring after:
1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04

© ISO Properties, Inc., 2004

Page 1 of 1    ☐

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
CG 20 37 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| As required by written contract . | |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to Section III – Limits Of Insurance:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13   © Insurance Services Office, Inc., 2012   Page 1 of 1

INTERLINE



**MARKEL®**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

CHANGE NUMBER: 8

| POLICY NUMBER:<br>16PKGNE60712 | POLICY CHANGES EFFECTIVE:<br>09/14/2017 | COMPANY:<br><br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED:<br>INCINIA CONTRACTING, INC. | AUTHORIZED REPRESENTATIVE<br><br>02860<br>Risk Placement Services, Inc. RPS Metcom/Paramus<br>245 Main St<br>Ridgefield Park NJ 07660 | |

COVERAGE PART(S) AFFECTED: Commercial General Liability

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name/Additional Named Insureds | ☐ Insured's Mailing Address | ☐ Policy Number |
| ☐ Effective/Expiration Date/Policy Period | ☐ Company | ☐ Locations/Location Description |
| ☐ Insured's Legal Status/Business Description | ☐ Minimum Earned Premium | ☐ Rates |
| ☒ Coverage Forms and Endorsements | ☐ Policy Cancel/Reinstatement | ☐ Limits/Exposures/Premium Basis |
| ☐ Additional Insureds, Loss Payees, Mortgagees | ☐ Buildings/Personal Property | ☐ Deductibles |
| ☐ Aggregate Cap | ☐ Classification/Class Codes | ☐ Underlying Insurance Information |
| ☐ Per Vehicle Limit | ☐ Vehicle | ☐ Drivers |
| ☐ Vehicle Description (Type/Year/Make/Model/ Vehicle Identification Number/Cost New/Value) | ☐ Equipment | ☐ Other (describe below) |

is (are) ☒ changed ☐ added ☐ deleted as shown below:

Amended CG 20 10 07 04 Add'l Insured – Owners, Lessees or Contractors to the policy as per attached.
Amended CG 20 37 04 13 Add'l Insured – Owners, Lessees or Contractors to the policy as attached.

The above amendments result in a change in the premium as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ | **NO CHANGES** | ☐ | **TO BE ADJUSTED AT AUDIT** | ☐ | **ADDITIONAL PREMIUM $** | ☐ | **RETURN PREMIUM $** |
| ☐ | **NO RETURN PREMIUM – CLAIM STILL IN PROCESS** | ☐ | **NO RETURN PREMIUM – TOTAL LOSS TO INSURED ITEM** | ☐ | **NO RETURN PREMIUM – FULLY EARNED PROVISION APPLIES** | ☐ | **OTHER (DESCRIBE):** |

All other terms and conditions remain unchanged.

AUTHORIZED REPRESENTATIVE

MEIL 1203 03 12          Includes copyrighted material of Insurance Services Office, Inc. with its permission.          Page 1 of 1

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
CG 20 10 07 04

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| As required by written contract with RXR Construction & Development LLC dated Oct. 21, 2016 | 9-47 Hall Street, Brooklyn, NY project |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04                    © ISO Properties, Inc., 2004                    Page 1 of 1        □

POLICY NUMBER: 16PKGNE60712

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| As required by written contract with RXR Construction & Development LLC dated Oct. 21, 2016 | 9-47 Hall Street, Brooklyn, NY project |
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to Section III – Limits Of Insurance:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 37 04 13                      © Insurance Services Office, Inc., 2012                      Page 1 of 1

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY
Ten Parkway North
Deerfield, Illinois 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof,** the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

_____
Secretary

_____
President

MJIL 1000 08 10                                        Page 1 of 1



**ENVIRONMENTAL**

# EVANSTON INSURANCE COMPANY

# EMERGENCY RESPONSE HOTLINE

# 1-855-44CLAIM

# (1-855-442-5246)

Markel has established an emergency response hotline for immediate reporting of pollution events or other events requiring emergency response.

Immediate reporting of such events ensures timely notice to us of pollution claims as well as other claims that may require immediate response.

Please use the hotline to notify us immediately of any situation you encounter that may lead to a pollution claim. When calling, identify yourself as a Markel Policyholder.

Using the hotline may help you to fulfill some of your responsibilities to us. Reimbursement of "emergency response costs" is conditioned on timely reporting by use of the emergency response hotline. Please refer to the policy for full details.

# CLAIMS REPORTING NOTICE

In addition to the above you must also report in writing any "Occurrence", Offense, Incident, "Claim", or "Suit", to:

Markel - Claims
P.O. Box 2009
Glen Allen, VA  23058-2009

Email:  newclaims@markelcorp.com

Fax: (855) 662-7535

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS AND/OR DUTIES IN THE EVENT OF AN "OCCURRENCE, OFFENSE, INCIDENT, "CLAIM" OR "SUIT".**

**MPEI 2000 12 15**                                                                                          **Page 1 of 1**



INTERLINE

# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

MPIL 1007 03 14                                                    **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

## ENVIRONMENTAL COMMON POLICY DECLARATIONS

**THIS POLICY MAY PROVIDE CLAIMS-MADE COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE YOUR RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.**

POLICY NUMBER: 16PKGNE60712                RENEWAL OF POLICY: NEW

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

INCINIA CONTRACTING, INC.

1360 CLIFTON AVE UNIT 365

CLIFTON, NJ 07012

Policy Period: From 10/18/2016 to 10/18/2017, at 12:01 A.M. Standard Time at your mailing address shown above.

Form of Business:

☐ Individual          ☐ Partnership          ☐ Joint Venture          ☐ Trust

☐ Limited Liability Company   ☒ Organization, including Corporation (but not incl. Partnership, Joint Venture or LLC)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

Coverage is provided for the following only if indicated with an X:

|   |   | Claims Made | Occurrence | Premium |
|---|---|---|---|---|
| ☒ | Commercial General Liability | ☐ | ☒ | INCLUDED |
| ☐ | Products-Completed Operations Liability (Monoline Coverage) | ☐ | ☐ | NOT COVERED |
| ☒ | Contractor's Pollution Liability | ☐ | ☒ | INCLUDED |
| ☐ | Professional Liability | ☒ | NOT AVAILABLE | NOT COVERED |
| ☐ | Environmental Impairment Liability | ☒ | NOT AVAILABLE | NOT COVERED |
| ☐ | Terrorism Risk Insurance Act (TRIA): | | | EXCLUDED |
| | | **Advance And Deposit Premium:** | | $▮▮▮▮▮ |
| | Other Charge (Specify): | NOT APPLICABLE | | $0.00 |
| | Other Charge (Specify): | NOT APPLICABLE | | $0.00 |
| | Inspection Fee (100% Fully Earned): | | | $350.00 |
| | | **TOTAL (Including all charges):** | | $▮▮▮▮▮ |
| | | **Minimum Retained Premium:** | | 25% |

Producer Number, Name and Mailing Address

02860

Risk Placement Services, Inc.

245 Main St.

Ridgefield Park, NJ 07660

MDEI 2004 05 13                                                          Page 1 of 2

| Combined General Aggregate Limit Of Insurance | $6,000,000 |
|---|---|
| The Amount shown in the schedule above is the most we will pay under any/all coverage parts attached to this policy | |

Audit Period (Indicated by an X):

☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly ☐ Other ☐ Flat

| Endorsements |
|---|
| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: |
| SEE FORMS SCHEDULE - MDIL 1001 |
| |

**These declarations, together with the General Terms and Conditions, Coverage Form Declarations, Coverage Form(s), and any Endorsements(s) complete the above numbered policy.**

| | 11/17/2016 |
|---|---|
| **Countersigned By** | **Countersignature Date** |

MDEI 2004 05 13

**Page 2 of 2**



**MARKEL®**

INTERLINE
POLICY NUMBER: 16PKGNE60712

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 08 10 | Evanston Policy Jacket |
| MPEI 2000 12 15 | Emergency Response Hotline |
| MPIL 1007 03 14 | Privacy Notice |
| MDEI 2004 05 13 | Environmental Common Policy Declarations |
| MDIL 1001 08 11 | Forms Schedule |
| MEEI 2700 05 13 | General Terms and Conditions Section |
| IL 02 08 09 07 | New Jersey Changes - Cancellation and Nonrenewal |
| MEEI 2206 03 14 | Minimum Earned Prem & Minimum Retained Prem Endt |
| MEEI 2211 05 16 | Waiver Of Transfer Of Rights Of Recovery |
| MEEI 2219 04 14 | Audit Rate Endorsement |
| MEEI 2226 02 16 | Self-Insured Retention |
| MEEI 2274 05 16 | Automatic Primary & NonContributory Insurance |
| MEEI 2284 05 13 | Separate Aggregate Limits Of Insurance |
| MEEI 2329 01 15 | Exclusion-Bodily Injury To Specified Workers |
| MEIL 1200 01 10 | Service of Suit |
| MEIL 1225 10 11 | Changes - Civil Union |
| MEIL 1308 04 16 | Exclusion Of Certified Acts Of Terrorism |
| MEIL 1320 11 13 | Application Warranty |
| MDGL 1008 08 11 | CGL Coverage Part Declarations |
| MEGL 0051 02 13 | Demolition And  Wrecking Exclusion |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| CG 04 35 12 07 | Employee Benefits Liability Coverage |
| CG 20 37 04 13 | Add'l Insured-Owners,Lessees,Contractors-Comp Ops |
| CG 21 49 09 99 | Total Pollution Exclusion Form |
| MEGL 1394 05 16 | Exclusion - Intellectual Property Hazard |
| MEGL 1397 07 10 | Exclusion - Aircraft, Auto Or Watercraft |
| MEGL 1542 05 16 | Additional Insured-Owners, Lessees, or Contractors |
| MGL 1213 07 12 | Data Breach Coverage - Occurrence |
| MDEI 2002 07 13 | Contractors Pollution Liability Supplemental Dec |
| MEEI 0002 06 12 | Contractor's Pollution Liability Coverage Form |
| MEEI 2244 08 10 | Non-Owned Disposal Site - Blanket Basis - OCC Form |
| MEEI 2247 08 10 | Temporary Storage of Asbestos |
| MEEI 2271 05 14 | Limited Fungi, Mold, or Microbial Matter Coverage |
| MEEI 2290 02 14 | Transp Pollution Liab (1st & 3rd Party Vehicles) |

**MDIL 1001 08 11**                                          **Page 1 of 1**

FILED: NEW YORK COUNTY CLERK 02/27/2023 05:12 PM
NYSCEF DOC. NO. 567
INDEX NO. 650988/2025
RECEIVED NYSCEF: 02/27/2023



**ENVIRONMENTAL**

# EVANSTON INSURANCE COMPANY

## GENERAL TERMS AND CONDITIONS SECTION

The following terms and conditions modify one or more of the Coverage Forms attached to your policy. Please read the following carefully to determine which terms and conditions apply to the applicable Coverage Forms. If any provision in these General Terms and Conditions is inconsistent with or in conflict with the terms and conditions of any Coverage Form, the terms and conditions of the applicable Coverage Form will control. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**I.    APPLICABLE TO ALL COVERAGE FORMS**

    **A.**  The following are added to the **CONDITIONS** sections of all Coverage Forms attached to this policy.

        **1.**  **Changes**

            This policy contains all the agreements between you and us concerning the insurance afforded by the policy. The first Named Insured shown in the Declarations will act on behalf of all "insureds" for the receipt and acceptance of any endorsement issued by us to form a part of this policy. This policy's terms and terms and conditions can be amended or waived only by endorsement issued by us and made a part of this policy. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this policy or estop us from asserting any right under the terms and conditions of this policy.

        **2.**  **Premiums**

            The first Named Insured shown in the Declarations:

            **a.**  Is responsible for the payment of all premiums; and

            **b.**  Will be the payee for any return premiums we pay.

        **3.**  **Transfer Of Your Rights And Duties Under This Policy**

            Your rights and duties under this policy may not be transferred without our prior written consent except in the case of death of an individual Named Insured. If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

        **4.**  **Choice Of Law**

            Unless otherwise expressly endorsed in the policy(ies), the laws of New York, without giving effect to its conflicts of law principles, governs all matters arising out of or relating to this policy and all of the transactions it contemplates, including, without limitation, its formation, validity, interpretation, construction, performance and enforcement.

        **5.**  **Representations**

MEEI 2700 05 13       Includes copyrighted material of Insurance Services Office, Inc.       **Page 1 of 14**
                                with its permission.

By accepting this insurance, you agree:

**a.** The statements in the Applications, Declarations and other materials submitted to us are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this insurance in reliance upon your representations.

6. **Notice And Reporting Provisions**

In the event of an "occurrence", offense, incident, "claim", or "suit", you must:

**a.** Report any spill or release immediately to **1-855-44CLAIM (1-855-442-5246)**. The Confirmation Code is "MARKEL SPILL."

**b.** Notify us immediately in writing of an "occurrence", offense, incident, "claim", or "suit." Notice to your insurance agent or broker does not constitute notice to Markel Service, Inc., the Markel Company providing this insurance, or any other person or entity acting on behalf of Markel Corporation for purposes of the receipt of notice.

**c.** Supply the following information, in writing, to the extent possible to:   Claims Department, Markel Service, Inc., at the address listed on your Claims Reporting Notice:

   **(1)** Date of report;

   **(2)** Date of "loss";

   **(3)** Name and phone number of individual reporting "loss";

   **(4)** Name of "insured";

   **(5)** City, state, zip code of "insured's" mailing address;

   **(6)** Contact name;

   **(7)** "Loss" information, including:

      **(a)** Description of "loss";

      **(b)** How;

      **(c)** When; and

      **(d)** Where.

Please also refer to the applicable **Duties In The Event Of Occurrence Offense, Incident, Claim Or Suit** condition of your Coverage Form(s) for all other requirements or responsibilities that you may have.

7. **Legal Action Against Us**

No person or organization has a right under this insurance:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an "insured"; or

**b.** To sue us under the insurance unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an

"insured" obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**8. Bankruptcy**

Bankruptcy or insolvency of you or of your estate will not relieve us of our obligations under this insurance.

In any bankruptcy or similar insolvency proceeding, we shall have full rights as a party in interest under U.S.C. § 1109(b) of the Bankruptcy Code or similar statute, including objecting to any Plan proposed or other matters affecting, directly or indirectly, the insurance or rights created hereunder.

It will be a material breach of this insurance for you to propose or support in a plan of reorganization, or otherwise, any provision or any claims resolution facilities that would alter, restrict, modify or affect, in any way, our rights under this insurance.

**9. Cancellation Or Nonrenewal**

This policy may be cancelled by you by surrender thereof to us or any of our authorized representatives or by mailing to us written notice stating when thereafter the cancellation shall be effective.

If we decide to cancel or not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of cancellation or nonrenewal not less:

1. 10 days prior to cancellation if we cancel for non-payment of premium;

2. 30 days prior to cancellation if we cancel for any other reason; or

3. 30 days prior to nonrenewal.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**10. Transfer Of Rights Of Recovery Against Others To Us**

If the "insured" has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. You must do nothing after a "loss" to impair them. At our request, you will bring "suit" or transfer those rights to us and help us enforce them.

**11. Assignment**

This insurance may not be assigned without our prior consent, which consent shall not be unreasonably withheld or delayed. Assignment of interest under this insurance shall not bind us until our consent has been endorsed hereon.

**12. Premium Audit**

a. At our discretion, we may compute all premiums for this insurance in accordance with our rules, rates, rating plans, premiums, and minimum premium requirements.

b. Premium shown as Advanced Premium on the Declarations page is a deposit premium only. At the close of each audit period we will compute earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

d. We may examine and audit your books and records as they relate to this insurance at any time during the policy period and up to three years afterward.

**MEEI 2700 05 13**          Includes copyrighted material of Insurance Services Office, Inc.          **Page 3 of 14**
                                          with its permission.

     **e.** Premium adjustments affected as a result of premium audits will be done after the insurance is no longer in effect, but may be done by us while the insurance is in effect.

     **f.** Premium audit adjustment calculations will be made to determine additional premium only. You agree with us that there will be no downward adjustments of the Advanced Premium.

**13. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this insurance to the first Named Insured, as shown on the Declarations, this insurance applies:

     **a.** As if each "insured" were the only "insured"; and

     **b.** Separately to each "insured" against whom "claim" is made or "suit" is brought.

**B.** The following are added to the **EXCLUSIONS** sections of all Coverage Forms attached to this policy:

     **1. Nuclear Energy Liability Exclusion**

          **a.** The insurance does not apply:

               **(1)** Under any liability Coverage, to "bodily injury" or "property damage":

                    **(a)** With respect to which an "insured" under the policy is also an "insured" under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an "insured" under any such policy but for its termination upon exhaustion or its limit of liability; or

                    **(b)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

                        **(i)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or

                        **(ii)** The "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

               **(2)** Under any Medical Payments Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

               **(3)** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

                    **(a)** The "nuclear material"

                        **(i)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured"; or

                        **(ii)** Has been discharged or dispersed therefrom;

                    **(b)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

                    **(c)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(c)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**MEEI 2700 05 13**          Includes copyrighted material of Insurance Services Office, Inc.     **Page 4 of 14**

                                 with its permission.

    **b.** As used in this endorsement:

      **(1)** "Hazardous properties" include radioactive, toxic or explosive properties;

      **(2)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

      **(3)** "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic energy Act of 1954 or in any law amendatory thereof;

      **(4)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

      **(5)** "Waste" means any waste material:

        **(a)** Containing "by-product material" other than tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

        **(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

      **(6)** "Nuclear facility" means:

        **(a)** Any "nuclear reactor";

        **(b)** Any equipment or device designed or used for:

          **(i)** Separating the isotopes of uranium or plutonium,

          **(ii)** Processing or utilizing "spent fuel", or

          **(iii)** Handling, processing or packaging "waste".

        **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

        **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

      and includes the site on which any of the forgoing is located, all operations conducted on such site and all premises used for such operations.

      **(7)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

      **(8)** "Property damage" includes all forms of radioactive contamination of property.

  **2. Computer Related Date Recognition And Other Electronic Problems**

    This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", "claims" as defined in the policy that result from the rendering or failure to render professional services or "cleanup cost", as defined in the policy, arising directly or indirectly out of:

    **a.** Any actual or alleged failure, malfunction or inadequacy of:

      **(1)** Any of the following, whether belonging to any "insured" or to others:

MEEI 2700 05 13         Includes copyrighted material of Insurance Services Office, Inc.       **Page 5 of 14**
                               with its permission.

(a) Computer hardware, including microprocessors;

(b) Computer application software;

(c) Computer operating systems and related software;

(d) Computer networks;

(e) Microprocessors (computer chips) not part of any computer system; or

(f) Any other computerized or electronic equipment or components; or

(2) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph I.B.2.a.(1) of this endorsement, due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

b. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph I.B.2.a.(1) of this endorsement.

## II. APPLICABLE WHENEVER MORE THAN ONE COVERAGE FORM IS ATTACHED TO THIS POLICY

The following is added to the **LIMITS OF INSURANCE** sections of the applicable Coverage Forms attached:

### A. Non-Cumulative Shared General Aggregate

The Combined General Aggregate Limit of Insurance shown on the **ENVIRONMENTAL COMMON POLICY DECLARATIONS** page is the most we will pay for the sum of:

1. "Cleanup costs" as defined in the Coverage Form;

2. Damages because of "bodily injury", "property damage", "personal and advertising injury";

3. "Claims" as defined in the Coverage Form; and,

4. Supplementary payments;

under the above referenced Coverage Forms.

However, this provision does not apply to:

1. Supplementary payments paid under the Commercial General Liability Coverage Form;

2. "Bodily injury" and "property damage" included in the "products-completed operations hazard" as defined in the Coverage Form; and;

3. Supplementary payments because of the "products-completed operations hazard"

unless altered by endorsement issued by us.

### B. No Duplication Of Coverage

Where this policy contains more than one Insuring Agreement or where we have issued more than one policy to an "Insured", only one Insuring agreement or policy will apply to the same "claim", "loss", "suit", damages, "business interruption expense" or "claims" expense. In the event that more than one Insuring Agreement or policy can apply to the same "claim, "loss", "suit", damages, "business interruption expense" or "claims" expense, then the only Insuring Agreement or policy that will apply will be that Insuring Agreement or policy under which we have accepted coverage, or that Insuring Agreement or policy that has been held to apply to such "claim", "loss",

**MEEI 2700 05 13**                  Includes copyrighted material of Insurance Services Office, Inc.                  **Page 6 of 14**
with its permission.

"suit", damages, "business interruption expense" or "claims" expense.

However, the foregoing does not apply to any "claim", "occurrence" or "suit" for medical expenses under **SECTION I – COVERAGES, COVERAGE C MEDICAL PAYMENTS** caused by "bodily injury" which is covered under **SECITON I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** in the Commercial General Liability Coverage Form.

## III. APPLICABLE TO OCCURRENCE COVERAGE FORMS ONLY (Not Applicable To Claims-Made Coverage Forms)

The following is added to the **LIMITS OF INSURANCE** sections of all occurrence Coverage Forms attached:

**Non-Stacking Of Limits Of Liability**

A. If more than one Insuring Agreement in this policy and any other policy, policies or Coverage Form(s) that we issued to you apply to the same or related "claim", damages, "pollution conditions" or "loss", then the most that we will pay under all such Insuring Agreements, policies and Coverage Form(s) for the sum of all such "claims", damages, "pollution conditions", or "loss" will be the applicable Limit of Insurance in effect at the date that the conditions that caused such "claim", damages, "pollution conditions" or "loss" first commenced, even if those conditions continue, change or resume after that date.

B. If the date on which the conditions first commenced cannot be determined or is before the inception date of the first such policy issued by us to which this insurance applies, then the conditions will be deemed to have occurred only on the inception date of the first such policy and all "claims", damages and "loss" caused by such conditions shall be subject to the Limits of Insurance of that first policy.

C. In no event will this insurance apply after the exhaustion of the applicable Limit of Insurance of the single policy that is designated to apply under Paragraphs A. or B. of this section III.

D. This section III. does not apply to excess, umbrella or similar policies that are purchased specifically to apply in excess of this policy.

## IV. APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY, OWNERS AND CONTRACTORS PROTECTIVE LIABILITY, PRODUCTS-COMPLETED OPERATIONS, ENVIRONMENTAL PROFESSIONAL LIABILITY, AND CONTRACTORS POLLUTION LIABILITY COVERAGE FORMS ONLY

A. The following is added to the **EXCLUSIONS** sections in the applicable Coverage Forms attached:

### 1. Exclusion for Separately Insured Projects (Wrap-Ups)

This insurance does not apply to any "claim" or "suit" or other coverage afforded under this insurance or any endorsement we issued based upon or arising out of any "work" or operations that are insured under a valid and collectible project-specific insurance policy, owner's protective insurance policy, owner-controlled insurance policy, "contractor"-controlled insurance policy, wrap-up policy or similar insurance program under which an "insured" is covered.

This exclusion does not apply where we specifically schedule such project as an insured project in an endorsement attached to this policy.

### 2. Insured Vs Insured Exclusion

If one or more additional "insured(s)", either on a scheduled or blanket basis, have been added to this insurance, then the following applies:

This insurance does not apply to "bodily injury" or "property damage" arising from or out of any "claim" made by or on behalf of an "insured" against any other "insured" or former "insured". However, this exclusion shall not apply with respect to "claims" against you made by any additional "insured" when specifically endorsed on the policy and as required by a written indemnification contract or agreement identified on the same endorsement naming the additional "insured(s)".

**MEEI 2700 05 13**              Includes copyrighted material of Insurance Services Office, Inc.              **Page 7 of 14**
                                            with its permission.

 

 

**3. Organic Pathogen**

   **a.** "Professional liability", "bodily injury", "property damage" or "personal and advertising injury" arising out of, or caused or contributed to by, toxic substances from bacteria, organic pathogens, bio-organic growth, and/or systemic chemical poisoning.

    This applies:

    **(1)** Whether arising out of actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of the substances referenced in Paragraph **a.** above;

    **(2)** Regardless of source, including but not limited to any goods, products or structures containing the substances referenced in Paragraph **a.** above, or their existence in any form in occupancy or construction, manufacture, sale, transportation, handling, storage, disposal or removal; and

    **(3)** Regardless of supervision, instructions, recommendations, requests, warnings or advice given or which should have been given about the substances referenced in Paragraph **a.** above.

   **b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way, responding to, or assessing the effects of the substances referenced in Paragraph **a.** above by any insured or by any other person or entity.

**B.** The following is added to the **CONDITIONS** sections in the applicable Coverage Forms attached:

  **Inspections And Surveys**

  **1.** We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

  **2.** We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

  **3.** Paragraphs **1.** and **2.** of this condition apply not only to us but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

  **4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**V. APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY, OWNERS AND CONTRACTORS PROTECTIVE LIABILITY, AND PRODUCTS-COMPLETED OPERATIONS COVERAGE FORMS ONLY**

  **A.** The following are added to the **EXCLUSIONS** sections of the applicable Coverage Forms attached.

| | | |
|---|---|---|
| MEEI 2700 05 13 | Includes copyrighted material of Insurance Services Office, Inc. with its permission. | **Page 8 of 14** |

This insurance does not apply to:

1. **Asbestos**

    a. Asbestos, asbestos fibers, abestiform talc or any material and/or substances containing asbestos, asbestos fibers or asbestiform talc or any asbestos related "bodily injury" or "property damage", or exposure to asbestos, asbestos fibers or asbestiform talc in any form, and/or manifestation of any asbestos related "bodily injury", including but not limited to asbestosis mesothelioma and/or bronchogenic carcinoma; or

    b. Any alleged act, error, omission or duty involving asbestos, asbestos fibers, asbestiform talc or any material and/or substances containing asbestos, asbestos fibers or asbestiform talc, its use, exposure, presence, existence, detection, removal, elimination or avoidance; or

    c. The use, exposure, presence, existence, detection, removal, elimination or avoidance of asbestos, asbestos fibers, asbestiform talc or any material and/or substances containing asbestos, asbestos fibers or asbestiform talc in any environment, building or structure.

2. **Lead**

    a. "Bodily injury", "property damage" or "personal and advertising injury" arising out of or contributed to in any way by lead, paint containing lead or any other material or substance containing lead;

    b. Coverage for medical expenses payable under **COVERAGE C MEDICAL PAYMENTS** in the Commercial General Liability Coverage Form arising out of or contributed to in any way by lead, paint containing lead or any other material or substance containing lead;

    c. Any "loss", cost or expense or damages arising out of any request, demand or order that any "insured" or others test for, monitor, clean up, remove, abate, contain, treat, detoxify or neutralize lead, paint containing lead or any other material or substance containing lead or in any way respond to, or assess the effects of lead; or

    d. Any "loss", cost or expense or damages arising out of any "claim" or "suit" relating to, testing for, monitoring, cleaning up, removing, abating, containing, treating, detoxifying or neutralizing lead, paint containing lead or any other material or substance containing lead, or in any way responding to, or assessing the effects of lead.

    The addition of this exclusion does not imply that other provisions, including but not limited to any pollution exclusion, do not also exclude coverage for lead related injury, damage, expense, cost, "loss", liability or legal obligation.

3. **Contractors, Engineers, Architects, Surveyors and Construction Managers**

    a. "Bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of or relating to the rendering of or failure to render any professional services by you or on your behalf.

    b. "Bodily injury," "property damage," "personal and advertising injury" or medical payments arising out of or related to:

       (1) The rendering of or failure to render any professional services by any "contractor", engineer, architect or surveyor who is or performing "work" on a project on which you serve as a construction manager; or

       (2) Inspection, supervision, quality control, architectural or engineering activities performed by or for you on a project on which you serve as a construction manager.

    Paragraph b. of this exclusion does not apply to "bodily injury," "property damage," "personal and advertising injury", or medical payments arising out of or relating to construction "work" or demolition "work" performed by you, your "employees" or your subcontractors.

MEEI 2700 05 13             Includes copyrighted material of Insurance Services Office, Inc.             **Page 9 of 14**
                                            with its permission.

Professional services includes, but is not limited to the following:

**a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications;

**b.** Supervisory, inspection, quality control, architectural or engineering activities;

**c.** Any act, error, or omission arising out of or related to any testing, evaluation, analysis, investigation, design, consultation or advice performed or provide by or on the "insured's" behalf; or

**d.** The reporting of or reliance upon any testing, evaluation, analysis, investigation, design, consultation or advice performed or provided by or on the "insured's" behalf.

4. **Professional Services**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of the rendering of or failure to render any professional services as defined in the policy or professional opinion whether or not a separate fee is charged for any such service or opinion.

5. **Fungi or Bacteria**

**a.** "Bodily injury", "property damage", or "personal and advertising injury" which would not have occurred or taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any "loss", cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any "insured" or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

6. **Punitive or Exemplary Damages**

Punitive damages, exemplary damages, multiplied damages, fines or penalties.

7. **Nanotubes and Nanotechnology**

**a.** "Bodily injury", "property damage", or "personal and advertising injury" arising, in whole or in part, either directly or indirectly out of the actual, alleged, threatened or suspected existence of, inhalation of, ingestion of, physical exposure to, or absorption of "nanotubes" or "nanotechnology" or any substance containing "nanotubes" or "nanotechnology", either alone or in combination with other substances

**b.** "Bodily injury", "property damage", including but not limited to devaluation of real or personal property, or "personal and advertising injury" arising in whole or in part, either directly or indirectly out of the actual, alleged, threatened or suspected existence, manufacture, storage, processing, use, sale, installation, removal, storage, disposal, distribution, transportation, handling of or contact with "nanotubes" or "nanotechnology" or an substance containing "nanotubes" or nanotechnology", either alone or in combination with other substances.

**c.** Any "loss", cost, expense, "claim" or "suit" by or on behalf of any private party or governmental authority for damages, or fine and/or penalty arising, in whole or in part, either directly or indirectly out of any request, demand, order, directive, or statutory or regulatory requirement that any "insured", or others, test for, monitor, abate, clean up, remove, contain, treat, detoxify or neutralize, remediate, dispose of, or in any way respond to or assess the effects of "nanotubes" or "nanotechnology" or any substance containing "nanotubes" or "nanotechnology", either alone or in combination with other substances.

MEEI 2700 05 13      Includes copyrighted material of Insurance Services Office, Inc.      **Page 10 of 14**
with its permission.

This exclusion applies to any goods or products, manufactured, sold, handled, distributed or disposed of by any party, as well as to:

a. Any warranties or representations made at any time with respect to the fitness, quality, durability, performance of uses of such goods or products; and

b. The providing of or failure to provide warnings or instructions related to such goods or products.

**8. Silica or Silica Mixed Dust**

a. "Bodily injury", "property damage", "personal and advertising injury", or medical expense arising, in whole or in part either directly or indirectly out of the actual, alleged, threatened or suspected existence of, inhalation of, ingestion of, physical exposure to, or absorption of "silica" or "silica-mixed dust" or any substance containing "silica" or "silica mixed dust", either alone or in combination with other substances.

b. "Bodily injury", "property damage", including but not limited to devaluation of real or personal property, or "personal and advertising injury" arising in whole or in part, either directly or indirectly out of the actual, alleged, threatened or suspected existence, manufacture, storage, processing, mining, use, sale, installation, removal, storage, disposal, distribution, transportation, handling of or contact with "silica" or "silica-mixed dust" " or any substance containing "silica" or "silica mixed dust", either alone or in combination with other substances.

c. Any "loss", cost, expense, "claim" or "suit" by or on behalf of any private party or governmental authority for damages, or fine and/or penalty arising, in whole or in part, either directly or indirectly out of any request, demand, order, directive, or statutory or regulatory requirement that any "insured", or others, test for monitor, abate, clean up, remove, contain, treat, detoxify or neutralize, remediate, dispose of, or in any way respond to or assess the effects of "silica" or "silica mixed dust", or any substance containing "silica" or "silica mixed dust", either alone or in combination with other substances.

This exclusion applies to any goods or products, manufactured, sold, handled, distributed or disposed of by any party, as well as to:

a. Any warranties or representations made at any time with respect to the fitness, quality, durability, performance of uses of such goods or products; and

b. The providing of or failure to provide warnings or instructions related to such goods or products.

This exclusion applies regardless of whether:

a. Injury or damage claimed is included within the "products-completed operations hazard" of the policy; or

b. An alleged cause for the injury or damage is the "insured's" negligent hiring, placement, training, supervision, retention, act, error or omission.

B. The following amend the **DEFINITIONS** sections of the applicable Coverage Forms attached.

1. The definition of "insured contract" in the applicable Coverage Forms attached is deleted and replaced with the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on

or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

   **a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   **b.** That indemnifies an architect, engineer or surveyor for injury or damage arising out of;

      **(1)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      **(2)** Giving directions or instructions, or failing to given them, if that is the primary cause of the injury or damage; or

   **c.** Under which the "insured", if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the "insured's" rendering or failure to render professional services, including those listed in **b.** above and supervisory, inspection, architectural or engineering activities.

**2.** The following are added to the **DEFINITIONS** sections in the applicable Coverage Forms attached:

   **a.** "Fungi" or "fungus" means any member of a kingdom of organisms (Fungi), including "molds" and mildews that live as saprotrophs or parasites, reproduce by spores, and lack chlorophyll, leaves, true stems and roots.

   **b.** "Microbial matter" means "fungi" or "mold" which reproduces through the splitting of cells, the release of spores or by any other means, whether or not such microbial matter is living.

   **c.** "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin or any of the spores, scents or byproducts resulting therefrom.

   **d.** "Silica" means :

      **(1)** Any form of crystalline or non-crystalline (amorphous) silica minerals, silica particles, silica compounds, silicon dioxide or silica dust including but not limited to diatomaceous earth, sand quartz, slate, granite and flint; or

      **(2)** Any form of synthetic silica, including precipitated silica, silica gel, pyrogenic or fumed silica or silica flour.

   **e.** "Silica-mixed dust" means a mixture or combination of "silica" and other dust or particles

   **f.** "Nanotubes" means hollow cylinders of carbon atoms or carbon fibers or any type or form of "nanotechnology" which contain remarkable strength and electrical properties used in any products, goods or materials, including but not limited to any single or multi-walled tube-shaped material having a diameter measuring on the nanometer scale or a fullerene molecule having a cylindrical or toroidal

shape.

   g. "Nanotechnology" means engineering at a molecular or atomic level or the science of manipulating materials on an atomic or molecular scale.

## VI. APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY, OWNERS AND CONTRACTORS PROTECTIVE LIABILITY, PRODUCTS-COMPLETED OPERATIONS, AND ENVIRO FLEX ENVIRONMENTAL IMPAIRMENT LIABILTY COVERAGE FORMS ONLY

The following is added to the **CONDITIONS** sections of the applicable Coverage Forms attached.

**Examination Of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## VII. APPLICABLE TO THE COMMERCIAL GENERAL LIABILITY AND OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORMS ONLY

The following is added to the **EXCLUSIONS** sections of the applicable Coverage Forms attached.

This insurance does not apply to:

**Employment Related Practices**

"Bodily injury" and/or "personal and advertising injury" to:

A. A person arising out of any:

   1. Refusal to employ that person;

   2. Termination of that person's employment; or

   3. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

B. The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices describe in Paragraphs **VII.A.1.2** or 3 above is directed.

This exclusion applies:

A. Whether the injury-causing event described in Paragraphs **VII.A.1.2** or **3** above occurs before employment, during employment or after employment of that person;

B. Whether the "insured" may be liable as an employer or in any other capacity; and

C. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## VIII. APPLICABLE TO ALL CLAIMS-MADE COVERAGE FORMS AND ENDORSEMENTS ATTACHED

The following additional conditions are added to the **EXTENDED REPORTING PERIOD** sections of the applicable Claims-Made Coverage Forms and endorsements attached hereto:

We do not have to provide an Extended Reporting Period where:

1. There is any failure to pay any outstanding premiums when due;

2. Any "insured" fails to repay any deductible amount we have paid;

MEEI 2700 05 13              Includes copyrighted material of Insurance Services Office, Inc.              **Page 13 of 14**
with its permission.

3.  Any "insured" has purchased any other insurance to replace the insurance provided under this policy; or

The Application for this policy, including any addenda thereto, contains any material misrepresentation of fact.

All other terms and conditions remain unchanged.

MEEI 2700 05 13              Includes copyrighted material of Insurance Services Office, Inc.              Page 14 of 14
with its permission.

**INTERLINE**
**IL 02 08 09 07**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW JERSEY CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

This provision shall not apply to any policy which has been in effect for less than 60 days at the time notice of cancellation is mailed or delivered, unless the policy is a renewal policy.

B. Paragraph 2. of the **Cancellation** Common Policy Condition is replaced by the following:

2. If this policy has been in effect for less than 60 days, we may cancel this policy for any reason subject to the following:

a. We may cancel this policy by mailing or delivering to the first Named Insured and any person entitled to notice under this policy written notice, of cancellation, at least:

(1) 10 days before the effective date of cancellation if we cancel for:

(a) Nonpayment of premium; or

(b) Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows:

(i) "The risk, danger or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. Any change in the circumstances of an insured that will increase the probability of such a destruction may be considered a 'moral hazard'"; and

(ii) "The substantial risk, danger or probability that the character, circumstances or personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership or other insured that will increase the probability of such a loss or liability may be considered a 'moral hazard'".

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**b.** In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation.

**C.** The following is added to the **Cancellation** Common Policy Condition:

**7. Cancellation Of Policies In Effect For 60 Days Or More**

**a.** If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f);

**(3)** Material misrepresentation or nondisclosure to us of a material fact at the time of acceptance of the risk;

**(4)** Increased hazard or material change in the risk assumed which we could not have reasonably contemplated at the time of assumption of the risk;

**(5)** Substantial breaches of contractual duties, conditions or warranties that materially affect the nature and/or insurability of the risk;

**(6)** Lack of cooperation from the Insured on loss control matters materially affecting insurability of the risk;

**(7)** Fraudulent acts against us by the insured or its representative that materially affect the nature of the risk insured;

**(8)** Loss of or reduction in available insurance capacity;

**(9)** Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

**(10)** Loss of or substantial changes in applicable reinsurance;

**(11)** Failure by the Insured to comply with any Federal, State or local fire, health, safety or building or construction regulation, law or ordinance with respect to an insured risk which substantially increases any hazard insured against within 60 days of written notification of a violation of any such law, regulation or ordinance;

**(12)** Failure by the Insured to provide reasonable and necessary underwriting information to us upon written request therefore and a reasonable opportunity to respond.

**(13)** Agency termination, provided:

**(a)** We document that replacement coverage at comparable rates and terms has been provided to the first Named Insured, and we have informed the first Named Insured, in writing, of the right to continue coverage with us; or

**(b)** We have informed the first Named Insured, in writing, of the right to continue coverage with us and the first Named Insured has agreed, in writing, to the cancellation or nonrenewal based on the termination of the first Named Insured's appointed agent.

**(14)** Any other reasons in accordance with our underwriting guidelines for cancellation of commercial lines coverage.

**b.** If we cancel this policy based on Paragraph **7.a.(1)** or **(2)** above, we will mail or deliver a written notice, to the first Named Insured and any person entitled to notice under this policy, at least 10 days before the effective date of cancellation. If we cancel this policy for any other reason listed above, we will mail or deliver a written notice to the first Named Insured and any person entitled to notice under this policy, not more than 120 days nor less than 30 days before the effective date of such cancellation.

**c.** In the notice of cancellation which is sent to the first Named Insured, we will state the reason for cancellation. For cancellation due to the nonpayment of premium, the notice will state the effect of nonpayment by the due date. Cancellation for nonpayment of premium will not be effective if payment of the amount due is made before the effective date set forth in the notice.

**d.** Notice will be sent to the last mailing addresses known to us, by:

**(1)** Certified mail; or

**(2)** First class mail, if we have obtained from the post office a date stamped proof of mailing showing names and addresses.

© ISO Properties, Inc., 2006       □

     e. We need not send notice of cancellation if you have:

       (1) Replaced coverage elsewhere; or

       (2) Specifically requested termination.

**D.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

   **1.** We may elect not to renew this policy for any reason permitted to cancel it. If we elect not to renew this policy, we will mail a notice of non-renewal, stating the reasons for nonrenewal, to the first Named Insured at least 30 days but not more than 120 days before the expiration date of this policy. If this policy does not have a fixed expiration date, it shall be deemed to expire annually on the anniversary of its inception.

   **2.** This notice will be sent to the first Named Insured at the last mailing address known to us by:

     **a.** Certified mail; or

     **b.** First class mail, if we have obtained from the post office a date stamped proof of mailing showing the first Named Insured's name and address.

   **3.** We need not mail or deliver this notice if you have:

     **a.** Replaced coverage elsewhere; or

     **b.** Specifically requested termination.

© ISO Properties, Inc., 2006 **Page 3 of 3** ☐


**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM AND MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following, where indicated by an "X" below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ ENVIRO FLEX ENVIRONMENTAL IMPAIRMENT LIABILITY COVERAGE FORM
☐ ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

| | |
|---|---|
| Minimum Earned Premium Percentage: | 100% |
| Minimum Retained Premium Percentage: | 25% |

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on the endorsement may or may not be defined in all Coverage Forms.

As respects only the coverage(s) indicated by an "X" above, the following Minimum Earned Premium and Minimum Retained provisions apply:

**A. Minimum Earned Premium**

1. This policy includes a Minimum Earned Premium applicable to the policy period shown on the Declarations. Unless otherwise stated, the Minimum Earned Premium is equal to the Advance And Deposit Premium shown on the Declarations, adjusted for subsequent endorsements.

2. In the event audit premiums are greater than the Advance And Deposit Premium, the additional premium is due and payable upon notice to the "insured". If audit premiums are less than the Advance And Deposit Premium, then we shall retain the Minimum Earned Premium Percentage shown in the Schedule above.

3. For the purpose of this policy:

   a. Advance And Deposit Premium is the premium shown on the Declarations and payable in full by the "insured" at policy inception.

   b. Minimum Earned Premium Percentage shown in the Schedule above is a percentage of the Advance And Deposit Premium shown on the Declarations. If no percentage is shown in the Schedule above, the Minimum Earned Premium shall be 100% of the Advance And Deposit Premium shown on the Declarations, adjusted for subsequent endorsements.

**B. Minimum Retained Premium**

1. In the event of cancellation by the "insured", the Minimum Retained Premium that we will retain for this policy is the greater of:

   a. The percentage of the Advance And Deposit Premium shown on the Declarations;

MEEI 2206 03 14          Includes copyrighted material of Insurance Services Office, Inc.,          **Page 1 of 2**
                        with its permission.

FILED: NEW YORK COUNTY CLERK 02/07/2023 05:44 PM          Page 130 of 138.

NYSCEF DOC. NO. 567

RECEIVED NYSCEF: 02/27/2023

 

    b.  The percentage of the Advance And Deposit Premium shown in the Schedule above;

    c.  Short rate or pro-rate of the Advance And Deposit Premium; or

    d.  Audit premium.

2.  In the event of cancellation for non-payment of premium after the effective date of the policy, such cancellation shall be considered cancellation at the "insured's" request, thereby activating this Minimum Retained Premium provision.

 

All other terms and conditions remain unchanged.

**ENVIRONMENTAL**

**MARKEL®**

## EVANSTON INSURANCE COMPANY

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US WRITTEN CONTRACT LIMITATION

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

| **Name Of Person Or Organization:** |
| Any person(s) or organization(s) with whom the insured agrees, in a written contract, signed by both parties and executed prior to the commencement of operations to provide a waiver of transfer of rights of recovery. |

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Transfer Of Rights Of Recovery Against Others To Us condition of the Coverage Form(s) indicated above:

We waive any right of recovery we may have against the person or organization shown in the Schedule of this endorsement because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a written contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule of this endorsement. This waiver will not apply to "occurrences" resulting from the sole negligence of the person or organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

MEEI 2211 05 16          Includes copyrighted material of Insurance Services Office, Inc.,          Page 1 of 1
                                      with its permission.



**ENVIRONMENTAL**
POLICY NUMBER: 16PKGNE60712

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AUDIT RATE ENDORSEMENT

This endorsement modifies insurance provided under the following, where indicated by an "X" below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ ENVIRO FLEX ENVIRONMENTAL IMPAIRMENT LIABILITY COVERAGE FORM
☐ ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

☒ **GROSS RECEIPTS**

| Rate per $1000 of Gross Receipts | Estimated Gross Receipts | Description |
|---|---|---|
| $ ▓▓ | $ Redacted | Contractors - Not Otherwise Classified |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

☐ **EACH PIPELINE MILE (OIL AND GAS INDUSTRY)**

| Rate per Mile | Estimated Miles of Pipeline | Description |
|---|---|---|
| | | Pipeline Operator |

☐ **EACH WELL (OIL AND GAS INDUSTRY)**

| Rate per Well | Estimated Number of Wells | Description/Type of Well |
|---|---|---|
| | | Operated Wells (Producing/Shut-In/Plugged & Abandoned) |
| | | Operated Wells to be Drilled |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) <25% Interest |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) 25-50% Interest |
| | | Non-Operated Wells (Producing/Shut-In/Plugged & Abandoned) >50% Interest |
| | | Non-Operated Wells to be Drilled <25% Interest |
| | | Non-Operated Wells to be Drilled 25%-50% Interest |
| | | Non-Operated Wells to be Drilled >50% Interest |

☐ **OTHER BASIS (DESCRIBE):**

| Rate per | Estimated Exposure | Description |
|---|---|---|
| | | |

**MEEI 2219 04 14**          Includes copyrighted material of Insurance Services Office, Inc., with its permission          Page 1 of 2

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Premium Audit provisions of the Coverage Form(s) indicated above:

**A.**  If Gross Receipts applies as indicated in the Schedule above:

This policy is auditable at the rate shown in the Schedule above in excess of the amount of "gross receipts" estimated at inception as shown in the Schedule above.

For the purpose of this endorsement the definition of "gross receipts" is as follows:

"Gross receipts" means the total amounts charged by the insured, subsidiaries, affiliates, and concessionaires of the insured or by others trading under the insured's name for:

a. All goods or products sold or distributed;

b. Operations or services performed during the policy period;

c. Rentals; and

d. Dues or fees;

Less:

a. Sales or excise taxes which are collected and submitted to a governmental division;

b. Credits for repossessed merchandise and products returned.

c. Allowances for damaged and spoiled goods;

d. Finance charges for items sold on installments;

e. Royalty income from patent rights or copyrights which are not product sales.

f. Intercompany sales.

**B.**  If Each Pipeline Mile applies as indicated in the Schedule above:

This policy is auditable at the rate shown in the Schedule above in excess of the amount of pipeline miles estimated at inception as shown in the Schedule above.

**C.**  If Each Well applies as indicated in the Schedule above:

This policy is auditable at the rate shown in the Schedule above in excess of the number of wells estimated at inception as shown in the Schedule above.

**D.**  If Other Basis applies as indicated in the Schedule above:

This policy is auditable based on the exposure described, and at the rate shown, in the Schedule above in excess of the amount of the described exposure estimated at inception as shown in the Schedule above.


All other terms and conditions remain unchanged.

**MEEI 2219 04 14**         Includes copyrighted material of Insurance Services Office, Inc.,         **Page 2 of 2**
                                       with its permission

                                        85 of 175



**ENVIRONMENTAL**
POLICY NUMBER: 16PKGNE60712

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SELF-INSURED RETENTION

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox(es) below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
☒ OTHER COVERAGE FORM (SPECIFY):  SEE BELOW

The following is added to the Coverage Form(s) indicated with an "X" above with respect to this endorsement, but only when the above-referenced coverage applies:

### SCHEDULE

### SELF-INSURED RETENTIONS

| | EACH CLAIM | EACH OCCURRENCE | EACH POLLUTION CONDITION |
|---|---|---|---|
| **COMMERCIAL GENERAL LIABILITY** | $ 10,000 | $ | Not Applicable |
| **CONTRACTOR'S POLLUTION LIABILITY** | Not Applicable | Not Applicable | $ 10,000 |
| **ENVIRONMENTAL PROFESSIONAL LIABILITY** | $ | Not Applicable | Not Applicable |
| **MONOLINE PRODUCTS/COMPLETED OPERATIONS LIABILITY** | $ | $ | Not Applicable |
| **OTHER:** Exclusion - Bodily Injury To Specified Workers (Defense Within Limits), MEEI 2329 0115 | $ 50,000 | $ | $ |
| Fungi, Mold or Microbial Matter Coverage | $ | $ | $ 10,000 |
| Transportation Pollution Liability | $ | $ | $ 10,000 |
| **AGGREGATE SELF-INSURED RETENTION: $** | | | |
| **MAINTENANCE DEDUCTIBLE:** | $ | $ | $ |

☒ Paragraph B.7. applies

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

A. Only with respect to coverage provided by this endorsement, Paragraphs 5., 6., 7. and 8. of Section III – Limits Of Insurance And Deductible in the **CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM** and the **ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM** are deleted in their entirety.

B. The following:

    1. Is added to Section III – Limits Of Insurance in the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** and the **PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM** and Section III – Limits Of Insurance And Deductible in the **CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM** and the **ENVIRONMENTAL PROFESSIONAL LIABILITY COVERAGE FORM**; and

    2. Except with respect to any Maintenance Deductible provided by this endorsement, replaces any and all deductibles attached to this policy;

MEEI 2226 02 16      Includes copyrighted material of Insurance Services Office, Inc., with **Page 1 of 4**
its permission.

but only with respect to coverage provided by this endorsement.

**Self-Insured Retention**

1. You agree to assume the retained limit(s) (herein called the Self-Insured Retention) stated in the Schedule of this endorsement. Our total obligation under this insurance and the limit of liability shown in the Declarations will apply in excess of the Self-Insured Retention.

2. If an Aggregate Self-Insured Retention amount is shown in the Schedule of this endorsement, the Aggregate Self-Insured Retention is the sum of all Self-Insured Retention(s) in the Schedule of this endorsement that apply during the policy period shown in the Declarations.

   However, once you have exhausted the Aggregate Self-Insured Retention, then a Maintenance Deductible may apply to each "claim", "suit", "occurrence" or "pollution condition" as shown in the Schedule of this endorsement.

3. Your bankruptcy, insolvency, or inability to pay the Self-Insured Retention or Maintenance Deductible, if any, will not increase our obligation under this insurance.

4. Whether or not there is any other insurance, either collectible or uncollectible, applicable to an "occurrence", "claim", "suit" or "pollution condition" within the Self-Insured Retention, you must make actual payment of the full Self-Insured Retention amount before the limits of insurance will apply. Compliance with this clause is a condition precedent for coverage under this insurance. We will make no payments of any type in the event you fail to comply with this clause.

5. Unless we have assumed control over the investigation, defense, or settlement of any "occurrence", "claim", "suit" or "pollution condition " per Paragraph B.7. below:

   a. You will have the obligation to provide proper defense and investigation, "cleanup costs", and any payments for any "occurrence", "claim", "suit" or "pollution condition" to which this insurance would otherwise apply but for this Self-Insured Retention, until your payments have exhausted the Self-Insured Retention;

   b. Such payments will be made at your own expense;

   c. You will have the obligation to accept any reasonable offer of settlement within the Self-Insured Retention;

   d. Defense expenses or defense costs incurred by you will erode the Self-Insured Retention; however, expenses for services of your "employees" or a mutually acceptable third-party administrator will not erode the Self-Insured Retention; and

   e. Your obligation to provide for your own defense will terminate upon the exhaustion of the Self-Insured Retention referenced above. Any further provisions for payment of Supplementary Payments, defense expenses, or defense costs will be subject to the terms and conditions of the Coverage Form(s) to which this endorsement is attached.

6. You will not incur costs, other than adjusting expenses, without our written consent in the event of any "occurrence", "claim", "suit" or "pollution condition" which appears likely to exceed the Self-Insured Retention.

7. If an entry has been made in the Schedule of this endorsement indicating that Paragraph B.7. applies, we will have the right, but not the duty, in all cases to assume control of the investigation, defense or settlement of any "occurrence", "claim", "suit" or "pollution condition". If we exercise this right, the following apply:

   a. You will remain responsible for the cost of all Supplementary Payments, defense expenses, defense costs, and damages within the Self-Insured Retention;

   b. At our request, you will advance to us any portion of the applicable Self-Insured Retention that we deem reasonable to pay for any "occurrence", "claim", "suit" or "pollution condition";

   c. If you have paid to us all or part of the applicable Self-Insured Retention and the total amount of the Supplementary Payments, defense expenses, defense costs, or damages that we pay for that "occurrence", "claim", "suit" or "pollution condition" is less than the applicable Self-Insured Retention, then we will reimburse you the amount you paid in excess of the amount we pay; and

   d. We will have the sole and absolute right to settle the "claim" or "suit" for any amount we deem reasonable, including any amount within the Self-Insured Retention. Although we agree to advise and consult with you prior to making any settlement, we will have no obligation to obtain your consent or the consent of any other insured, to any settlement we make that requires payment from you of any amount within the Self-Insured Retention. You and any other insured hereby waive any claim or defense against us resulting from our entering into any such settlement without your approval.

MEEI 2226 02 16          Includes copyrighted material of Insurance Services Office, Inc., with          **Page 2 of 4**
                                              its permission.

8.  Defense expenses or defense costs incurred by you will erode the Maintenance Deductible.

C.  With respect to this endorsement, the following is added to the Duties condition of the Coverage Form(s) indicated above:

1.  Unless we have assumed control over the investigation, defense, or settlement of any "occurrence", "claim", "suit" or "pollution condition" per Paragraph **B.7.** above:

    a.  You or your third-party administrator will provide us with loss runs on a quarterly basis of all "occurrences", "claims", "suits" or "pollution conditions" which may affect this Coverage Form as follows:

        (1) Such reports will include the following:

            (a) The name of the claimant;

            (b) The date of the "occurrence" or "pollution condition";

            (c) A description of the "occurrence" or "pollution condition";

            (d) The type of damage or injury;

            (e) An indication of open or closed status;

            (f) The date the "claim", "occurrence" or "pollution condition" was reported; and

            (g) The amount of all paid loss and expense and the estimated future amount of all loss and expense.

        (2) Each report is to be submitted within 20 days, or longer period of time with our prior written approval, following the end of every quarter, including after expiration, until there are no open "claims".

    b.  You or your third-party administrator will promptly report to us each "claim", "suit", "occurrence" or "pollution condition" for which the estimated amount of net damages is 50% or more of the Self-Insured Retention shown in the Schedule of this endorsement.

    c.  You or your third-party administrator will report promptly to us all cases of serious injury which, regardless of liability or coverage, may involve this insurance including, but not limited to, the following:

        (1) Spinal cord injury including, but not limited to, paraplegia or quadriplegia;

        (2) Amputations including, but not limited to, those requiring a prosthesis;

        (3) Brain damage affecting mentality or central nervous system such as permanent disorientation, behavior disorder, personality change, seizures, motor deficiency, inability to speak (aphasia), hemiplegia, unconsciousness or coma;

        (4) Loss of hearing or sight;

        (5) Third-degree burns involving over 10% of the body or second-degree burns involving over 30% of the body;

        (6) Multiple fractures involving more than one member, area of the body, or non-union;

        (7) Fracture of both heel bones (fractured bilateral os calcis);

        (8) Nerve damage causing paralysis and loss of sensation anywhere on the body;

        (9) Massive internal injuries affecting body organs;

        (10)Injury to nerves at base of spinal canal (cauda equina) or any other back injury resulting in incontinence of bowel or bladder;

        (11)Fatalities;

        (12)Any other serious injury which, in your judgment might involve us;

        (13)Reflex Sympathetic Dystrophy (Complex Regional Pain Syndrome);

        (14)Sexual assault, molestation or abuse;

        (15)Class actions; or

        (16)Construction defect "claims".

These provisions, **C.1.a.** through **c.**, are a condition precedent to coverage. You have the responsibility to guarantee proper reporting. Your failure to comply with the reporting requirements may result in a denial of coverage under the Coverage Form.

2.  You will cooperate with us and, upon our request, assist in making settlements in the conduct of "claims" or "suits" and in enforcing any right of contribution or indemnity against any person or organization who may be liable to you because of liability assumed under this Coverage Form. You will also attend hearings and trials and assist in securing and giving evidence and obtaining witnesses.

3.  You will at all times:

    a.  Provide to us, or our duly appointed representatives, such information, assistance, and signed statements as we or our duly appointed representatives may require; and

    b.  Assist in the defense of any "claim" or "suit" without charge to us.

4.  You will indemnify and hold us harmless from all loss and costs, including but not limited to, adjusting expense and attorney fees incurred in the investigation, defense or settlement of any "claim", "occurrence", "suit", or "pollution condition" incurred by us included within the Self-Insured Retention. You will further indemnify and hold us harmless from any and all costs incurred by us including but not limited to the reasonable value of company "employee" services and attorney fees incurred in the enforcement of this agreement.

**D.** Only with respect to provisions included in this Self-Insured Retention endorsement, the following is added to all Cancellation conditions:

In the event you fail or refuse to pay any amount owed within the applicable Self-Insured Retention, we may cancel this insurance upon 30 days prior written notice to the first Named Insured. Any notice of cancellation sent by us to the first Named Insured will be deemed notice to each insured. If we cancel this insurance because of your failure or refusal to pay any amount within the applicable Self-Insured Retention, we will have no responsibility for any "occurrence", "claim", "suit" or "pollution condition" reported to us after the effective date of cancellation.

All other terms and conditions remain unchanged.

**MEEI 2226 02 16**        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        **Page 4 of 4**

ENVIRONMENTAL

**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AUTOMATIC PRIMARY AND NON-CONTRIBUTORY INSURANCE

This endorsement modifies insurance provided under the following, where indicated by an "X" in the checkbox below:

☒ COMMERCIAL GENERAL LIABILITY COVERAGE FORM
☒ CONTRACTOR'S POLLUTION LIABILITY COVERAGE FORM
☐ OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
☐ PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

| Person Or Organization: |
| --- |
| Any additional insured with whom you agree in a written contract signed by both parties and executed prior to the commencement of operations to provide Primary and Non-Contributory status under this insurance. |

With respect to the coverage provided by this endorsement, the following is added to the Other Insurance condition of the Coverage Form(s) indicated above:

**Primary And Non-Contributory**

This insurance is primary to, and will not seek contribution from, any other insurance available to the Person Or Organization shown in the Schedule of this endorsement. However, this does not apply to any "claim", "suit" or "pollution condition" resulting from the sole negligence of the Person Or Organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

MEEI 2274 05 16      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      **Page 1 of 1**